**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHAMBER OF COMMERCE OF THE** | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-02014-RWR |
| | ) | |
| **JACQUES SERVIN, et al.** | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST AMENDED COMPLAINT**

Defendants Jacques Servin, Igor Vamos, Support and Commitment, Inc., David Sievers, Morgan Goodwin, Sarah Murphy and John and Jane Does No. 1-20 (collectively "Defendants"), by undersigned counsel and pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure, respectfully move this Court to dismiss Plaintiff's First Amended Complaint on the grounds that Plaintiff's First Amended Complaint fails to state a claim upon which relief can be granted.  This motion is based on the attached Memorandum of Points and Authorities, the Declaration of Jacques Servin and the Exhibits attached thereto, all papers on file in this action, all matters subject to judicial notice, and such other and further matters as may be presented to the Court prior to the determination of the motion.

Dated this 5th day of January, 2010.

Respectfully submitted,

    /s/  Robert Corn-Revere
Robert Corn-Revere (D.C. Bar No. 375415)
bobcornrevere@dwt.com
Lisa B. Zycherman (D.C. Bar No. 495277)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
(202) 973-4225
(202) 973-4499 fax

Bruce E. H. Johnson (*admitted pro hac vice*)
brucejohnson@dwt.com
Ambika Doran (*admitted pro hac vice*)
ambikedoran@dwt.com
DAVIS WRIGHT TREMAINE, LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
(206) 757-7700 fax

Thomas R. Burke (*admitted pro hac vice*)
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE, LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
(415) 276-6500
(415) 276-6599 fax

Matthew Zimmerman (*pro hac vice pending*)
mattz@eff.org
Corynne McSherry (*pro hac vice pending*)
corynne@eff.org
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
(415) 436-9993 fax

## CERTIFICATE OF SERVICE

Pursuant to LCvR 5.3, I hereby certify that, on January 5, 2010, I electronically filed with the Clerk of the Court the foregoing Motion to Dismiss, Memorandum and Points and Authorities in Support Thereof, attached Declaration of Jacques Servin and accompanying exhibits and Notice of Exhibit Attachment Not Formatted For Electronic Filing, and proposed order using the CM/ECF system, and service was effected electronically pursuant to LCvR 5.4(d) on the party listed below.  Pursuant to LCvR 5.4(e)(1)(B), Exhibit B to the Declaration of Jacques Servin was served via U.S. Mail, first class postage prepaid, on the same.

> Michael John Mueller
> Hunton & Williams LLP
> 1900 K Street, NW, Suite 1200
> Washington, DC 20006
> Email: mmueller@hunton.com

> ____/s/   Robert Corn-Revere_____
> Robert Corn-Revere (D.C. Bar No. 375415)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,** | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )   Case No. 09-CV-02014-RWR ) |
| **JACQUES SERVIN, et al.** | ) ) |
| Defendants. | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED
COMPLAINT**

Robert Corn-Revere (D.C. Bar No. 375415)
bobcornrevere@dwt.com
Lisa B. Zycherman (D.C. Bar No. 495277)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006
(202) 973-4225
(202) 973-4499 fax

Thomas R. Burke (*admitted pro hac vice*)
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE, LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
(415) 276-6500
(415) 276-6599 fax

Bruce E. H. Johnson (*admitted pro hac vice*)
brucejohnson@dwt.com
Ambika Doran (*admitted pro hac vice*)
ambikedoran@dwt.com
DAVIS WRIGHT TREMAINE, LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
(206) 757-7700 fax

Matthew Zimmerman (*pro hac vice pending*)
mattz@eff.org
Corynne McSherry (*pro hac vice pending*)
corynne@eff.org
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
(415) 436-9993 fax

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................................................. iii

I.    PRELIMINARY STATEMENT ............................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................. 3

      A.    The Parties. ................................................................................................. 3

            1.    Chamber of Commerce of The United States. .................................. 3

            2.    The Yes Men and The Action Factory. ............................................. 4

      B.    The Climate Change Parody. ...................................................................... 5

      C.    This Lawsuit. .............................................................................................. 8

III.  STANDARD OF REVIEW .................................................................................... 8

IV.   ARGUMENT ........................................................................................................ 11

      A.    The First Amendment Protects The Defendants' Political Parody Of The
            Chamber's Position on Climate Change. ................................................... 11

            1.    Political Parodies Are Fully Protected Speech. .............................. 12

            2.    The Chamber Cannot Plead Other Claims to Avoid This Constitutional Bar. .... 19

      B.    The Yes Men's Speech Cannot Be Subject to Liability Under The Lanham Act. ....... 20

            1.    The Yes Men Parody Was Not Commercial. ................................... 21

            2.    The Yes Men's Use of The Chamber's Trademarks Was Nominative. ............. 23

      C.    Use of The Chamber's Marks Did Not Dilute The Marks. ........................ 25

      D.    Defendants Did Not Engage in Unfair Competition or Infringe The Chamber's
            Trademarks. ............................................................................................... 27

      E.    The Court Should Dismiss the Remaining Claims. ................................... 27

            1.    The Court Should Dismiss The Chamber's False Advertising Claim. ............. 27

            2.    The Court Should Dismiss The Chamber's Cyberpiracy Claim. ..................... 29

            3.    The Court Should Dismiss The Chamber's Unlawful Trade Practices
                  Claim. ............................................................................................ 32

4.      The Court Should Dismiss The Chamber's Injurious Falsehood Claim............33

5.      The Court Should Dismiss The Chamber's Prima Facie Tort Claim. ...............36

F.      The Defendants Will Be Entitled to Attorney's Fees Under The Lanham Act...........39

V.   CONCLUSION ..................................................................................................................40

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*America Online, Inc. v. IMS*,
  24 F. Supp. 2d 548 (E.D. Va. 1998) ..................................................................26

*Art Metal-USA, Inc. v. United States*,
  753 F.2d 1151 (D.C. Cir. 1985) ..................................................... 33, 34, 35, 36

*Asay v. Hallmark Cards, Inc.*,
  594 F.2d 692 (8th Cir. 1979) ..............................................................................9

*Ashcroft v. Iqbal*,
  129 S. Ct 1937 (2009) ........................................................................................9

*Avery Dennison Corp. v. Sumpton*,
  189 F.3d 868 (9th Cir. 1999) .............................................................................26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................8, 9

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984) ..........................................................................................19

*Bramesco v. Drug Computer Consultants*,
  834 F. Supp. 120 (S.D.N.Y. 1993) .....................................................................9

*Burnett v. Twentieth Century Fox Film Corp.*,
  491 F. Supp. 2d 962 (C.D. Cal. 2007) ...............................................................25

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ..........................................................................................15

*Caplan v. Am. Baby, Inc.*,
  582 F. Supp. 869 (S.D.N.Y. 1984) ....................................................................10

*Cardtoons, L.C. v. Major League Baseball Players Ass'n*,
  95 F.3d 959 (10th Cir. 1996) ................................................................ 13, 17, 18

*Cashmere & Camel Hair Mfrs. Inst. v Saks Fifth Ave.*,
  284 F.3d 302 (1st Cir. 2002) .............................................................................28

*Central Hudson Gas & Elec. v. Public Serv. Comm'n*,
  447 U.S. 557 (1980) ..........................................................................................21

*Charles Atlas, Ltd. v. DC Comics, Inc.*,
  112 F. Supp. 2d 330 (S.D.N.Y. 2000) ...............................................................13

*Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*,
    886 F.2d 490 (2d Cir. 1989) ................................................................. 13, 18, 27

*Coles v. Washington Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C. 1995) ...............................................................10

*CPC Int'l v. Skippy, Inc.*,
    214 F.3d 456 (4th Cir. 2000) .............................................................. 14, 34

*Eagle Hosp. Physicians, Inc. v. SRG Consulting, Inc.*,
    561 F.3d 1298 (11th Cir. 2009) ................................................................31

*EEOC v. St. Francis Xavier Parochial Sch.*,
    117 F.3d 621 (D.C. Cir. 1997) ...................................................................6

*Erick Bowman Remedy Co. v. Jensen Salsbery Labs.*,
    17 F.2d 255 (8th Cir. 1926) .....................................................................35

*Eveready Battery Co., Inc. v. Adolph Coors Co.*,
    765 F. Supp. 440 (N.D. Ill. 1991) ...........................................................17

*Federal Deposit Ins. Corp. v. Bathgate*,
    27 F.3d 850 (3rd Cir. 1994) .......................................................................9

*Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n*,
    471 F. Supp. 126 (D.D.C. 1979) .............................................................10

*Fernandez v. Jones*,
    No. 07-1448(RMC), 2009 WL 2768289 (D.D.C. Sept. 2, 2009) .........................28

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
    12 F. Supp. 2d 1068 (C.D. Cal. 1998) .............................................................20

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ...................................................................15

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) ...................................................................9

*Ford Motor Co. v. Catalanotte*,
    342 F.3d 543 (6th Cir. 2003) ...................................................................31

*Fowler v. Curtis Publ'g*,
    182 F.2d 377 (D.C. Cir. 1950) ..................................................... 34, 35, 36

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd.*
    *of Culinary Workers*,
    542 F.2d 1076 (9th Cir. 1976) ...................................................................9

iv

*Government of Rwanda v. Rwanda Working Group,*
   227 F. Supp. 2d 45 (D.D.C. 2002) ....................................................................3

*Hasbro, Inc. v. Internet Entm't Group, Ltd.,*
   No. C96-130WD, 1996 WL 84853 (W.D. Wash. Feb. 9, 1996) ..........................26

*Highland Renovation Corp. v. Hanover Ins. Group,*
   620 F. Supp. 2d 79 (D.D.C.2009) ....................................................................3

*Hustler Magazine, Inc. v. Falwell,*
   485 U.S. 46 (1988) ....................................................................................20, 34

*Hydro-Tech Corp. v. Sundstrand Corp.,*
   673 F.2d 1171 (10th Cir. 1982)........................................................................10

*IMAF, S.p.A. v. J.C. Penney Co.,*
   810 F. Supp. 96 (S.D.N.Y. 1992)......................................................................40

*Independent Commc'ns Network, Inc. v. MCI Telecomms. Corp.,*
   657 F. Supp. 785 (D.D.C. 1987) ......................................................................33

*International Order of Job's Daughters v. Lindeburg & Co.,*
   633 F.2d 912 (9th Cir. 1980) ...........................................................................24

*Jordache Enters., Inc. v. Hogg Wyld, Ltd.,*
   828 F.2d 1482 (10th Cir. 1987)........................................................................17

*Kaempe v. Meyers,*
   367 F.3d 958 (D.C. Cir. 2004) ...........................................................................6

*L.L. Bean, Inc. v. Drake Publishers, Inc.,*
   811 F.2d 26 (1st Cir. 1987)..............................................................................15

*Lamparello v. Falwell,*
   420 F.3d 309 (4th Cir. 2005) ...........................................................................29

*Lane v. Random House, Inc.,*
   985 F. Supp. 141 (D.D.C. 1995) ......................................................................22

*Leibovitz v. Paramount Pictures Corp.,*
   137 F.3d 109 (2d Cir. 1998) ............................................................................17

*Letica Corp. v. Sweetheart Cup Co.,*
   790 F. Supp. 702 (E.D. Mich. 1992) ................................................................10

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,*
   507 F.3d 252 (4th Cir. 2007) .....................................................................25, 27

v

*Lucas Nursery & Landscaping v. Grosse*,
 359 F.3d 806 (6th Cir. 2004) ............................................. 31

*Lucasfilm Ltd. v. Media Mkt. Group, Ltd.*,
 182 F. Supp. 2d 897 (N.D. Cal. 2002) ................................. 15

*Lucent Technologies, Inc. v. Lucentsucks.com*,
 95 F. Supp. 2d 528 (E.D. Va. 2000) .................................... 30

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*,
 No. 00 Civ.6086 (GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ................................ 17

*Mattel, Inc. v. MCA Records, Inc.*,
 296 F.3d 894 (9th Cir. 2002) ............................................. 25

*Mattel Inc. v. Walking Mountain Prods.*,
 353 F.3d 792 (9th Cir. 2003) ........................................ 13, 25

*Mattel, Inc. v. Walking Mountain Prods.*,
 No. CV99-8543RSWL (RZX), 2004 WL 1454100 (C.D. Cal. June 21, 2004) ............... 13, 40

*Mazanderan v. Independent Taxi Owners' Ass'n*,
 700 F. Supp. 588 (D.D.C. 1988) ........................................ 32

*McKenzie v. Dow Jones & Co.*,
 2009 U.S. App. LEXIS 26734 (2d Cir. 2009) ...................... 39

*Miller & Son Paving, Co. v. Wrightstown Township Civic Ass'n*,
 443 F. Supp. 1268 (E.D. Pa. 1978) ..................................... 10

*National Life Ins. Co. v. Phillips Publ'g, Inc.*,
 793 F. Supp. 627 (D. Md. 1992) ........................................ 22

*New Kids on the Block v. News America Publ'ns, Inc.*,
 971 F.2d 302 (9th Cir. 1992) ............................................. 24

*New York Times Co. v. Sullivan*,
 376 U.S. 254 (1964) .................................................... 19, 35

*Newborn v. Yahoo! Inc.*,
 437 F. Supp. 2d 1 (D.D.C. 2006) ....................................... 40

*Nike, Inc. v. "Just Did It" Enter.*,
 6 F.3d 1225 (7th Cir. 1993) .............................................. 14

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*,
 771 F.2d 521 (D.C. Cir. 1985) ........................................... 39

*Oregon Natural Res. Council v. Mohla,*
    944 F.2d 531 (9th Cir. 1991) ...................................................................................10

*Phantom Touring, Inc. v. Affiliated Pub'lns,*
    953 F.2d 724 (1st Cir. 1992) ....................................................................................9

*Philadelphia Newspapers v. Hepps,*
    475 U.S. 767 (1986) ................................................................................................35

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989) .............................................................................14, 18

*Rohr-Gurnee Motors, Inc. v. Patterson,*
    2004 U.S. Dist. LEXIS 2068 (N. D. Ill. 2004) ....................................................30

*Schmidheiny v. Weber,*
    319 F.3d 581 (3rd Cir. 2003) ................................................................................31

*SEC v. Wall Street Publ'g Inst., Inc.,*
    851 F.2d 365 (D.C. Cir. 1988) ..............................................................................21

*Smith v. Wal-Mart Stores, Inc.,*
    537 F. Supp. 2d 1302 (N.D. Ga. 2008) .................................................................25

*Spanish Int'l Commc'ns Corp. v. Leibowitz,*
    608 F. Supp. 178 (S.D. Fla. 1985) ........................................................................10

*Taucher v. Born,*
    53 F. Supp. 2d 464 (D.D.C. 1999) ..................................................................21, 28

*Tiffany (NJ) Inc. v. eBay, Inc.,*
    576 F. Supp. 2d 463 (S.D.N.Y. 2008) ...................................................................24

*United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian*
    *Constr. Corp.,*
    95 F.3d 153 (2d Cir. 1996) ...................................................................................37

*United States ex rel. Smith v. Yale Univ.,*
    415 F. Supp. 2d 58 (D. Conn. 2006) .......................................................................9

*United States v. BCCI Holdings (Luxembourg), S.A.,*
    961 F. Supp. 287 (D.D.C. 1997) .............................................................................3

*United States v. Philip Morris USA Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) ............................................................................21

*Universal City Studios, Inc. v. Ideal Publ'g Corp.*,
   3 Media L. Rptr. 1297 (S.D.N.Y. 1977)..............................................................24

*Virtual Works, Inc. v. Volkswagon of Am., Inc.*,
   238 F.3d 264 (4th Cir. 2001) ...........................................................................31

*Washington Post v. Robinson*,
   935 F.2d 282 (D.C. Cir. 1991) .........................................................................3

*Washington Post v. Keogh*,
   364 F.2d 96 (1966) ........................................................................................10

*Yankee Publ'g Inc. v. News Am. Publ'g, Inc.*,
   809 F. Supp. 267 (S.D.N.Y. 1992) ..................................................................13

## STATE CASES

*ATI, Inc. v. Ruder & Finn, Inc.*,
   42 N.Y.2d 454, 368 N.E.2d 1230 (1977) ....................................................38, 39

*Belsky v. Lowenthal*,
   62 A.D.2d 319, 405 N.Y.S.2d 62 (1st Dep't 1978).......................................37, 38

*Blatty v. New York Times Co.*,
   42 Cal.3d 1033 (1986)...................................................................................20

*Butler v. Delaware Otsego Corp.*,
   203 A.D.2d 783, 610 N.Y.S.2d 664 (3rd Dep't 1994) .......................................38

*Carleton v. Winter*,
   901 A.2d 174 (D.C. 2006) .............................................................................32

*DeBerry v. First Gov't Mortg. & Investors Corp.*,
   743 A.2d 699 (D.C. 1999) .............................................................................32

*District Cablevision Ltd. P'ship v. Bassin*,
   828 A.2d 714 (D.C. 2003) .............................................................................32

*Howard v. Riggs Nat'l Bank*,
   432 A.2d 701 (D.C. 1981) .........................................................................32, 33

*LaCoff v. Buena Vista Publ'g, Inc.*,
   183 Misc. 2d 600 (N.Y. Sup. Ct. 2000)...........................................................22

*Myers v. Plan Takoma, Inc.*,
   472 A.2d 44 (D.C. App. 1983)........................................................................11

*New Times, Inc. v. Isaacks*,
    146 S.W.3d 144 (Tex. 2004)......................................................................................*passim*

*New York Pub. Interest Research Group, Inc. v. Insurance Info. Inst.*,
    161 A.D.2d 204 (1st Dep't 1990)......................................................................................22

*Pulaski Constr. Co. v. Air Frame Hangars, Inc.*,
    950 A.2d 868 (N.J. 2008) .................................................................................................37

*San Francisco Bay Guardian v. Superior Court*,
    17 Cal. App. 4th 655 (1993) ................................................................................16, 19, 27

*Schwartz v. Franklin Nat'l Bank*,
    718 A.2d 553 (D.C. 1998) ...............................................................................................36

*Springer v. Viking Press*,
    90 A.D.2d 315, 457 N.Y.S.2d 246 (1st Dep't 1982)........................................................38


**FEDERAL STATUTES**

15 U.S.C. § 1114(1) ..............................................................................................................20

15 U.S.C. § 1117(a)(3) ..........................................................................................................39

15 U.S.C. § 1125(a) ....................................................................................................20, 27, 28

15 U.S.C. § 1125(c)(3) ..................................................................................................20, 25

15 U.S.C. § 1125(d) ...............................................................................................29, 30, 32


**STATE STATUTES**

D.C. Code § 28-304 ...............................................................................................................32

D.C. Code § 28-3901(3) ........................................................................................................33


**RULES**

Fed. R. Civ. P. 12(b)(6)......................................................................................................*passim*

Fed. R. Civ. P. 12(d) ...............................................................................................................3

CONSTITUTIONAL PROVISIONS

First Amendment ........................................................................................................ *passim*

LEGISLATIVE MATERIALS

H.R. Rep. No. 106-412 (1999) ....................................................................................31

S. Rep. No. 106-140 (1999).................................................................................29, 31

S. Rep. No. 93-1400 (1974)........................................................................................39

JOURNALS AND LAW REVIEWS

Robert Denicola, *Trademarks as Speech:  Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis. L. Rev. 158 ............................14

Jon M. Garon, *Media & Monopoly in the Information Age:  Slowing the Convergence at the Marketplace of Ideas*, 17 Cardozo Arts & Ent. L.J. 491 (1999) ......................................19

Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. Rev. 960 (1993) ....................................14

Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687 (1999) ................................................................................................15

Debra Cassens Weiss, *The North Face Sues The South Butt for Trademark Infringement*, ABA Journal, Dec. 15, 2009 ..............................................................................................2

OTHER AUTHORITIES

2 Moore's Federal Practice 1921 (1948)..................................................................35

103 N.Y. Jur.2d, Torts (2009)...................................................................................37

McCarthy on Trademarks and Unfair Competition  ........................................ 2, 26, 31

Restatement (Second) of Torts ..................................................................................36

## I.      PRELIMINARY STATEMENT

The issue of climate change presents perhaps the most pressing scientific – and political

issue – that the world has ever faced.  The U.S. Chamber of Commerce's ("Chamber's")

skepticism of climate change[1] has led many large members, including Apple, Inc. and Pacific

Gas & Electric to withdraw from the nation's largest business trade organization.  The Yes Men,

famous for impersonating government officials and business executives, created and carried out

an elaborate parody designed to poke fun at the Chamber and spark debate over its position on

climate change.

That parody culminated in a press conference during which a Yes Men member,

pretending to be a Chamber spokesperson, purported to announce that the Chamber would shift

its position dramatically, recognizing climate change and supporting associated legislation.  In

this lawsuit, the Chamber alleges its logo and service marks appeared on the podium at the press

conference, as well as on a press release, prepared comments, and website designed to look like

the Chamber's website.  Although a representative of the Chamber interrupted the faux press

conference – calling it a "stunt" – a mere thirteen minutes after it began and numerous news

outlets reported the press conference as a "hoax," the Chamber now alleges that, because

defendants necessarily used its marks as part of the parody, this political action violated its

trademark rights.

---

[1] Officially, the Chamber has publicly called for a hearing with evidence as to the truth of the science behind climate change.  *See*, *e.g.*, Jim Tankersley, *U.S. Chamber of Commerce seeks trial on global warming*, L.A. Times, Aug. 25, 2009, *available at* http://articles.latimes.com/ 2009/aug/25/nation/na-climate-trial25 (last visited Jan. 5, 2010); *see also* Chamber of Commerce, Supplemental Statement in Support of Petition for EPA to Conduct Its Endangerment Finding Proceeding on the Record, Aug. 25, 2009, *available at* http://www.uschamber.com/assets/env/uscocpetendangerment.pdf (last visited Jan. 5, 2010) (stating the Chamber's position that there is an "urgent need for the endangerment issue to be resolved on the record of the scientific evidence, with evidentiary procedures to ensure scientific integrity, rather than an informal process that permits ex parte communications and non-transparent policy and political inputs.").

1

The Chamber is not the first hyper-sensitive trademark owner to attempt to use the courts to punish critical speech that happens to use its marks.[2]  Court after court has rejected similar efforts, finding that neither trademark nor any other law can be a conduit to silencing core political speech about matters of political concern so clearly protected by the First Amendment. Moreover, even accepting the Chamber's allegations as true for the purpose of this motion, the defendants' use of the Chamber's trademarks was nominative and unquestionably designed to mock and ridicule the Chamber's stance on climate change.  Consequently, this Court should recognize the Chamber's lawsuit for what it is – an action seeking to block ridicule of its positions on this issue of profound public interest and to civilly punish and chill future criticism. The Court should summarily dismiss the lawsuit in its entirety with prejudice.

---

[2] The Chamber appears to fall within a the category of "Hyper-Sensitive [Trademark] Owners" described by noted trademark scholar Professor Thomas McCarthy:

> Some of the litigation brought by trademark owners against those who make fun of their company's policies by the use of parodies of their trademarks reveals that some mark owners are hyper-sensitive to such humorous and sometimes caustic criticism.  Perhaps it is because many top executives in large companies are not used to being mocked and made fun of.  Therefore, they are ready, willing and able to unleash the dogs of litigation against anyone who makes fun of the symbol of their company.  But the more successful and famous a company and its products becomes, the more likely it will become a societal symbol of something.  Then it is more likely that critics will use humorous parody to take potshots at the company and its symbols.  A certain toughening of the hide may be a more effective response than asking the courts to silence the clowning critic.

6 McCarthy on Trademarks and Unfair Competition § 31:153.  Consider, for example, the North Face's recent trademark infringement lawsuit filed against a teen who created "The South Butt" and used the slogan "Never Stop Relaxing" (as opposed to the North Face's "Never Stop Exploring") to help pay for college, and included a disclaimer on his website stating:  "If you are unable to discern the difference between a face and a butt, we encourage you to buy North Face products."  Debra Cassens Weiss, *The North Face Sues The South Butt for Trademark Infringement*, ABA Journal, Dec. 15, 2009, *available at* http://www.abajournal.com/weekly/ article/the_north_face_sues_the_south_butt_for_trademark_infringement (last visited Dec. 18, 2009).

## II.    FACTUAL BACKGROUND

### A.    The Parties.

#### 1.    Chamber of Commerce of The United States.

Plaintiff Chamber of Commerce of the United States is a non-profit company whose membership comprises businesses of all sizes, sectors, and regions.  First Amended Compl. ¶ 1. A formidable political force, the Chamber spent $34 million alone in lobbying in the third quarter of 2009.  *See* Jenna Staul, *Chamber of Commerce Spends $34 Million On Lobbying in Three Months* (Oct. 20, 2009), *available at* http://www.huffingtonpost.com/2009/10/20/ chamber-of-commerce-spend_n_327046.html (last visited Dec. 13, 2009).[3]

Recently, the Chamber stepped up its campaign against the Obama Administration's proposed energy policies, generating a significant amount of controversy when it suggested holding a public hearing on the scientific evidence for human-made climate change, calling it "the Scopes monkey trial of the 21st century."  Tankersley, *supra* note 1.  Its position caused at least four major companies – Exelon Corp., PNM Resources, Inc., PG&E Corp., and Apple, Inc. – to withdraw their membership from the group, and another – Nike, Inc. – to withdraw from its board.  *See* Michael Burnham and Anne C. Mulkern, *Enviros Waging 'Orchestrated Pressure Campaign' on Climate Bill - U.S. Chamber CEO*, N.Y. Times, Oct. 9, 2009, *available at* http://www.nytimes.com/gwire/2009/10/09/09greenwire-enviros-waging-orchestrated-pressure-

---

[3] The court may take judicial notice of "facts generally known as a result of newspaper articles." *Washington Post v. Robinson,* 935 F.2d 282, 291 (D.C. Cir. 1991); *see also Government of Rwanda v. Rwanda Working Group,* 227 F. Supp. 2d 45, 60 n.6 (D.D.C. 2002); *United States v. BCCI Holdings (Luxembourg), S.A.,* 961 F. Supp. 287, 290 n.1 (D.D.C. 1997).  The court may also convert a motion to dismiss referencing information outside the pleadings and filed pursuant to Fed. R. Civ. P. 12(b)(6) into a motion for summary judgment.  *See Highland Renovation Corp. v. Hanover Ins. Group*, 620 F. Supp. 2d 79, 82 (D.D.C.2009) (explaining that "when 'matters outside the pleadings are presented to and not excluded by the court' on a motion to dismiss under Rule 12(b)(6), 'the motion must be treated as one for summary judgment[.]'") (*quoting* Fed. R. Civ. P. 12(d)).

campaign-28715.html (last visited Dec. 13, 2009).  These defections generated extensive media

coverage.  *See, e.g.,* Editorial, *Feeling the heat:  The U.S. Chamber of Commerce's stand on*

*climate legislation has cost it members and credibility*, L.A. Times, Oct. 12, 2009, *available at*

http://articles.latimes.com/2009/oct/12/opinion/ed-chamber12 (last visited Dec. 13, 2009).

2.      <strong>The Yes Men and The Action Factory.</strong>

Defendants Igor Vamos and Jacques Servin are long-time activists and artists more

commonly known as the "Yes Men."  The Yes Men regularly engage in "identity correction,"

posing as business and government representatives and making statements on their behalf to

raise popular awareness of the real effects of those entities' activities.  *See* First Amended

Compl. ¶¶ 2, 3.  For example, as early as 1999, the Yes Men created a website parodying then-

Texas Gov. George W. Bush's political campaign.  Terry M. Neal, *Satirical Website Poses*

*Political Test*, Wash. Post., Nov. 29, 1999, *available at* http://www.washingtonpost.com/wp-

srv/WPcap/ 1999-11/29/002r-112999-idx.html (last visited Dec. 13, 2009).  Numerous other

examples of the Yes Men's political parodies are illustrative.[4]  Each of these actions resulted in

---

[4] Consider the following examples:
- In 2002, the Yes Men created a parody website of the World Trade Organization that criticized trade liberalization rules for increasing poverty and inequality and impersonated WTO personnel.  Andrew Walker, *WTO falls victim to spoof website*, BBC News, May 24, 2002, *available at* http://news.bbc.co.uk/2/hi/business/2006536.stm (last visited Dec. 13, 2009).

- In December 2004, on the 20th anniversary of the catastrophic gas leak in Bhopal, India, a Yes Men member appeared on the BBC, posing as a spokesperson for Dow Chemical (the owner of the company responsible for the incident), to offer $12 billion in compensation for medical care and clean-up efforts.  *See* CNN.com, *Bhopal hoax sends Dow stock down* (Dec. 3, 2004), http://www.cnn.com/2004/WORLD/europe/12/03/bhopal.hoax/ (last visited Dec. 13, 2009).

- In August 2006, the Yes Men appeared at a conference in New Orleans, and posing as a representative from the United States Department of Housing and Urban Development, promised to reopen closed public housing units rather than tear them town.  *See* CNN.com,

4

widespread media coverage, often calling attention to issues that were not (or were no longer) high on the public radar, such as the failure to adequately compensate victims of the Bhopal disaster and the destruction of public housing units in New Orleans.  In addition to their political work, Mr. Vamos and Mr. Servin are professors with the Rensselaer Polytechnic Institute and the Parsons School of Design, respectively.

The remaining defendants, Morgan Goodwin, David Sievers, and Sarah Murphy, are young political activists working with the District of Columbia "Action Factory," one of numerous activist groups devoted to changing public policy on climate change.

Unless otherwise specified, this Motion will refer to defendants collectively as Defendants or Yes Men.

### B.  The Climate Change Parody.

The incident upon which the Chamber bases its lawsuit is the latest in a long line of Yes Men political parodies.  According to the First Amended Complaint, on October 16, 2009, the

---

*Oops:  Impostor scams Louisiana officials* (Aug. 28, 2006), http://www.cnn.com/2006/ POLITICS/08/28/ hud.hoax/index.html (last visited Dec. 13, 2009).

• In June 2007, the Yes Men posed as Exxon Mobil and National Petroleum Council representatives at a Canadian oil conference to propose that the oil industry use dying humans to produce needed oil.  Gar Smith, *On America's New Energy Future*, S.F. Chron., July 1, 2008, *available at* http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2008/06/30/ EDNR11F05I.DTL (last visited Dec. 13, 2009).

• In November 2008, the Yes Men distributed 80,000 copies of a fake July 4, 2009 *New York Times* with headlines such as "Iraq War Ends" and "Nation Sets Its Sights On Building a Sane Economy."  Sewell Chan, *Liberal Pranksters Hand Out Times Spoof*, N.Y. Times, Nov. 12, 2008, *available at* http://cityroom.blogs.nytimes.com/2008/11/12/pranksters-spoof-the-times/ (last visited Dec. 13, 2009).

• In September 2009, just before the United Nations' climate change conference, the Yes Men distributed fake editions of *New York Post* headlines warning about impending environmental doom.  Jason Linkins, *Fake New York Post: The Yes Men's Latest Takes On the Environment*, Huffington Post (Sept. 21, 2009), http://www.huffingtonpost.com/2009/ 09/21/the-yes-mens-latest-fake_n_293242.html (last visited Dec. 13, 2009).

Yes Men registered the domain name "chamber-of-commerce.us" and posted a website that "appears identical to that of the chamber" but contains a "fake 'Speeches' page and a fake 'Press Releases' page." First Amended Compl. ¶¶ 19-20. Two of these pages allegedly used the Chamber's logo and service mark. *Id.* ¶ 20.

The Chamber alleges that its marks also appeared on copies of a press release and prepared statements. *Id.* ¶ 23. The press release, issued by one "Erica Avidus,"[5] was titled "U.S. Chamber of Commerce Announces Free Enterprise Survival Strategy: Internal Conflict Resolves in Commitment to Long-Term Prosperity." *See* Declaration of Jacques Servin (hereinafter "Servin Decl."), Ex. A.[6] Misspelling Chamber President Tom Donohue's name, the press release quoted Chamber spokesman "Hingo Sembra" as announcing an "about-face on climate policy" and a "moratorium on lobbying and publicity work opposing climate legislation." *Id.*

On October 19, 2009, the Yes Men held a press conference, representing themselves as Chamber officials. *See* Servin Decl., Ex. B; *see also* First Amended Compl. ¶ 15. Accompanying the press conference was a prepared statement, which the Chamber alleges used its logo and service marks. *Id.* ¶ 23. Speaking at a podium featuring the Chamber's logo and service marks, a purported Chamber representative (but real member of the Yes Men), Jacques Servin read in part from the prepared comments. *Id.* ¶ 25; Servin Decl., Ex. B. About thirteen

---

[5] "Avidus" is Latin for "greedy."

[6] The Court may consider the allegedly infringing press release, prepared remarks, website, and video even for purposes of a Rule 12(b)(6) motion, because the Chamber expressly referenced and relied upon them in the First Amended Complaint (¶ 15) and they are thus integral to the complaint. *See Kaempe v. Meyers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (documents which are referred to in complaint and integral to plaintiff's claim may be considered on motion to dismiss); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997) (in deciding a 12(b)(6) motion to dismiss, court will consider facts alleged in the pleadings and documents attached as exhibits or incorporated by reference in the pleadings).

minutes into the presentation, real Chamber of Commerce spokesperson Eric Wolfschlegel announced that he is a true representative of the Chamber and that the press conference was "not an official U.S. Chamber of Commerce event," calling it a "stunt."  *Id; see also* First Amended Compl. ¶ 25.  Mr. Wolfschlegel also accused the individuals conducting the conference of "misrepresenting" the Chamber.  Servin Decl., Ex. B.  At the end of the event, a reporter questioned defendant Mr. Servin, who described the purpose of the event as to set forth the only "sane" position the Chamber could take on climate change.  *Id.*

Thus, although the First Amended Complaint alleges that "legitimate news organizations" such as Reuters, the New York Times, the Washington Post, CNBC and Fox Business Network, published news reports that they had to retract, First Amended Compl. ¶ 20, the First Amended Complaint also concedes that the hoax was exposed in the middle of the press conference; indeed, almost all of the coverage of the event acknowledged the parody as such.  *Id.* ¶ 25; *see, e.g.,* Lisa Lerer and Michael Calderone, *CNBC, Reuters Fall For Climate Hoax,* Politico (Oct. 19, 2009), *available at* http://www.politico.com/ news/stories/1009/28456.html (noting that Reuters corrected its wire story the same day, and that CNBC and Fox Business Network anchors were forced to correct themselves mid-sentence); *see also* http://www.youtube.com/ watch?v=chAJeuBmmog (video of Fox Business Network anchor correcting himself mid-sentence); http://www.huffingtonpost.com/2009/10/19/chamber-of-commerce-hoax_n_326069.html (same with respect to CNBC); http://motherjones.com/mojo/ 2009/10/watch-video-yes-men-make-rachel-maddow-show (video footage from Rachel Maddow show that day reporting the story as a "hoax").  And, since that time, several news outlets have criticized the Chamber's apparent inability to take a joke.  *See, e.g.,* Editorial, *Under the Chamber's Cyber-Skin,* L.A. Times, Nov. 16, 2009, *available at* http://www.latimes.com/news/

opinion/editorials/la-ed-yesmen16-2009nov16,0,3827699.story (last visited Dec. 13, 2009);

Editorial, *Lawsuit Obtuse,* St. Louis Post-Dispatch, Oct. 28, 2009, *available at*

http://www.stltoday.com/blogzone/the-platform/published-editorials/2009/10/lawsuit-obtuse/

(last visited Dec. 13, 2009).

> **C.     This Lawsuit.**

The Chamber has a long history of opposing frivolous litigation, and frequently opposes

legislation on this basis.  *See, e.g.,* http://www.uschamber.com/issues/index/labor/eeo.htm

(opposing equal employment opportunity legislation); U.S. Chamber Urges Supreme Court To

Reject Regulation-By-Litigation Approach, Sept. 3, 2009, *available at*

http://www.uschamber.com/nclc/090903_pr.htm (last visited Dec. 13, 2009); Press Release, U.S.

Chamber of Commerce, U.S. Chamber Disappointed In House Passage of Flawed Labor Bills,

Jan. 9, 2009, *available at* http://www.uschamber.com/press/releases/2009/january/090109_

labor.htm (last visited Dec. 13, 2009).  Yet, on November 6, 2009, the Chamber filed its First

Amended Complaint against the Yes Men, seeking an injunction prohibiting the Yes Men from

continuing to engage in political speech, and damages for their actions.  The Chamber alleges a

host of claims under the Lanham Act, including trademark infringement, *id.* ¶¶ 45-52, unfair

competition, *id.* ¶¶ 53-58, trademark dilution, ¶¶ 59-66, false advertising, ¶¶ 67-73, cyberpiracy,

¶¶ 74-79, in addition to several common law claims, including unlawful trade practices, *id.* ¶¶80-

84, publication of injurious falsehood, ¶¶ 85-91, and prima facie tort, ¶¶ 92-96.

> **III.     STANDARD OF REVIEW**

A court must dismiss a complaint where it fails to state a claim upon which relief can be

granted.  Fed. R. Civ. P. 12(b)(6).  A complaint meets this standard where the plaintiff fails to

provide legally sufficient grounds to support his entitlement to relief.  *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of

action" is insufficient.  *Id.* (citations omitted).  Rather, the "[f]actual allegations must be enough

to raise a right to relief above the speculative level . . . ."  *Id.* (citations omitted).  The plaintiff

must make "a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Id.* at 555 n.3.

The Supreme Court recently reiterated this standard, holding that the federal rules "demand[]

more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1949 (2009).[7]

Because this lawsuit implicates speech protected by the First Amendment, the Chamber

faces a heightened pleading standard.  "[W]here a plaintiff seeks damages . . . for conduct which

is *prima facie* protected by the First Amendment, the danger that the mere pendency of the action

will chill the exercise of First Amendment rights requires more specific allegations than would

otherwise be required."  *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002) (*quoting*

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary*

*Workers*, 542 F.2d 1076, 1082-83 (9th Cir. 1976)).  Many courts have confirmed this heightened

standard, finding that defamation plaintiffs must allege with specificity the elements of their

claims, for example by identifying the allegedly libelous statements.[8]  In other contexts, too,

these First Amendment rules have spurred courts to require plaintiffs to meet additional

---

[7] *Iqbal* made clear that the ruling in *Twombly* is not limited to antitrust cases.  *Ashcroft*, 129 S. Ct. at 1953.

[8] *See, e.g., Federal Deposit Ins. Corp. v. Bathgate*,  27 F.3d 850, 875 (3rd Cir. 1994) (dismissal was appropriate where party claiming defamation failed to identify allegedly libelous statements); *Phantom Touring, Inc. v. Affiliated Pub'lns*, 953 F.2d 724, 728 n.6 (1st Cir. 1992) (party sued "is entitled to knowledge of the precise language challenged as defamatory, and the plaintiff therefore is limited to its complaint in defining the scope of the alleged defamation"); *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692, 698-99 (8th Cir. 1979); *United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 108-09 (D. Conn. 2006) (dismissing defamation complaint for failure to allege with sufficient specificity); *Bramesco v. Drug Computer Consultants*, 834 F. Supp. 120, 122 (S.D.N.Y. 1993) (defamation allegations "so bereft of factual content" that court denied request to replead).

specificity requirements to survive a motion to dismiss.[9]  For example, in *Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 471 F. Supp. 126 (D.D.C. 1979), this Court recognized, in applying the *Noerr-Pennington* doctrine, that "it is particularly important that the Court carefully scrutinize the adequacy of plaintiffs' claims" where meritless suits can "chill the exercise of First Amendment rights."

The District of Columbia Circuit Court of Appeals has also recognized these principles, most notably in the oft-quoted case *Washington Post v. Keogh*, 364 F.2d 96, 968 (1966). Although *Keogh* involved summary judgment, its reasoning is equally relevant when applied to motions to dismiss.  The court stated:

> In the First Amendment area, summary procedures are even more essential.  For the stake here, if harassment succeeds, is free debate. . . .  Unless persons, including newspapers, desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors.  And to this extent debate on public issues and the conduct of public officials will become less uninhibited, less robust, and less wide-open, for self-censorship affecting the whole public is "hardly less virulent for being privately administered."

*Id.* at 968; *see also Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995)

("Given the threat to the first amendment posed by nonmeritorious defamation actions, it is

---

[9] For example, those seeking to challenge an individual's First Amendment petition rights face heightened pleading requirements.  *See Oregon Natural Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991); *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1177 n.8 (10th Cir. 1982) ("[W]e recognize that dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) normally is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  But this is not an ordinary case. This case involves a plaintiff seeking damages for conduct which is *prima facie* protected by the first amendment.") (internal quotation marks and citation omitted); *Letica Corp. v. Sweetheart Cup Co.*, 790 F. Supp. 702, 704-05 (E.D. Mich. 1992) ("While such factual allegations alone may be sufficient to survive a motion to dismiss, in the present action they are not because the offending behavior constitutes protected first amendment activity . . . ."); *Spanish Int'l Commc'ns Corp. v. Leibowitz*, 608 F. Supp. 178, 182 (S.D. Fla. 1985) (same); *Caplan v. Am. Baby, Inc.*, 582 F. Supp. 869 (S.D.N.Y. 1984) (same); *Miller & Son Paving, Co. v. Wrightstown Township Civic Ass'n*, 443 F. Supp. 1268, 1273 (E.D. Pa. 1978) (same).

particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted.") (citation omitted); *Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 50 (D.C. App. 1983) ("In this area, perhaps more than any other, the early sifting of groundless allegations from meritorious claims made possible by a Rule 12(b)(6) motion is an altogether appropriate and necessary judicial function.").

## IV.   ARGUMENT

### A.   The First Amendment Protects The Defendants' Political Parody Of The Chamber's Position on Climate Change.

This country has a "long and storied tradition of satiric comment" that has "enhanced political debate," and allows the public to distinguish those "who take themselves seriously and those whose self-perspective is somewhat more relaxed." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 151 (Tex. 2004). Indeed, "[n]othing is more thoroughly democratic than to have the high-and-mighty lampooned and spoofed." *Id.* The Chamber apparently disagrees.

The actions the Chamber complains of here are simply the latest in a time-honored tradition of using parody and satire to make crucial political points and spark political debate. A few salient examples bear noting. In 1729, Jonathan Swift, published *A Modest Proposal: For preventing the children of poor people in Ireland, from being a burden on their parents or country, and for making them beneficial to the publick* (1729), *available at* http://www.gutenberg.org/files/1080/1080-h/1080-h.htm. The "Proposal" advocated the consumption of Irish babies; Swift's intent was to call attention to the extreme poverty of the Irish people under English rule. The point was initially lost on some shocked readers, but it stands as one of the most influential political writings in Anglo-American history. More recently, in 1996, the spring issue of a leading journal of cultural and scientific studies, *Social Text*, included an article by Alan Sokal, a physics professor at New York University, arguing that

gravity, as normally construed, was a "capitalist fiction" and should be replaced by a new theory, "quantum gravity," that would better reflect post-modern political thinking, if not actual physical reality. That same day, Sokal published a piece in another academic publication, *Lingua Franca*, explaining that the first piece was a hoax and that any competent mathematician or physicist would have known it. As Sokal intended, the article and its aftermath sparked a widespread debate about postmodern science studies. *See* http://www.physics.nyu.edu/faculty/sokal/#papers.

Like Defendants' tactics here, successful hoaxes rely on two elements: (1) presenting a surprising or disturbing proposition that would provoke an immediate reaction from an audience; and (2) some sort of "reveal," without which the hoax would be ineffective. For example, Swift's "Proposal" would not accomplish its purpose if the reader did not come to understand his true point about the desperate circumstances of the Irish. Alan Sokal's hoax would not have accomplished its purpose if he had not published the accompanying piece in *Lingua Franca*. Similarly, Defendants' action was effective precisely because the Chamber promptly denied taking the position ascribed to it – as the Defendants knew it would.

The Court should recognize the Chamber's lawsuit for what it is – an attempt to use intellectual property and related law to punish a political parody that the Chamber found humorless, and which cast unwanted light on its controversial position on climate change precisely when members of the organization were rethinking whether they wanted to be associated with it. The Chamber's collective claims sound in defamation. *See, e.g.*, First Amended Compl. ¶¶ 34, 71. Because the defendants were merely criticizing the Chamber's controversial position through parody, the First Amendment protects their conduct.

### 1.     Political Parodies Are Fully Protected Speech.

Courts have repeatedly found that parodies are fully protected First Amendment speech, declining to impose liability under the guise of intellectual property and other laws. "[B]ecause

parody is a form of social and literary criticism, it has socially significant value as free speech under the First Amendment." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003) (internal quotation marks and citation omitted) (use of term "BARBIE" in title of photographs was protected speech because photographer was parodying plaintiff's Barbie dolls).[10]  Undoubtedly, parody implicates the First Amendment's "core concerns," *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 972 (10th Cir. 1996) (baseball trading cards using caricatures of baseball players for purposes of criticism in form of parody were protected speech), and courts uniformly have recognized "the broad scope permitted parody in First Amendment law."  *See also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 493 (2d Cir. 1989) ("Spy Notes" that criticized not only "Cliffs Notes" style, but also particular novels, were protected).  As the Southern District of New York stated:

> [W]hen unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right.  In recognition of this potential conflict, the Second Circuit has construed the Lanham Act narrowly when the unauthorized use of the trademark is for the purpose of a communicative message, rather than identification of product origin.  Thus, where the unauthorized use of a trademark is for expressive purposes of comedy, parody, allusion, criticism, news reporting, and commentary, the law requires a balancing of the rights of the trademark owner against the interests of free speech.

*Yankee Publ'g Inc. v. News Am. Publ'g, Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992) (dismissing claims brought by publishers of "The Old Farmer's Almanac" against magazine where latter used Almanac's trade dress as part of annual Christmas gift guide); *see also Charles Atlas, Ltd.*

---

[10] In *Walking Mountain*, the trial court subsequently awarded the defendant more than $1.8 million in attorneys' fees because Mattel had prosecuted the action despite the obviously parodic nature of the defendant's work.  *See Mattel, Inc. v. Walking Mountain Prods.*, No. CV99-8543RSWL(RZX), 2004 WL 1454100, at *1-4 (C.D. Cal. June 21, 2004).

*v. DC Comics, Inc.*, 112 F. Supp. 2d 330 (S.D.N.Y. 2000) (use of character resembling Superman to criticize Superman's misogynistic characteristics was protected speech).

A business's interest in its good will does not defeat this interest. Indeed, Lanham Act decisions consistently recognize that trademarks do not give a markholder veto power over all uses of its mark, and for good reason. Online and off, trademarks – words, symbols, colors – are also essential components of everyday language, used by companies, consumers and citizens to share information. *See* Alex Kozinski, *Trademarks Unplugged*, 68 N.Y.U. L. Rev. 960, 973 (1993) ("[trademarks] often provide some of our most vivid metaphors, as well as the most compelling political imagery in political campaigns . . . . [A]llowing the trademark holder to restrict their use implicates our collective interest in free and open communication."); *see also* Robert Denicola, *Trademarks as Speech: Constitutional Implications of the Emerging Rationales for the Protection of Trade Symbols*, 1982 Wis. L. Rev. 158, 195-96 ("Famous trademarks . . . become an important, perhaps at times indispensable, part of the public vocabulary. Rules restricting the use of well-known trademarks may therefore restrict the communication of ideas."). Thus, legislators and courts have taken care to ensure that trademark rights are not used to impose monopolies on language and intrude on First Amendment values. *See*, *e.g.*, *Nike, Inc. v. "Just Did It" Enter.*, 6 F.3d 1225, 1226 (7th Cir. 1993) (reversing summary judgment for Nike where defendant sold T-shirts with "MIKE" and Nike swoosh; stating: "When businesses seek the national spotlight, part of the territory includes accepting a certain amount of ridicule. The First Amendment, which protects individuals from laws infringing free expression, allows such ridicule in the form of parody."); *Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir. 1989) ("Because overextension of Lanham Act restrictions . . . might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict."); *CPC Int'l v. Skippy, Inc.*,

14

214 F.3d 456, 462 (4th Cir. 2000) ("[i]t is important that trademarks not be 'transformed from rights against unfair competition to rights to control language.'" (*quoting* Mark Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1710-11 (1999)).

Importantly, parody does not lose its First Amendment protections just because it makes the subject of the parody appear contemptible.  As the Ninth Circuit has explained, "[d]estructive parodies play an important role in social and literary criticism and thus merit protection even though they may discourage or discredit an original author."  *Fisher v. Dees*, 794 F.2d 432, 437-38 (9th Cir. 1986) (internal quotation marks and citation omitted).  Nor does an offensive parody lose its protection.  The Supreme Court has made clear that "[w]hether . . . parody is in good taste or bad *does not and should not matter to fair use*."  *Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 582 (1994) (emphasis added).  The Court in *Campbell* thus held that no claim arose from 2 Live Crew's sexually explicit parody of Roy Orbison's classic song "Pretty Woman." *Id.*; *see also* in *L.L. Bean, Inc. v. Drake Publishers, Inc*., 811 F.2d 26, 27, 34 (1st Cir. 1987) (First Amendment protected a pornographic magazine's parody of the wholesome and outdoorsy L.L. Bean catalog against infringement, dilution, and unfair competition claims); *Lucasfilm Ltd. v. Media Mkt. Group, Ltd*., 182 F. Supp. 2d 897, 901 (N.D. Cal. 2002) (denying motion for preliminary injunction on copyright and trademark infringement claims brought by the producers of the *Star Wars* films against the producers of a pornographic spoof).

 Nor does the fact that a parody is particularly effective (i.e., that it initially confuses its audience) make it subject to less First Amendment protection.  For example, in *Isaacks*, 146 S.W.3d 144, 147, after a Texas judge ordered a thirteen-year-old detained in November 1999 after he wrote a school assignment about terrorism, *The Dallas Observer* published a satirical article about a "diminutive" six-year-old girl whom the judge jailed for writing a book report

about *Where the Wild Things Are*.  In the story, the prosecutor had not yet decided whether to bring charges, but purportedly stated:  "We've considered having her certified to stand trial as an adult, but even in Texas there are some limits."  *Id.* at 147-48.  In a libel lawsuit, the Texas Supreme Court found for the defendant.  It stated:

> Some satire, like the article at issue here, relies for its force and effect on the idea of attribution of ideas and words to someone who never uttered them.  The satiric effect emerges only as the reader concludes by the very outrageousness of the words that the whole thing is a put-on.  The comic effect is achieved because the reader sees the words as the absurd expression of positions or ideas associated with the purported author.  It is not surprising, therefore, that respondents complain that only readers who read the entire article would "get" the joke.  As they argue, "many readers will read the first few paragraphs of an article and form an opinion."  But we cannot impose civil liability based on the subjective interpretation of a reader who has formed an opinion about the article's veracity after reading a sentence or two out of context; that person is not an objectively reasonable reader.

*Id.* at 157-59 (internal quotation marks omitted); *see also San Francisco Bay Guardian v. Superior Court*, 17 Cal. App. 4th 655, 660 (1993) ("The fact that real party furnished declarations of a few people who stated that they did not recognize the letter as a joke does not raise a question of fact as to the view of the average reader.  The question is not one that is to be answered by taking a poll of readers but is to be answered by considering the entire context in which the offending material appears.").

The *Isaacks* court went on to note that good satire often does mislead, citing a series of humorous examples:

> For example, earlier this year, the Beijing Evening News, in a story written by Huang Ke, reported that Congress was threatening to bolt Washington, D.C. unless it got a new, modern Capitol building, complete with retractable roof.  Daniel Terdiman, *Onion Taken Seriously, Film at 11*, WIRED, April 14, 2004, at http://www.wired.com/news/culture/0,1284,63048,00.html (last visited Sept. 1, 2004 and available in Clerk of Court's file).  Unfortunately, Ke's source for this information was *The Onion*, the

> satirical publication that bills itself as "America's Finest News
> Source." *Id.* The *Evening News* later apologized but blamed *The
> Onion*, writing that "[s]ome small American newspapers frequently
> fabricate offbeat news to trick people into noticing them with the
> aim of making money." *Id.* (quoting Beijing Evening News).
> According to Carol Kolb, *Onion* editor, "People every single day
> think *The Onion* stories are real." *Id.* One piece, called "Al-Qaida
> Allegedly Engaging in Telemarketing," prompted the Branch
> County, Michigan sheriff's department to issue an urgent press
> release warning of the purported practice. *Id.* In a similar vein, an
> article entitled "Chinese Woman Gives Birth to Septuplets: Has
> One Week to Choose" provoked prayer vigils on behalf of the six
> babies who would be rejected. *Id.* Additionally, Deborah Norville
> reported on MSNBC that more than half of all exercise done in the
> United States happens in TV infomercials for workout machines, a
> "statistic" obtained from an *Onion* article. *Id.*

*Id.* at 158 n.7.

Finally, even if, as the Chamber alleges, the parody was part of a "promotion," First

Amended Compl. ¶¶ 15-16, advertisements are protected parodies.  For example, the Second

Circuit held that a spoof of the plaintiff's famous nude photograph of a pregnant Demi Moore

was protected, even though the parody appeared in the form of an advertisement for an upcoming

film.  *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998).  Another court

found that MasterCard could not maintain Lanham Act claims against political candidate Ralph

Nader, who ran ads that parodied the credit-card company's "Priceless" ad campaign.  *See*

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 Civ.6086 (GBD), 2004 WL

434404, at *8 (S.D.N.Y. Mar. 8, 2004); *see also Eveready Battery Co., Inc. v. Adolph Coors Co.*,

765 F. Supp. 440, 450 (N.D. Ill. 1991) (parody protected brewer from trademark action by

battery manufacturer where brewer featured mechanical rabbit beating on a drum in an

advertisement).[11]

---

[11] Courts even have extended protection to parodies that appeared on merchandise that had no
relationship to any more traditional, expressive content. *See Cardtoons*, 95 F.3d 959 (parody
baseball trading cards protected under First Amendment); *Jordache Enters., Inc. v. Hogg Wyld,*

Of course, this is not to say that *every* parody is cloaked with *absolute* protection.  The

Second Circuit has developed a widely used test for making this inquiry.  *See Rogers v.*

*Grimaldi*, 875 F.2d 994 (2d Cir. 1989).  The court found that, "in general the [Lanham] Act

should be construed to apply to artistic works only where the public interest in avoiding

consumer confusion outweighs the public interest in free expression."  *Id.* at 999.  In *Rogers*, the

actress Ginger Rogers sued the producers and distributors of the film "Ginger and Fred," a movie

about two retired dancers who were known by the nicknames Ginger and Fred because they

imitated Ginger Rogers and Fred Astaire.  The Second Circuit found the First Amendment

protected the defendant's use of Rogers's name, even though titles of films are a commercial-

artistic hybrid.  *Id.* at 998.  In reaching its conclusion, the court noted that the title of the film had

some artistic relevance to the film, and the names Ginger and Fred were "not arbitrarily chosen

just to exploit the publicity value of their real life counterparts but instead have genuine

relevance to the film's story."  *Id.* at 1001; *see also Cliffs Notes*, 886 F.2d at 495.

Here, the Chamber's Lanham Act claims fail to trump the important public interest

served by the First Amendment.  The Yes Men deliberately used the Chamber's logo and service

marks to poke fun at it.  Without using the Chamber's marks, the parody would have lost

virtually all of its force and purpose.  That the Chamber may be dissatisfied with the critical

speech, or that it does not perceive the humor, is irrelevant.  That no reasonable viewer would

actually mistake the Yes Men's position for the Chamber's is evident by numerous factors, not

the least of which is the Chamber's interruption of the press conference, during which it

---

*Ltd.*, 828 F.2d 1482 (10th Cir. 1987) (jeans with label that featured smiling pig and "Lardashe"
logo held to be protected parody of  Jordache jeans).  As the Tenth Circuit concluded in
*Cardtoons*, there is "no principled distinction between speech and merchandise that informs our
First Amendment analysis.  The fact that expressive materials are sold neither renders the speech
unprotected, nor alters the level of protection under the First Amendment."  95 F.3d at 970
(citations omitted).

repeatedly characterized the event as a "stunt," and not one put on by the "real" Chamber of Commerce.  *See* Servin Decl., Ex. B.

The Yes Men's parody does have a superficial degree of plausibility, but such is the hallmark of satire.  *Isaacks,* 146 S.W.3d at 167.  "Satire works precisely because it evokes other materials."  Jon M. Garon, *Media & Monopoly in the Information Age:  Slowing the Convergence at the Marketplace of Ideas*, 17 Cardozo Arts & Ent. L.J. 491, 557 (1999). "[T]he very nature of parody . . . is to catch the reader off guard at first glance, after which the 'victim' recognizes that the joke is on him to the extent that it caught him unaware."  *San Francisco Bay Guardian*, 17 Cal. App. 4th at 660. "That does not necessarily make it actionable, however."  *Isaacks,* 146 S.W.3d at 167.  While a reader may initially approach the press releases and conference as providing straight news, the Yes Men's material "contains such a procession of improbable quotes and unlikely events that a reasonable reader could only conclude that the [event] was satirical."  *Id*.  On balance, the obvious clues in the press conference, the Yes Men's "general and intentionally irreverent tone," its "semi-regular publication of satire, as well as the satire's timing and commentary on a then-existing controversy" lead to the conclusion that the climate change parody could not reasonably be understood as stating actual facts about the Chamber.  *Id*.

### 2.   The Chamber Cannot Plead Other Claims to Avoid This Constitutional Bar.

The Chamber cannot evade constitutional free speech protections through the expedient of alleging claims under the Lanham Act instead of a defamation claim.  *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984) (treating the fact that the case before it was one of product disparagement rather than defamation as *immaterial* and discussing the importance of "independent judicial review").

19

Most notably, in *Hustler Magazine, Inc.  v. Falwell*, 485 U.S. 46, 50, 54-57 (1988), the

Supreme Court held that the First Amendment barred not only the Reverend Jerry Falwell's

defamation claim arising from a satirical feature in *Hustler* magazine that characterized Falwell

as engaged in an incestuous relationship, but also his intentional infliction of emotional distress

claim arising from the same publication.  Constitutional protections "are not peculiar to

[defamation] actions but apply to all claims *whose gravamen is the alleged injurious falsehood of*

*a statement.*"  *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042-43, 1045 (1986) (emphasis

added) (broadly applying constitutional limitations protecting free speech to different causes of

action other than defamation so as not to "frustrate the[] underlying purpose" of the

constitutional protections); *see also Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F.

Supp. 2d 1068, 1082 (C.D. Cal. 1998) (rejecting "'creative pleading'" as a way to avoid "'First

Amendment limitations placed on litigation against speech'") (*quoting Blatty*, 42 Cal.3d at

1045).

> **B.     The Yes Men's Speech Cannot Be Subject to Liability Under The Lanham**
> **Act.**

The Chamber alleges the parody was merely a promotion for the Yes Men's upcoming

film, First Amended Complaint, ¶¶ 15-16, presumably because it must show that the speech is

commercial to prevail on its claims.  Indeed, all but one Lanham Act section that the Chamber

alleges the Yes Men have violated explicitly require the speech be commercial in nature.[12]

Although the parody cases do not distinguish between commercial and noncommercial speech, it

is significant that the Yes Men's speech, as challenged by Plaintiffs, was non-commercial in

---

[12] *See* 15 U.S.C. § 1114(1) (requiring for infringement either the mark be used "in commerce" or
on objects that are "for sale"); 15 U.S.C. § 1125(a) (unfair competition and false advertising;
requires use of mark "in commerce"); 15 U.S.C. § 1125(c)(3) (dilution; explicitly excluding
"noncommercial use of the mark" and "parodying, criticizing or commenting upon the famous
mark owner").

nature, and its Lanham Act claims must fail as a matter of law.  And even if the speech were to be considered commercial for purposes of this motion, the Chamber alleges no valid Lanham Act claims.

### 1.     The Yes Men Parody Was Not Commercial.

Speech is not commercial "simply because it concerns economic subjects or is sold for a profit."  *Taucher v. Born*, 53 F. Supp. 2d 464, 480 (D.D.C. 1999).  "Traditionally, only speech which does no more than propose a commercial transaction has been considered commercial speech for the purposes of the First Amendment."  *Id.* (internal quotations and citation omitted).  *See also United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1143-44 (D.C. Cir. 2009) (*quoting Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 561-62 (1980)).  As a consequence, courts do not treat speech as "commercial" merely because the speaker may have some financial interest.  Accordingly, the D.C. Circuit held that a monthly stock market magazine was not commercial speech even though publisher was operating as an unregistered investment advisor.  *SEC v. Wall Street Publ'g Inst., Inc.*, 851 F.2d 365 (D.C. Cir. 1988).  *See also Taucher*, 53 F. Supp. 2d at 480 (information regarding commodity futures trading is noncommercial speech even where published by investment advisor).

Here, the Yes Men's parody did not propose a commercial transaction, nor was it related solely to the Yes Men's economic interests.  Years before the events that prompted this lawsuit, the Yes Men were known for satirizing government and corporations to make political statements.  The press conference had no connection to the Yes Men film and was focused entirely on the Chamber's position on climate change.  Indeed, just after the press conference and before this litigation began, Mr. Servin told an interviewer that his purpose was to profess the only "sane" position the Chamber could take on the very political debate about climate change.  *See* Servin Decl., Ex. B.

Assuming, *arguendo*, Plaintiff's allegations as true for this motion, even if the parody were viewed as a promotion for the Yes Men film, it still should be considered noncommercial speech.  It is well established that advertising for expressive works – even in the form of separate advertisements – is protected to the same extent as the works themselves.  Courts regularly reject challenges to advertising materials for constitutionally protected works.  Were the law otherwise, the First Amendment protection for speech would be lost once the speaker provided a potential audience with a preview of the contents of the speech to come.  The speaker would have to forego any informative publicity or risk liability for the content of the preview.  The Constitution does not permit such a Hobson's choice.

In *Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995), for instance, the plaintiff sued a book publisher over statements made in newspaper advertisements for a book assessing conspiracy theories about the assassination of President Kennedy.  The court held that the full First Amendment protection accorded to the contents of the book must apply with equal force to advertisements promoting its sale.  It explained that "[t]he critical question is whether the promotional material relates to a speech product that is itself protected" and that "the challenged advertisement is not about laundry detergent; it cannot be divorced from [the book] and the book is protected speech."  *Id.* at 152; *see also National Life Ins. Co. v. Phillips Publ'g, Inc.*, 793 F. Supp. 627 (D. Md. 1992) (refusing to classify advertisements for a newsletter as commercial speech because the advertisements accurately reprinted portions of the newsletter); *LaCoff v. Buena Vista Publ'g, Inc.*, 183 Misc. 2d 600, 608-09 (N.Y. Sup. Ct. 2000) ("advertising that promotes noncommercial speech, such as a book, is accorded the same constitutional protection as the speech it advertises"); *New York Pub. Interest Research Group, Inc. v.*

*Insurance Info. Inst.* 161 A.D.2d 204, 206 (1st Dep't 1990) (advertisements designed to influence public debate were not commercial speech).

In this case, it is indisputable that the Yes Men's parody was designed to influence the public debate, which it did, spurring widespread media coverage. Even accepting the Chamber's allegation, that the press conference and related activity was nothing more than a promotional lead-up to the Yes Men film, the film itself simply documents other political parodies the Yes Men had already conducted, hopefully further raising public awareness of those corporate and governmental actions that were the subject of those parodies. The Chamber does not allege anything else, and there is no allegation – nor could there be – that the Action Factory defendants could profit from the film.

Under these circumstances, the defendants' speech was clearly noncommercial, and the Chamber's Lanham Act claims must therefore fail.

### 2.     The Yes Men's Use of The Chamber's Trademarks Was Nominative.

Even if the Chamber could plausibly maintain that there were some commercial element to the press conference at issue here, it does not give rise to a valid trademark claim. Precisely because the Yes Men sought only to identify the Chamber and poke fun at it, Defendants' use of the Chamber's marks – on a website, and at the press conference – is nominative. While the Chamber may be embarrassed by being parodied by defendants for its position on climate change, the Lanham Act does not give trademark owners a monopoly over all uses of their marks. Rather, it is narrowly available to protect consumers against deception as to the origin of products.

The Lanham Act is intended "to protect consumers against deceptive designations of the origin of goods and, conversely, to enable producers to differentiate their products from those of others." *International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 918 (9th

Cir. 1980). "Nominative uses" of a trademark, i.e., use of a mark to identify or refer to the mark

holder's product, do not give rise to any cause of action under trademark laws. Nominative uses

thus fall outside the scope of activities prohibited by the Lanham Act.

The Ninth Circuit acknowledged these bedrock trademark principles in *New Kids on the*

*Block v. News America Publ'ns, Inc.*, 971 F.2d 302 (9th Cir. 1992), and held that the nominative

use of another's mark does not give rise to a Lanham Act claim. In *New Kids*, the plaintiffs – a

music band – asserted that two newspapers violated the band's trademark rights by using its

trademark in a poll and in materials promoting the existence of the poll. The poll asked the

public to vote for their favorite band member by calling a telephone number, and the newspapers

charged consumers 50 cents per call. The Ninth Circuit rejected all of the band's claims because

the newspapers' nominative use of the NEW KIDS trademark fell outside the scope of any

conduct prohibited by the trademark laws. As the court recognized, "[i]t is no more reasonably

possible . . . to refer to the New Kids as an entity than it is to refer to the Chicago Bulls,

Volkswagens or the Boston Marathon without using the trademark. Indeed, how could someone

not conversant with the proper names of the individual New Kids talk about the group at all?"

*Id.* at 308. The commercial nature of the poll did not alter the analysis, and the court stressed

that whether the use of the mark occurs in activities "carried on for profit and in competition

with the trademark holder's business is beside the point." [13]

---

[13] *New Kids on the Block*, 971 F.2d at 309. *See also Universal City Studios, Inc. v. Ideal Publ'g Corp.*, 3 Media L. Rptr. 1297 (S.D.N.Y. 1977) (denying motion for preliminary injunction where magazine used television show's HARDY BOYS trademark in connection with photograph of show's stars); *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d 463 (S.D.N.Y. 2008) (applying test to find that eBay's use of TIFFANY marks on website was fair use; Tiffany jewelry was not readily identifiable without use of mark; use of mark was limited to Tiffany name; eBay did not do anything to suggest sponsorship of the goods).

In this case, it would not have been possible to conduct this political parody without use of the Chamber's marks, and the defendants used the marks no more than necessary to identify the Chamber.  In this particular context, where the very purpose of parody *requires* discovery of the fact that the Chamber was being lampooned for its political positions, there is no chance that the event would imply the Chamber's endorsement of the Yes Men.  The use of trademarks for this purpose cannot support the Lanham Act claims.

### C.  Use of The Chamber's Marks Did Not Dilute The Marks.

The 2006 Trademark Dilution Revision Act expressly prohibits any claims for dilution (by blurring or by tarnishment) where a party engages in "[a]ny fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with . . . *parodying, criticizing, or commenting upon* the famous mark owner or the goods or services of the famous mark owner."[14]  The Yes Men's speech is unquestionably a political parody and therefore cannot form the basis of a trademark dilution claim.  *See Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC,* 507 F.3d 252 (4th Cir. 2007) (use of mark CHEWY VUITON for dog chew toys was parody of LOUIS VUITTON mark for luxury handbags).

---

[14] 15 U.S.C. § 1125(c)(3) (emphasis added).  Also, as discussed *supra,* the Yes Men's use of the Chamber's marks falls squarely within the Lanham Act's exemption of "noncommercial use[s]" from the anti-dilution provisions.  15 U.S.C. § 1125(c)(3)(C).  For example, use of the BARBIE trademark in a song and in its title was not actionable under the dilution laws, even though the mark was used to sell the song.  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906-07 (9th Cir. 2002); *see also Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792  (9th Cir. 2003) (photographs parodying BARBIE doll did not tarnish BARBIE image); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1339-40 (N.D. Ga. 2008) (no dilution where Wal-Mart critic created parody marks, such as "Walocaust" and "Wal-Qaeda"); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962 (C.D. Cal. 2007) (dismissing dilution claim against a television cartoon parody of performer Carol Burnett because noncommercial speech).

The Chamber contends that the use of its marks diluted the value of these marks by tarnishing and blurring them.  Yet, the kinds of activities recognized by law as capable of "tarnishing" a trademark are wholly different from those complained of by the Chamber. Dilution by tarnishment occurs when a famous mark is used as the defendant's trademark in association with goods or services with some sort of negative connotation, such as sexually explicit, lewd, or otherwise undesirable goods or services.[15]  Here, the Yes Men simply incorporated the Chamber's marks into a political parody.  Under these facts, there can be no dilution by tarnishment.  The Yes Men's use of the Chamber's marks did not create any association with the Chamber because it was a parody, and any reasonable reader would have promptly recognized it as such.

Plaintiff's dilution by blurring claim rests on no firmer theoretical footing.  The law only recognizes a dilution by blurring claim when a defendant applies another's mark to the defendant's product, thereby creating the possibility that the trademark will lose its ability to serve as a unique identifier for the mark owner's product.  "Dilution works its harm not by causing confusion in consumers' minds regarding the source of a good or service, but by creating an association in consumers' minds between a mark and a different good or service." *Welles*, 279 F.3d at 805.  To demonstrate the concept of blurring, the *Welles* court gave the example of cocoa sold under the trademark ROLLS ROYCE.  Consumers would not be confused as to

---

[15]*See, e.g., Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 881 (9th Cir. 1999) ("Tarnishment occurs when a defendant's use of a mark similar to a plaintiff's presents a danger that consumers will form unfavorable associations with the mark."); *America Online, Inc. v. IMS,* 24 F. Supp. 2d 548 (E.D. Va. 1998) (the famous mark AOL was diluted under a tarnishment theory by use as a mark on junk e-mail); *Hasbro, Inc. v. Internet Entm't Group, Ltd.,* No. C96-130WD, 1996 WL 84853 (W.D. Wash. Feb. 9, 1996) (famous mark CANDY LAND was held diluted by tarnishment by "candyland.com," an internet website showing sexually explicit pictures).  When this negative association causes "some degree of probable loss of the capability of the mark to serve as a distinctive identifier," dilution by tarnishment has occurred.  McCarthy on Trademark and Unfair Competition § 24.95 (4th ed. 2003).

whether the car manufacturer was the source of the cocoa, but such use of the ROLLS ROYCE mark could dilute the strength of the mark by causing people to associate the mark with more than one producer of products.  *Id.* at 805-06.  Here, where there is no product with which to associate the Chamber, a dilution claim must fail.

### D.     Defendants Did Not Engage in Unfair Competition or Infringe The Chamber's Trademarks.

According to the Chamber, mere use of its marks in the parody will somehow confuse consumers as to whether it was the source of or sponsor of the parody, allegedly in violation of Sections 43(a) of the Lanham Act, and constitutes both trademark infringement and unfair competition.  First Amended Compl. ¶ 48.  Again, because initial confusion is the very nature of parody, this claim cannot survive.  As the Second Circuit explained in *Cliffs Notes*, "[i]t is hard to imagine . . . a successful parody of Time magazine that did not reproduce Time's trademarked red border.  A parody must convey two simultaneous-and-contradictory-messages:  that it is the original, but also that it is *not* the original and is instead a parody."  886 F.2d at 494.  *See also Issacks*, 146 S.W.3d 144 at 161 ("'Stop the madness' does have a superficial degree of plausibility, but such is the hallmark satire."); *San Francisco Bay Guardian*, 17 Cal. App. 4th at 660 ("[T]he very nature of parody . . . is to catch the reader off guard at first glance, after which the 'victim' recognizes that the joke is on him to the extent that it caught him unaware.").

### E.     The Court Should Dismiss the Remaining Claims.

### 1.     The Court Should Dismiss The Chamber's False Advertising Claim.

The Chamber's false advertising claim under Section 1125(a) of the Lanham Act similarly fails for reasons already stated.  "In order to recover under the Lanham Act for false advertising, Plaintiffs must show that Defendants 'made statements of fact in [their] commercial advertising promotion that were (1) false or misleading, (2) actually or likely deceptive, (3)

material in their effects on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff.'" *Fernandez v. Jones*, No. 07-1448(RMC), 2009 WL 2768289, at *8 (D.D.C. Sept. 2, 2009) (internal citations omitted). The Chamber's claim fails because the speech is not commercial and did not materially affect individuals' or business' "buying decisions." *Id.*

First and foremost, the Chamber's false advertising claim fails because the Yes Men's speech was noncommercial in nature and did not in any way "propose a commercial transaction." *Taucher*, 53 F. Supp. 2d at 480. Even if the parody was executed in conjunction with the Yes Men's movie, the parody itself is a separate work and was not commercial or uttered "in commerce." 15 U.S.C. § 1125(a).

Furthermore, even if this Court could find that the speech in question was somehow commercial, the Chamber does not allege Yes Men's statements materially affected anyone's purchasing or "buying decisions." *Fernandez*, 2009 WL 2768289, at *8. "Whether a misrepresentation is material has nothing to do with the nature of the relief sought or the defendant's intent. Rather, materiality focuses on whether the false or misleading statement is likely to make a difference to purchasers. Thus, even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers." *Cashmere & Camel Hair Mfrs. Inst. v Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002). Here, the Yes Men's parody was revealed so quickly, and by design – within a matter of minutes of its commencement – that there is no possibility that no decision or action of any consumer or business could have been based on the Yes Men's statements. Moreover, it strains credulity to believe that anyone would have approached the Yes Men to lobby for them on pro-business positions, or that the defendants in

any other way would have supplanted the Chamber's business.

### 2.    The Court Should Dismiss The Chamber's Cyberpiracy Claim.

The Chamber's cyberpiracy claim is brought under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d).  To state a cybersquatting claim under the ACPA, the Chamber must allege that (1) U.S. CHAMBER OF COMMERCE is a distinctive or famous mark entitled to protection; (2) the Yes Men's www.chamber-of-commerce.us domain name is identical or confusingly similar to the Chamber's mark; *and* (3) that the Yes Men registered their domain name with the bad faith intent to profit from it.  15 U.S.C. § 1125(d)(1)(A).  The Chamber's cybersquatting claim does not sufficiently allege a bad faith intent to profit.  Indeed, the Chamber does not and cannot allege that the Yes Men are motivated by profit, let alone a bad faith intent to profit.  Accordingly, the instant case is a far cry from the "squatting" activity made illegal by the ACPA.

In amending the Lanham Act in 1999 to add the ACPA, "Congress left little doubt that it did not intend for trademark laws to impinge the First Amendment rights of critics and commentators."  *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005).  Congress directed that in determining whether an individual has engaged in cybersquatting, the courts may consider whether the person's use of the mark is a "bona fide noncommercial or fair use."  15 U.S.C. § 1125(d)(1)(B)(i)(IV).  The legislature believed this provision was necessary to "protect[] the rights of Internet users and the interests of all Americans in free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc."  S. Rep. No. 106-140 (1999).  In furtherance of Congress's intent, the ACPA sets out a list of nine non-exclusive factors that "a court may consider" in determining whether a defendant had "a bad faith intent to profit."  15 U.S.C. § 1125(d)(1)(B)(I).  The fourth factor, which considers "the person's bona fide noncommercial or fair use of the mark in a site

accessible under the domain name," *id.* § 1125(d)(1)(B)(i)(IV), is applicable here because that factor concerns domain names used for "criticism, comment, or parody" and the www.chamber-of-commerce.us domain name was used by the Yes Men for the purpose of political parody.

Courts have had no difficulty in rejecting cybersquatting claims where trademarks were used for the very purpose at issue in this case – criticism of the trademark holder or political parody. Thus, in *Rohr-Gurnee Motors, Inc. v. Patterson*, 2004 U.S. Dist. LEXIS 2068 (N. D. Ill. 2004), the court held that the ACPA's safe harbor provision shielded the defendant from liability where the disgruntled car buyer registered the domain names "gurneevolkswagen.com" and "gurneevolkswagon.com" to detail her bad experience with the company. Similarly, in *Lucent Technologies, Inc. v. Lucentsucks.com*, 95 F. Supp. 2d 528, 535-36 (E.D. Va. 2000), the court observed that "[a] successful showing that lucentsucks.com is effective parody and/or a cite for critical commentary would seriously undermine the requisite elements for [the ACPA]." Here, the Chamber's cybersquatting claim under the ACPA is unfounded because the Yes Men's use of the subject domain name is "bona fide noncommercial or fair use." 15 U.S.C. § 1125(d)(1)(B)(i)(IV).

Moreover, the plain language of the ACPA provides that a defendant is liable under the Act only where a plaintiff can establish that the defendant had a "bad faith *intent to profit.*" 15 U.S.C. § 1125(d) (emphasis added). The Senate Report accompanying the ACPA illustrates how the "bad faith intent to profit" is the essence of the wrong that the Act seeks to combat. That report defines cybersquatters as those who:

> (1) "register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks;"
> (2) "register well-known marks as domain names and warehouse those marks with the hope of selling them to the highest bidder;"
> (3) "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark

owner's site to the cybersquatter's own site;" (4) "target distinctive
marks to defraud consumers, including to engage in counterfeiting
activities."

*Lucas Nursery & Landscaping v. Grosse*, 359 F.3d 806, 809-10 (6th Cir. 2004) (*quoting* S. Rep.

No. 106-140, at 5-6 (1999).[16]

   In this case, the Chamber does not – and cannot – allege that the Yes Men were

motivated by profit, let alone a bad faith intent to profit.  What the Chamber complains of in

Count V is actually "bona fide noncommercial or fair use" of a domain name for the purpose of

political parody and criticism.  The Chamber's First Amended Complaint does not allege that the

Yes Men's domain name www.chamber-of-commerce.us contains any advertisements, or links

to advertisers.  It does not allege that the Yes Men are trying to sell the domain name to the

Chamber or others for profit.  Instead, the Chamber merely allege that the Yes Men used their

---

[16] Congress enacted the ACPA in response to concerns over the "proliferation of
cybersquatting – the Internet version of a land grab."  *Virtual Works, Inc. v. Volkswagon of Am.,
Inc.*, 238 F.3d 264, 267 (4th Cir. 2001).  The practice of holding domain names for ransom with
an intent to profit directly from selling the domain name itself is the "paradigmatic"
targeted by the Act.  *Lucas Nursery*, 359 F.3d at 810; *see also Schmidheiny v. Weber*, 319 F.3d
581, 582 (3rd Cir. 2003) ("The purpose of the Anti-cybersquatting Act is to 'curtail one form of
cybersquatting – the act of registering someone else's name as a domain name for the purpose of
demanding remuneration from the person in exchange for the domain name.'") (*citing* 145 Cong.
Rec. S14715 (daily ed. Nov. 17, 1999) (statement of Sen. Lott)); *Ford Motor Co. v. Catalanotte*,
342 F.3d 543, 549 (6th Cir. 2003) ("Registering a famous trademark as a domain name and then
offering it for sale to the trademark owner is exactly the wrong Congress intended to remedy
when it passed the ACPA."); *cf. Eagle Hosp. Physicians, Inc. v. SRG Consulting, Inc.*, 561 F.3d
1298, 1307 (11th Cir. 2009) (defining cybersquatting as "'the conduct of one who reserves with
a network information center a domain name consisting of the mark or name of a company for
the purpose of relinquishing the right to the domain name back to the legitimate owner for a
price'" (*quoting* McCarthy on Trademarks and Unfair Competition § 24:17 (4th ed. 2008)); H.R.
Rep. No. 106-412, at 5 (1999) (identifying cybersquatters as those "who register numerous
domain names containing American trademarks or tradenames only to hold them ransom in
exchange for money").  The Chamber does not allege that the Yes Men designed to sell a domain
name for profit.  Moreover, the Chamber has failed to establish that the Yes Men had any
intention to profit from the www.chamber-of-commerce.us website by selling the domain name
registration, by selling or advertising products on the www.chamber-of-commerce.us website to
unsuspecting consumers in search of the Chamber's website, or by using the domain name in any
other way to obtain a profit.

website to make false and/or misleading statements about defendants.  Such statements and

postings on the Yes Men's website are fair comment and certainly critical commentary, but the

Yes Men's use of the www.chamber-of-commerce.us domain name lacks a "bad faith intent to

profit," required under § 1125(d).  Because the Chamber does not allege such intent, Count V

fails to state a claim on which relief may be granted and is subject to dismissal under Fed. R.

Civ. P. 12(b)(6).

### 3. The Court Should Dismiss The Chamber's Unlawful Trade Practices Claim.

At Count VI of the Complaint, the Chamber improperly asserts a claim under the District

of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-304, a statute

enacted to provide remedies for consumers who are wronged by unlawful trade practices.  The

Complaint contains no allegations that the Chamber and the Yes Men have a consumer-merchant

relationship or that Defendants are even merchants under the statute.  Accordingly, the

Chamber's assertion of a claim under the CPPA is wholly unfounded and should be dismissed.

"The District of Columbia Consumer Protection Procedures Act affords a panoply of

strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers

who are victimized by unlawful trade practices."  *District Cablevision Ltd. P'ship v. Bassin*, 828

A.2d 714, 717 (D.C. 2003).  The CPPA's protections apply to a wide range of practices and

transactions.  *See, e.g., DeBerry v. First Gov't Mortg. & Investors Corp.*, 743 A.2d 699, 700-01

(D.C. 1999).  Nonetheless, the CPPA "was designed to police trade practices arising *only* out of

consumer-merchant relationships," *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 709 (D.C. 1981)

(emphasis added), and does not apply to commercial dealings outside the consumer sphere.  *See,*

*e.g., Carleton v. Winter*, 901 A.2d 174, 179 (D.C. 2006) (stating that the CPPA regulates conduct

of merchants or goods suppliers); *Mazanderan v. Independent Taxi Owners' Ass'n*, 700 F. Supp.

588, 591 (D.D.C. 1988) (holding that a taxicab operator's purchase of gasoline and supplies was not a consumer transaction within the coverage of the CPPA because it was made "in connection with his role as an independent businessman"); *Independent Commc'ns Network, Inc. v. MCI Telecomms. Corp.*, 657 F. Supp. 785, 787 (D.D.C. 1987) ("[The CPPA] is not intended to supply merchants with a private cause of action against other merchants."). The Chamber makes no attempt to allege that it has a consumer-merchant relationship with the Yes Men. Moreover, there are simply no facts in the First Amended Complaint to support any allegation of commercial dealings between Plaintiff and Defendant of any nature.

Indeed, the Yes Men do not even qualify as merchants under the CPPA. The CPPA defines "merchant" as a "person who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(3) (2001); *see also Howard*, 432 A.2d at 709 ("While a 'merchant' is not limited to the actual seller of the goods or services complained of, he must be a 'person' connected with the 'supply' side of a consumer transaction."). The Chamber fails to allege that the Yes Men are merchants under the CPAA, nor could they. The Yes Men are political activists, filmmakers, and satirists. They do not trade in consumer goods and are not merchants under the CPPA.

### 4. The Court Should Dismiss The Chamber's Injurious Falsehood Claim.

Even if the Court finds the First Amendment does not protect Defendants' activities, the Chamber's injurious falsehood claim must fail because the statements in question were not published with reckless disregard for the truth and because Chamber has not shown sufficient loss. The tort of injurious falsehood, also known as "trade libel" or "slander of goods" or "disparagement of property," protects against false statements that disparage plaintiff's

intangible assets.  *See, e.g., Art Metal-USA, Inc. v. United States*, 753 F.2d 1151 (D.C. Cir.

1985).  In order to prevail on this claim, plaintiff must show pecuniary harm resulting from

unprivileged publication of false statements with reckless disregard for the falsity.  *Id.*; *Q Int'l

Courtier, Inc. v. Seagraves*, 27 Media L. Rptr. 1982 (D.D.C. Feb. 26, 1999) ("To state a claim,

the plaintiff must allege pecuniary harm resulting from the defendant's unprivileged publication

of false statements, with knowledge of reckless disregard of the falsity, concerning the plaintiff's

property or product.").  Injurious falsehood is closely related to libel, except that the plaintiff

must go further and show pecuniary harm or special damages.  *Fowler v. Curtis Publ'g*, 182 F.2d

377, 378 (D.C. Cir. 1950) ("[T]he averment of [special damages] is essential in stating a cause of

action for disparagement").

      Here, the Chamber fails to state a claim for injurious falsehood because they do not

adequately allege that the Yes Men made any statements with "reckless disregard of the falsity."

*Art Metal-USA*, 753 F.2d at 1155.  This standard is also the same applied to public figures who

seek to "recover for the tort of intentional infliction of emotional distress by reason of

publication [which] contains a false statement of fact which was made with 'actual malice,' *i.e.,*

with knowledge that the statement was false or with reckless disregard as to whether or not it

was true."  *See Falwell*, 485 U.S at 56.  Under this standard, the U.S. Supreme Court has said

that if a "parody could not 'reasonably be understood as describing actual facts about

[respondent] or actual events in which [he] participated,'" then that speech cannot be found to

have been made with reckless disregard for the truth.  *Id*. at 57.  To say that such political parody

speech was made with "reckless disregard of falsity" under this standard would subject countless

political satirists to claims for injurious falsehood and consequently chill First Amendment

rights.

While the Yes Men did publish "false" statements in the press conference, the parody was revealed so quickly – in a matter of minutes – that no reasonable person could understand the parody as being "fact" for more than a fleeting moment.  When First Amendment rights are implicated and a plaintiff endeavors to show "reckless disregard of falsity," *Art Metal-USA*, 753 F.2d at 1155, this "showing must be made with 'convincing clarity,' or, in a later formulation, by 'clear and convincing proof. . .'" *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 773 (1986) (internal citations omitted); *see also New York Times v. Sullivan*, 376 U.S. 254, 285-86 (1964) (stating that "the constitutional standard demands" that a plaintiff show "convincing clarity" when attempting to satisfy the analogous "actual malice" standard).  The Chamber's allegations fail to meet this constitutional standard.

Furthermore, the Chamber fails to state a claim for injurious falsehood because it does not adequately allege pecuniary loss or special damages.  "'[T]he complaint must set forth precisely in what way the special damage resulted from the spoken or written words; it is not sufficient to *allege generally* that the plaintiff has suffered special damages, or that the party has been *put to great costs and expenses*.'" *Fowler*, 182 F.2d at 379 (emphasis added) (*citing* 2 Moore's Federal Practice 1921-1923 (1948)).  For example, courts have noted that a plaintiff must "'allege either the loss of particular customers by name, or a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Fowler*, 182 F.2d at 379 (*citing Erick Bowman Remedy Co. v. Jensen Salsbery Labs.*, 17 F.2d 255, 261 (8th Cir. 1926)).  If the Chamber wanted to "predicate its right to recover damages" on general loss of custom and goodwill, "it should have alleged facts showing an established business, the amount of sales for a substantial period preceding the publication, the amount of sales subsequent to the publication, facts showing that such loss in

sales were the natural and probably result of such publication, and facts showing that plaintiff could not allege the names of particular customers who withdrew or withheld their custom." *Id.*

Here, the Chamber merely states that its pecuniary loss is "the cost of legal and investigative fees" to address the hoax website and "the cost incurred for Chamber personnel to investigate and address" the press conference. These "damages" were not the "natural and direct result" of defendants' actions; rather, they are the result of the Chamber's overreaction to the Yes Men's protected speech. *Id.* The Chamber does not allege that the Yes Men's actions were the direct cause of, for example, a person's decision not to donate money to the Chamber or a business declining the Chamber's representation specifically based on the alleged actions. The Chamber does not allege that Defendants' actual statements caused any direct harm; essentially, they alleged that they have been "put to great costs and expenses," which is not sufficient to state a claim for injurious falsehood. *Id.*

### 5. The Court Should Dismiss The Chamber's Prima Facie Tort Claim.

Finally, the Court should dismiss the Chamber's "Prima Facie Tort" claim, which is not recognized by District of Columbia courts. *See Schwartz v. Franklin Nat'l Bank*, 718 A.2d 553, 556-57 (D.C. 1998) (noting that the District of Columbia has not recognized prima facie tort); *Art Metal-USA*, 577 F. Supp. at 184 (D.D.C. 1983) ("District of Columbia courts have not embraced a form of generic tort like the *prima facie* tort recognized by New York courts . . . ."). Even if this Court were to recognize the Prima Facie Tort claim under the laws of another state, such as New York, the Chamber has failed to state such a claim.

Section 870 of the Restatement (Second) of Torts describes a prima facie tort, in part as: "[o]ne who intentionally causes injury to another is subject to a liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances." Comment a explains that this tort "is intended to serve as a guide for determining when liability

36

should be imposed for harm that was intentionally inflicted, even though the conduct does not come within the requirements of one of the well established and named intentional torts." *See also Pulaski Constr. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 870 (N.J. 2008) ("Assuming, without deciding, that our common law may admit of a cause of action for prima facie tort, it is solely a gap-filler. That is, the availability of the prima facie tort doctrine is limited exclusively to those instances of intentional and culpable conduct unjustified under the circumstances that, as a threshold matter, do not fall within a traditional tort cause of action.").

Although in paragraph 94 of the First Amended Complaint the Chamber asserts that the alleged tortious behavior occurred in New York, the Chamber has not specifically pled for redress under the laws of New York. Further, New York courts have generally been wary about the over-extension of prima facie tort as a cause of action:

> Although the doctrine of prima facie tort was developed to provide a remedy for injurious intentional conduct that does not fall within the categories of the traditional torts, the concept that the law should never suffer injury and damage without remedy has limitations mandated by public policy. Thus, prima facie tort is not a "catch-all" alternative for every cause of action that fails to establish the elements of traditional torts.

103 N.Y. Jur.2d, Torts, Section 21 (2009) (footnotes omitted); *see also Belsky v. Lowenthal*, 62 A.D.2d 319, 405 N.Y.S.2d 62, 65 (1st Dep't 1978) ("Prima facie tort should not become a 'catch-all' alternative for every cause of action which cannot stand on its legs."). Under New York law, there are four elements to a claim of prima facie tort: "(1) an intentional infliction of harm; (2) without excuse or justification and motivated solely by malice; (3) resulting in special damages; (4) by an act that would otherwise be lawful." *United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996).

Here, setting aside the Chamber's failure to properly invoke New York law, the Chamber's prima facie tort claim cannot stand for at least two additional reasons. First, where

"[t]he factual allegations underlying [the prima facie tort] cause of action relate to the dissemination of allegedly defamatory materials," that cause of action "must fail." *Butler v. Delaware Otsego Corp.*, 203 A.D.2d 783, 610 N.Y.S.2d 664, 665 (3rd Dep't 1994); *see also Springer v. Viking Press*, 90 A.D.2d 315, 457 N.Y.S.2d 246, 248 (1st Dep't 1982) (in case involving allegedly libelous depiction of plaintiff in novel, there was "no warrant for invocation of the prima facie tort doctrine" where plaintiff could not succeed "without, at the same time, establishing the classical tort of libel"). The Chamber's complaint, which repeatedly uses defamation terminology (*see, e.g.*, First Amended Compl. ¶¶ 34, 71), under the guise of a purported Lanham Act action, cannot properly be considered to raise a claim of prima facie tort.

Moreover, New York courts have been strict in holding that a cause of action for prima facie tort will not lie unless the actions complained of can be plausibly said to have been motivated solely by malice towards the plaintiff. In the context of cases involving acts of expression, wherever a defendant's actions can be seen, at least in part, as having been motivated by the desire to express some opinion, a cause of action for prima facie tort will fail. This is so even if the actions complained of were motivated in part by a desire to injure the plaintiff. *See Belsky v. Lowenthal*, 405 N.Y.S.2d at 65 ("liberal application of 'malicious' to the motives" of the defendant will not alone make out a cause of action for prima facie tort).

A good example is *ATI, Inc. v. Ruder & Finn, Inc.*, 42 N.Y.2d 454, 368 N.E.2d 1230 (1977), in which the plaintiff, a manufacturer of aerosol products, alleged that a public relations firm, and related entities, generated negative publicity about the effect of these products upon the ozone layer as a means of intimidating the plaintiff into hiring it to produce positive publicity about aerosol products. The New York Court of Appeals held that since the possible harm arising from the use of aerosol products was a bona fide controversy, "perhaps some defendants

were motivated to harm plaintiff by alerting the public as to the potential hazard does not require a conclusion that these defendants' conduct is without justification.  Whatever defendants' motivation . . . [there is] a reasonable basis for concluding that aerosols may damage the environment and this must be deemed a justification which the law will recognize."  42 N.Y.2d at 460.

Here, even assuming that the Yes Men were motivated by some desire to harm the Chamber, it is not possible to disregard the fact that their activities are aimed at advancing their elaborate parody designed to poke fun at the Chamber and spark debate over its position on climate change.  Indeed, the Chamber itself alleges that Mr. Servin impersonated a representative of the Chamber and "began to ostensibly represent the Chamber's position on climate change legislation" during the Yes Men's hoax.  First Amended Compl. ¶ 25.  The Chamber's admission that the Yes Men had an entirely different agenda, precludes its ability to state a cause of action for prima facie tort.  *See also McKenzie v. Dow Jones & Co.*, 2009 U.S. App. LEXIS 26734 (2d Cir. 2009) (explaining that in the context of cases involving acts of expression, a cause of action for prima facie tort will fail even if the actions complained of were motivated in part by a desire to injure the plaintiff).

### F.    The Defendants Will Be Entitled to Attorney's Fees Under The Lanham Act.

The Lanham Act—under which the Chamber brings the majority of its claims – authorizes an award of attorneys' fees for the prevailing party.  See 15 U.S.C. § 1117(a)(3) (allowing an award  of "reasonable attorney fees to the prevailing party" in "exceptional cases" under the Lanham Act).  This provision does not just protect plaintiffs; indeed, "Congress endeavored to afford protection to defendants 'against unfounded suits . . . for harassment and the like.'"  *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 524 (D.C. Cir. 1985) (*citing* S. Rep. No. 93-1400, at 5, 6 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 7132,

7136).

Attorney's fees are generally awarded under this section when the "plaintiff was motivated by willfulness or bad faith in bringing the underlying action." *Newborn v. Yahoo! Inc.*, 437 F. Supp. 2d 1, 8 (D.D.C. 2006). *See, e.g.*, *IMAF, S.p.A. v. J.C. Penney Co.*, 810 F. Supp. 96, 100 (S.D.N.Y. 1992) (awarding attorney's fees under Lanham Act to defendant since "there [was] no possible way that [plaintiff] reasonably could have expected to succeed on a Lanham Act claim" and the defendant " was forced to incur expenses and devote time to defend against a lawsuit that . . . utterly lacked a solid legal foundation"); *see also Mattel, Inc. v. Walking Mountain Productions*, 2004 WL 1454100 at *3, *supra* at fn. 9 (granting Defendant's motion for fees and costs and stating that "[a]s to the factors of compensation and deterrence, Mattel (a large corporation) brought objectively unreasonable copyright claims against an individual artist. This is just the sort of situation in which this Court should award attorneys fees to deter this type of litigation which contravenes the intent of the Copyright Act."). In this case, for the reasons stated above, there is no possible way that the Chamber can reasonably expect to succeed on its claims, and an aware of attorney's fees would deter this type of litigation in the future. Consequently, the Yes Men will be entitled to recover the reasonable attorney's fees spent defending this action.

## V.    CONCLUSION

For all the reasons stated herein, the Yes Men's motion to dismiss should be granted in full and the Chamber's First Amended Complaint summarily dismissed with prejudice. The Yes Men also respectfully request that this Court award them their costs and attorneys' fees for having to defend their First Amendment-protected political speech.

Dated this 5th day of January, 2010.

Respectfully submitted,

    /s/  Robert Corn-Revere
Robert Corn-Revere (D.C. Bar No. 375415)
Lisa B. Zycherman (D.C. Bar No. 495277)
DAVIS WRIGHT TREMAINE, LLP
1919 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006
(202) 973-4225
(202) 973-4499 fax
bobcornrevere@dwt.com
lisazycherman@dwt.com
Bruce E. H. Johnson (*admitted pro hac vice*)
brucejohnson@dwt.com
Ambika Doran (*admitted pro hac vice*)
ambikedoran@dwt.com
DAVIS WRIGHT TREMAINE, LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
(206) 757-7700 fax

Thomas R. Burke (*admitted pro hac vice*)
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE, LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
(415) 276-6500
(415) 276-6599 fax

Matthew Zimmerman (*pro hac vice pending*)
mattz@eff.org
Corynne McSherry (*pro hac vice pending*)
corynne@eff.org
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
(415) 436-9993 fax