# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )   Case No. 09-CV-02014-RWR ) |
| JACQUES SERVIN, et al. | ) ) |
| Defendants. | ) |

**MEMORANDUM OF AMICUS CURIAE PUBLIC CITIZEN IN SUPPORT OF DISMISSAL OF THE TRADEMARK AND UNFAIR COMPETITION CLAIMS**

Gregory A. Beck (DC Bar # 494479)
Deepak Gupta (DC Bar # 495451)
Margaret Kwoka (DC Bar # 988255)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-1000
Email: dgupta@citizen.org, gbeck@citizen.org,
mkwoka@citizen.org
Counsel for Amicus Curiae Public Citizen

January 19, 2010

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

INTEREST OF AMICUS CURIAE .......................................................................................2

ARGUMENT...........................................................................................................................3

    I.      The First Amendment Precludes the Application of Trademark Law to Noncommercial Speech, Including the Core Political Speech at Issue Here...................................................................................................................3

    II.     The Chamber's Trademark Claims Rest on Confusion Irrelevant to the Legitimate Purposes of Trademark Law.................................................................7

         A.    Trademark Law Prohibits Only Use of a Mark That Would Mislead Consumers in Their Purchasing Decisions. ..................................7

         B.    The Likelihood of Confusion Test Is Satisfied Only When Consumers Are Confused About the Origin of Competing Goods. ..........13

CONCLUSION......................................................................................................................16

## INTRODUCTION

The Chamber of Commerce of the United States, the world's largest lobbying organization, brought this suit in response to a hoax perpetrated by a small band of political activists known as the "Yes Men." Impersonating representatives of the Chamber, the Yes Men held a press conference purporting to announce a major change in the Chamber's position on climate-change legislation. The hoax was intended to draw public attention to the Chamber's lobbying campaign against such legislation, and depended on temporarily misleading people into thinking that the press conference was a Chamber-sponsored event. In this sense, it appears that the hoax was a success—some media sources briefly reported the press conference as real before issuing corrections.

Pointing out that the standard for trademark infringement under the Lanham Act is a "likelihood of confusion," the Chamber argues that the Yes Men are liable for the "confusion" resulting from the prank. Accordingly, the Chamber argues that the Yes Men should be enjoined from disseminating footage of the prank and forced to disgorge any profits from a movie they released in theaters at about the same time.

Not every kind of confusion, however, is trademark infringement. Trademark law creates a commercial claim that applies only to competition for goods or services in the marketplace. This limitation is not only built into the language of the Lanham Act; it is required by the First Amendment to avoid restricting commentary, including the core political speech at issue here. *See Taubman v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003). The Chamber's interest in its trademark is therefore derivative of, and extends no further than, trademark's primary consumer-protection function. *See Lucasfilm Ltd. v. High Frontier*, 622 F. Supp. 931, 933-34 (D.D.C. 1985). The "likelihood of confusion" test, which courts use to determine liability for trademark

infringement, is merely a rough guide to determining whether the relevant form of consumer confusion exists.

In this case, there is no possibility that the Chamber's allegations, even if true, would create a likelihood of confusion among customers as to goods and services in the marketplace. Trademark law has no role to play where, as here, the only relevant marketplace is the marketplace of ideas.[1]

## INTEREST OF AMICUS CURIAE

Public Citizen is a national consumer-advocacy organization based in Washington, D.C. Since its founding in 1971, Public Citizen has advocated for protections for people who speak out about the government and corporate activity. Along with its efforts to encourage public participation, Public Citizen has brought and defended many cases involving the First Amendment right to participate in public debates. For the past decade, Public Citizen has observed an increasing number of companies invoking their intellectual property rights to prevent people from expressing their negative opinions. In Public Citizen's experience, companies often sue or threaten to sue without a substantial legal basis, hoping to silence their critics through the threat of ruinous litigation. Public Citizen lawyers have successfully represented speakers in many of the leading cases at the intersection of trademark and First Amendment law, including *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005); *Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005); *Taubman v. Webfeats*, 319 F.3d 770 (6th Cir. 2003); and *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008).

---

[1] This brief discusses only the aspects of the case relevant to statutory trademark and unfair competition law, which are the bases for Counts I, II, III, IV, V, and VI of the Chamber's complaint. Counts VII and VIII, the common-law claims for "publication of injurious falsehood" and "prima facie tort," also raise important First Amendment issues, *see Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988), but we do not address them here.

**ARGUMENT**

The limited purpose of trademark law is to avoid confusion in the marketplace for goods and services. The Chamber's trademark claims should be dismissed because they impermissibly seek to extend trademark law beyond the commercial marketplace, in violation of both constitutional and statutory limits. In Part I, we explain that the First Amendment bars any extension of trademark law to noncommercial speech, including the purely political speech at issue here. In Part II, we show that the Chamber's trademark claims are unrelated to the legitimate purpose of the trademark laws—preventing confusion that could mislead consumers in their purchasing decisions.

**I.   The First Amendment Precludes the Application of Trademark Law to Noncommercial Speech, Including the Core Political Speech at Issue Here.**

"As a matter of First Amendment law, commercial speech may be regulated in ways that would be impermissible if the same regulation were applied to noncommercial expressions." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005). "The Lanham Act is constitutional because it only regulates commercial speech, which is entitled to reduced protections under the First Amendment." *Taubman*, 319 F.3d at 774; *see* Lisa P. Ramsey, *Increasing First Amendment Scrutiny on Trademark Law*, 61 SMU L. Rev. 381 (2008).

Thus, the threshold question in assessing the Chamber's trademark claims is whether the Yes Men's use of the Chamber's marks was "commercial and therefore within the jurisdiction of the Lanham Act." *Taubman,* 319 F.3d at 774. If the use of a trademark constitutes commercial speech, "then, and only then, do we analyze [the] use for a likelihood of confusion." *Id.* "The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of

view." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) (quoting *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir. 1987)).

Commercial speech is speech that does "no more than propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771 n.24 (1976). Not every use of a trademark is "commercial" in this sense. Otherwise, trademark rights would become "rights to control language" and would interfere with "the ability to discuss the products or criticize the conduct of companies that may be of widespread public concern and importance." *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005) (quoting Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1710-11 (1999)). The use of a trademark is "commercial speech" for First Amendment purposes only when it "encourages consumers to enter into a commercial transaction by providing information" as to "the source of commercial goods or services." Ramsey, *First Amendment Scrutiny,* 61 SMU L. Rev. at 396; *see Friedman v. Rogers*, 440 U.S. 1, 11 (1979) ("[T]he optometrist who uses a trade name 'does not wish to editorialize on any subject, cultural, philosophical, or political.' . . . His purpose is strictly business. The use of trade names in connection with optometrical practice, then, is a form of commercial speech and nothing more.") (quoting *Va. State Bd. of Pharmacy*, 425 U.S. at 761).

Judged by this standard, the Yes Men's press conference was not commercial in any relevant sense. It did not propose any commercial transaction, but was instead an audacious political stunt designed to embarrass the Chamber by highlighting its controversial stance on global climate change. The Yes Men made use of the Chamber's marks only to further that purely political aim, not to promote any goods or services in competition with the Chamber. The only marketplace relevant here is the marketplace of ideas.

Nevertheless, the Chamber repeatedly tries to characterize the press conference not as a political critique of the Chamber's climate-change position, but as merely a "promotion" of the Yes Men's film. First Am. Compl. at 2, 4, 7, 12, 14. That characterization is dubious at best. But even if it were accurate, it would not transform the Yes Men's political speech into commercial speech. The film itself, which documents the Yes Men's political activities, is protected speech. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952). This Court has held that when "promotional material relates to a speech product that is itself protected," that material is not purely commercial speech and may enjoy the protection of the underlying speech product. *Lane v. Random House, Inc.*, 985 F. Supp. 141, 152 (D.D.C. 1995) ("[T]he challenged advertisement is not about laundry detergent [and] the book is protected speech. . . . The court finds no justification for categorizing the Random House advertisement as commercial speech, nor for diminishing the constitutional safeguards to which it is properly entitled."); *see also Gordon and Breach Sci. Pubs. S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1540-1542 (S.D.N.Y. 1994) (scientific journal surveys fell outside the constitutional reach of the Lanham Act because, to the extent they constituted "advertising," the advertising was for a constitutionally protected product and thus was not purely commercial speech); *cf. Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 67 n.14 (1983) (material advertising is "an activity itself protected by the First Amendment" that may fall outside category of commercial speech). To be sure, any advertisement may run afoul of the trademark laws if it makes commercial use of another's trademark to falsely identify the source of the goods or services being advertised—but no such use is even alleged here.

The First Amendment's limitations on trademark law take on additional significance in this case because the challenged activity not only falls outside of the realm of commercial speech, but involves core political speech concerning one of the most weighty and controversial

issues of the day. The Supreme Court's "First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 422 (1992). This case implicates speech in that "highest, most protected position." By its own account, the Chamber seeks to enjoin the Yes Men's speech because it deems that speech to be "destructive of the public discourse." First Am. Compl. at 2.

But the First Amendment does not permit courts to enjoin political speech simply because it may be confusing or hurtful. *Rickert v. State*, 168 P.3d 826 (Wash. 2007) (striking down a statute prohibiting "false statements" in political advertisements). For example, dissemination of a political flyer or a newspaper article about a public figure could not be enjoined, or made the basis for an award of damages under unfair competition law, simply because some readers would likely find it confusing. *O'Connor v. Superior Court*, 223 Cal. Rptr. 357, 361 (1986). "The notion that the government, rather than the people, may be the final arbiter of truth in political debate is fundamentally at odds with the First Amendment." *Rickert,* 168 P.3d at 846. Instead, as Justice Brandeis famously explained, in the political context, "the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927).[2]

---

[2] In 1988, Congress addressed the status of political speech under the trademark laws when it amended the Lanham Act to prohibit only "false designation of origin . . . in *commercial* advertising or promotion." 15 U.S.C. § 1125(a) (emphasis added). At the time of the debate in Congress, "the 1988 presidential campaign was in full swing and the candidates were exchanging strident charges of misrepresentation. The addition of the word 'commercial' was meant to protect political candidates from civil liability under [§ 1125(a) ]." 2 Jerome Gilson, *Trademark Protection and Practice* § 7.02[6][d], at 7-67 (2002). As Representative Kastenmeier, the House co-sponsor of the legislation, explained:

(continued . . .)

Trademark law does not run afoul of these First Amendment principles precisely because it restricts only commercial speech, which is fundamentally different from political speech. "Although some false and misleading statements are entitled to First Amendment protection in the political realm, the special character of commercial expression justifies restrictions on misleading speech that would not be tolerated elsewhere." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 495 (1995) (Stevens, J., concurring) (internal citations omitted). This distinction is justified in part because false or misleading commercial speech "lacks the value that sometimes inheres in false or misleading political speech. Transaction-driven speech usually does not touch on a subject of public debate, and thus misleading statements in that context are unlikely to engender the beneficial public discourse that flows from political controversy." *Id.* at 496. Consistent with the First Amendment, the trademark law may regulate only such "transaction-driven speech."

## II. The Chamber's Trademark Claims Rest on Confusion Irrelevant to the Legitimate Purposes of Trademark Law.

### A. Trademark Law Prohibits Only Use of a Mark That Would Mislead Consumers in Their Purchasing Decisions.

The Chamber's request to enjoin the Yes Men's use of its trademark in a context unrelated to the sale of goods or services stretches trademark law far beyond its proper boundaries. The "limited purpose of trademark protections . . . is to avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into

---

> Political advertising and promotion is political speech, and therefore not encompassed by the term "commercial." This is true whether what is being promoted is an individual candidacy for public office, or a particular political issue or point of view. It is true regardless of whether the promoter is an individual or a for-profit entity.

134 Cong. Rec. at H10,421 (daily ed. Oct. 19, 1988); *see also Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 110-12 (6th Cir. 1995) (examining the legislative history of § 1125(a) and noting that both houses agreed that the provision "exclud[ed] political speech").

buying a product they mistakenly believe is sponsored by the trademark owner." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003) (internal quotations and alterations omitted). As codified in the Lanham Act, trademark law is designed to protect consumers by prohibiting deceptive designations of origin that affect buying decisions—in other words, the "passing off" of goods or services in commerce as those of another. *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980); *see also Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996) ("Trademark infringement and unfair competition laws exist largely to protect the public from confusion anent the actual source of goods or services."); Mark A. Lemley & Mark McKenna, *Irrelevant Confusion*, 62 Stan. L. Rev. 413, 414-16, 427-29 (forthcoming 2010), *available at* http://ssrn.com/abstract=1407793.

Trademarks accomplish their consumer-protection function by assuring consumers that goods with the same trademark both "(1) originated from the same source; and (2) are of equal quality." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009). If companies were not restricted from using the marks of competitors, consumers would have no way of judging the quality of a product's source. Consumers buying soda labeled "Coca-Cola," for example, could not know whether they were buying a product of the Coca-Cola Company or of an impostor. They would thus inevitably be confused and, as a result, would sometimes buy the wrong product by mistake. *See United States v. Giles*, 213 F.3d 1247, 1252 (10th Cir. 2000); Lemley & McKenna, *Irrelevant Confusion*, 62 Stan. L. Rev. at 414-16, 427-29.[3]

---

[3] Sometimes a trademark is used not to represent that a company is the *producer* of product, but that the company has *approved* of the product's quality. In such cases, misleading use of a trademark could cause consumers to falsely believe that the product has met the licensing company's quality standards. For this reason, courts hold that trademark law protects
(continued . . .)

None of the interests protected by trademarks is implicated here. Because the Yes Men used the Chamber's mark only as part of a hoax, there is no competing product for consumers to purchase and thus no possibility that consumers will purchase the wrong product by mistake. In this regard, the case closely resembles *Winship Green Nursing Center*, 103 F.3d 196. There, a company attempting to avert the unionization of its employees distributed literature purporting to be from the union, using union letterhead and the fake signature of a union official. *Id.* at 198-99. The union sued for trademark infringement, and, on appeal, the First Circuit upheld summary judgment for the employer on the ground that the stunt would not likely confuse any employees given the suspicion with which they would view such material in the course of a heated political battle. *Id.* at 207. The court also noted the other "special circumstances" in the case that "point[ed] in the same direction," including "the noncommercial nature of the unauthorized use, the absence of any competition between the parties in the representational services market, and the fact that [the employer] did not appropriate the mark for use 'in connection with' any services of its own." *Id.* The court stated that it was "unwilling to stretch the Lanham Act into unfamiliar contours simply for the sake of punishing conduct that [it] deplore[d]." *Id.* In a concurrence, Judge Saris concluded that the Lanham Act was not implicated because "the deception did not occur in connection with commercial sales or advertising, as required under the Act, but rather in campaign hand-outs." *Id.* at 209.

Rather than allege that any consumers were harmed by the Yes Men's hoax, the Chamber alleges that the use of its mark "damaged the goodwill and reputation" of its trademark. First

---

licensed use of trademarks to designate quality. *See* Lemley & McKenna, *Irrelevant Confusion*, 62 Stan. L. Rev. at 432-34. Licensing of a trademark in ways that do not designate quality, however, is not protected by trademark law and can lead to the invalidation of the trademark. *See, e.g., Stanfield v. Osborne Indus.*, 52 F.3d 867, 871-72 (10th Cir. 1995).

Am. Compl. ¶ 45. The trademark laws, however, "exist not to protect trademarks, but . . . to protect the consuming public from confusion, concomitantly protecting the trademark owner's right to a non-confused public." *James Burrough Ltd. v. Sign of Beefeater*, 540 F.2d 266, 276 (7th Cir. 1976). A company's interest in its trademark is therefore protectable "only to the extent that [the trademark] distinguishes a producer's goods" from those of its competitors, and thus only if there is a risk of misleading consumers in their purchasing decisions. *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 460-61 (5th Cir. 2003). For this reason, courts hold that the Lanham Act is not implicated where the alleged infringer uses a trademark for purposes of commentary or criticism rather than to identify goods or services for sale. In *Taubman*, for example, the defendant set up a website at the domain name shopsatwillowbend.com to comment on a shopping mall called "Shops at Willow Bend." 319 F.3d at 771-72. When the shopping mall sued for infringement, the court held that the defendant's use of the trademark in his domain name fell outside the boundaries of the Lanham Act because the use was not "in connection with the sale . . . or advertising of any goods or services." *Id.* at 774-76, 777-78. Similarly, the court in *Bosley Medical Institute* held that the defendant's use of the domain name bosleymedical.com to criticize Bosley Medical Institute, Inc. did not implicate the Lanham Act because the defendant did not offer a competing service. 403 F.3d at 679-80; *see also CPC Int'l, Inc. v. Skippy Inc.*, 214 F.3d 456, 461-62 (4th Cir. 2000) (holding that the purposes of the trademark laws are related to giving consumers accurate information about commercial products and do not prevent critics from commenting on commercial products).

Although courts sometimes describe trademarks as a property right of the trademark owner, "[a] trademark is not property in the ordinary sense." *Lucasfilm*, 622 F. Supp. at 933 (internal quotation omitted). Rather, the "'property right' or protection accorded a trademark

owner can only be understood in the context of trademark law and its purposes." *Job's Daughters*, 633 F.2d at 919. When a trademark owner files suit, it is acting as a proxy for the consumer interests that trademarks are primarily designed to protect. *See* Lemley & McKenna, *Irrelevant Confusion*, 62 Stan. L. Rev. at 434. What is protected, however, is not the trademark owner's property right in the trademark, but the public's right to be free from confusion. In the words of Justice Holmes, a trademark "only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his." *Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368 (1924); *see also Job's Daughters*, 633 F.2d at 919 ("A trademark owner has a property right only insofar as is necessary to prevent consumer confusion as to who produced the goods and to facilitate differentiation of the trademark owner's goods.").[4]

The only way in which the Chamber alleges that the Yes Men's hoax caused confusion was in "prevent[ing] the public and the press from knowing [its] true position," at least temporarily, on global warming issues. First Am. Compl. at 1. Confusion over the origin or attribution of ideas, however, is not the sort of confusion the trademark laws were designed to address. In *Lucasfilm*, for example, the creator of the *Star Wars* movies sued the makers of political ads that used the words "Star Wars" to describe the Reagan administration's Strategic Defense Initiative. 622 F. Supp. at 932. The film company argued that the "defendants' efforts to persuade the public of their viewpoint [was] a 'service' within the meaning of the Lanham Act." *Id.* at 934. Judge Gesell disagreed, holding that "[p]urveying points of view is not a service," and that, even if it were, "television messages that are only used to express those ideas do not sell or

---

[4] By protecting trademark owners, trademarks also indirectly benefit consumers by giving companies an incentive to produce higher-quality products. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164 (1995); *see also* Lemley & McKenna, *Irrelevant Confusion*, 62 Stan. L. Rev. at 414 & n.3.

advertise them." *Id.* The court concluded that, because the defendants were "not engaged in selling anything but ideas," there could be no trademark infringement. *Id.* at 934. For the same reason, public confusion about the Chamber's views on global warming—even assuming such confusion exists—is not actionable under the trademark laws. *See also Reddy Comms., Inc. v. Envt'l Action Found.*, 477 F. Supp. 936, 945-46 (D.D.C. 1979) (rejecting an energy company's claim that an environmental group's caricature of its service mark violated the Lanham Act where the group did not use the mark in connection with the sale of any competing goods or services).

That is not to say, however, that nonprofit organizations such as the Chamber have no protection under trademark law. Courts have held competition for the solicitation of donations and the provision of membership benefits to be subject to the Lanham Act. *See United We Stand Am., Inc. v. United We Stand, Am. N.Y. , Inc.*, 128 F.3d 86, 90 (2d Cir. 1997). Thus, the Chamber might have an infringement claim if there were a *competing* nonprofit group using the same name in a way likely to mislead potential members. *See, e.g.*, *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 559 F. Supp. 1337, 1341 n.1, 1342 (D.D.C. 1983), *rev'd on other grounds*, *NAACP v. NAACP Legal Def. & Educ. Fund, Inc.*, 753 F.2d 131 (D.C. Cir. 1985) (granting summary judgment for trademark infringement to a nonprofit where "[e]ven sophisticated contributors" had made "mistakes in trying to make contributions to one or the other").[5] A hoax, however, is not a good or a service that a consumer might purchase, much less a good or service in competition with any offered by the Chamber. *See Lucasfilm*, 622 F. Supp. at 934 (concluding

---

[5] The Chamber itself has made such claims. *See, e.g.*, *Chamber of Commerce v. United States Hispanic Chamber of Commerce Found.*, Nos. 08-00076, 08-00077, 08-00079 (D.D.C. 2008); *Chamber of Commerce v. United States Hispanic Chamber of Commerce Found.*, 2008 WL 506271 (S.D.N.Y. 2008); *Chamber of Commerce v. United States Chamber of Shipping*, No. 97-01818 (D.D.C. 1997).

that there was no infringement where the defendants had not used the trademark "as a title for their organization or propaganda campaign in a way that might create confusion among contributors or supporters"). This case therefore goes far beyond the proper function of trademark law—"to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute." *General Elec. Co. v. Speicher*, 877 F.2d 531, 534-35 (7th Cir. 1989).

> **B.     The Likelihood of Confusion Test Is Satisfied Only When Consumers Are Confused About the Origin of Competing Goods.**

To evaluate whether a particular use of a trademark constitutes infringement, courts use the "likelihood of confusion" test. The test asks "whether use of the plaintiff's trademark by the defendant is 'likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association' of the two products." *Mattel, Inc.*, 353 F.3d at 806-807. Courts typically approach the test by examining a non-exclusive list of factors that may contribute to consumers being misled, including "(1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) evidence of actual confusion; (5) the defendant's purpose or reciprocal good faith in adopting its own mark; (6) the quality of defendant's product; and (7) the sophistication of the buyers." *Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 48 (D.D.C. 2006). Application of the factors is flexible, and no one factor is dispositive. *Id.*

The common thread among the factors is that, applied properly, each bears on the "ultimate question" in a trademark case: "the likelihood of consumer confusion as to the origin of the product or service bearing the allegedly infringing mark." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). Most of the factors—the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the quality of the

defendant's product, and the defendant's intent to confuse—go directly to the question whether consumers encountering the trademarks in the marketplace are likely to buy the wrong product by mistake. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898-99 (7th Cir. 2001). Courts often regard the final factor—actual confusion—as the most important factor because it demonstrates that the defendant's use of a mark has in fact misled consumers. *See George & Co.*, 575 F.3d at 398.

Courts also recognize, however, that the relative importance of the factors varies depending on the context of the case. *See, e.g.*, *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1316 (N.D. Ga. 2008); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 498-99 (E.D. Va. 2006). "It is only when the feature in fact identifies source and the imitation is likely to deceive prospective purchasers who care about source that the imitator is subject to liability." *West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 596 (6th Cir. 1955). In other words, the test requires more than just likely consumer confusion—the consumer must likely be confused in a way that is material to trademark law. *See Taubman*, 319 F.3d at 776 ("[T]he only important question is whether there is a likelihood of confusion *between the parties' goods or services*.").

In an ordinary infringement case, consumers are more likely to be confused when marks are very similar, appear on similar products, are marketed in similar channels, and appeal to the same class of consumers. These factors are not apposite, however, when the defendant is not marketing any products that compete with the plaintiff's goods or services. Moreover, the factors have little or no relevance to situations involving parody, satire, criticism, or other forms of commentary on a trademark or its owner. *See, e.g.*, *Smith*, 537 F. Supp. 2d at 1316; *Haute Diggity Dog*, 464 F. Supp. 2d at 499-500. In those cases, the defendant will always have

intentionally copied the mark, often exactly or quite closely, to make it recognizable to the intended audience. *Haute Diggity Dog*, 464 F. Supp. 2d at 499. In light of these limitations, courts apply the factors cautiously, and only to the extent that they shed light on the question of whether the defendant's use of the mark is likely to confuse consumers in their purchasing decisions. *See Entrepreneur Media, Inc.*, 279 F.3d at 1141.[6]

The court should be equally careful about applying the likelihood of confusion test here, where the alleged trademark infringement is a hoax. In this unique context, examination of the traditional factors is not helpful because the purpose of the prank was to closely impersonate the Chamber. Indeed, the prank's success depended on achieving some level of temporary confusion. Nevertheless, the Yes Men's use of the Chamber's trademark "cannot mislead consumers into buying a competing product" because nobody intending to pay for membership to the Chamber could mistakenly become a member of the Yes Men. *Bosley Med. Inst.*, 403 F.3d at 679-80. Thus, regardless of whether consumers fell for the stunt, "[t]he dangers that the

---

[6] Although the Chamber's trademark dilution claim does not require a likelihood of confusion, it still requires an improper association between the Chamber's trademark and *some other product*—a showing that the Chamber cannot make here. "Dilution works its harm not by causing confusion in consumers' minds regarding the source of a good or service, but by creating an association in consumers' minds between a mark and a different good or service." *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 805 (9th Cir. 2002). The theory behind dilution is that, when companies trade on the distinctiveness of famous trademarks to sell their own goods and services—such as would be the case with Kodak pianos or Buick aspirin—the trademark over time can "lose its ability to serve as a unique identifier of the plaintiff's product." *Id.*; *see* Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. at 1698. Here, the Chamber is not contending that consumers will associate the Chamber's mark with any product or service of the Yes Men, thereby diluting the mark's uniqueness, but that members of the public will, at least temporarily, wrongly attribute the Yes Men's press conference to the Chamber. Such a "fear of over-attribution does not give rise to a tenable blurring claim." *Wham-O, Inc. v. Paramount Pictures Corp.*, 286 F. Supp. 2d 1254, 1262 (N.D. Cal. 2003). Indeed, using a trademark to refer to the trademark owner itself, rather than to some unrelated good or service, can never dilute that mark because such a use, if anything, strengthens the association between the trademark and its owner. *See id.*

Lanham Act was designed to address are simply not at issue." *Id.*; *see also Taubman*, 319 F.3d at 776 (holding that, even if visitors to a website would likely be confused as to the site's origin, the trademark laws were inapplicable as long as there was no confusion as to the origin of the parties' goods and services).

## CONCLUSION

The Chamber's trademark and unfair competition claims should be dismissed.

Respectfully submitted,

/s/Gregory A. Beck
Gregory A. Beck (DC Bar # 494479)
Deepak Gupta (DC Bar # 495451)
Margaret Kwoka (DC Bar # 988255)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
202-588-1000
Email: dgupta@citizen.org, gbeck@citizen.org, mkwoka@citizen.org
Counsel for Amicus Curiae Public Citizen