## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,** )<br>)<br>)<br>) | |
| **Plaintiff,** )<br>) | |
| **v.** ) | **Case No.: 1:09-cv-02014 - (RWR)** |
| )<br>**JACQUES SERVIN (aka ANDY BICHLBAUM aka HINGO SEMBRA), IGOR VAMOS (aka MIKE BONANNO), SUPPORT AND COMMITMENT, INC., DAVID SIEVERS, MORGAN GOODWIN, SARAH MURPHY, and JOHN and JANE DOES NOS. 1-20,** )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| **Defendants.** )<br>) | |

## PLAINTIFF'S OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Plaintiff, the Chamber of Commerce of the United States of America (the "Chamber"), hereby opposes Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (Docket No. 15). The Chamber's opposition is based on this Memorandum of Points and Authorities, all papers on file in this action, all matters properly subject to judicial notice, and such other and further matters as may be presented to the Court prior to the determination of the motion.

Dated this 5th day of February, 2010.

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 2

II.  FACTUAL BACKGROUND ......................................................................... 3

   A.   The Parties ............................................................................................. 3

     1.   Chamber of Commerce of the United States of America ............................... 3

     2.   The Yes Men ................................................................................ 4

     3.   Avaaz Action Factory DC ................................................................ 5

   B.   The Scheme To Misappropriate The Chamber's Intellectual Property
     In Order To Cause Confusion In Traditional And New Media ......................... 6

   C.   This Lawsuit ......................................................................................... 8

III.  SUMMARY OF ARGUMENT ....................................................................... 10

IV.  DEFENDANTS HAVE MISCHARACTERIZED THE STANDARD OF REVIEW ..... 14

V.   IDENTITY THEFT IS NOT PROTECTED BY THE FIRST AMENDMENT. .......... 18

   A.   The First Amendment Does Not Protect The Defendants' Misappropriation
     Of The Chamber's Name And Intellectual Property. ................................... 18

     1.   The Defendants Were Not Engaged In A "Parody." .................................. 18

     2.   Parody Is Not, In Any Event, Fully Protected by the First Amendment. ............ 20

VI.  DEFENDANTS HAVE ENGAGED IN MULTIPLE VIOLATIONS
     OF THE LANHAM ACT ................................................................................ 29

   A.   The Chamber Has Properly Alleged Trademark Infringement,
     Including The Requirement That The Use Be "In Commerce." ....................... 31

   B.   Defendants' Use Of The Chamber's Marks Was Not Nominative ................... 34

   C.   Defendants Diluted The Chamber's Marks. .............................................. 36

   D.   The Defendants' Actions Amount to False Advertising. ............................... 37

   E.   Defendants Have Engaged In Cyberpiracy ............................................... 38

i

VII.    DEFENDANTS' CONDUCT IS ACTIONABLE UNDER STATE LAW. .................... 40

A.   The Complaint States A Valid Claim For Unlawful Trade Practices
Under D.C. Code Section 28-3904. ................................................................ 40

B.   The Complaint States A Valid Claim For Injurious Falsehood....................................... 44

    1.   The Defendants' Unsubstantiated Assertion That They Did Not Act With Reckless
Disregard Of The Truth Involves A Factual Issue That Cannot Be Resolved On A
Motion To Dismiss. ..................................................................................... 46

    2.   The Complaint Adequately Alleges That The Defendants' False Statements Caused
Pecuniary Loss. ......................................................................................... 49

C.   The Complaint States A Valid Claim For Prima Facie Tort............................................. 51

VIII.   THE DEFENDANTS' CLAIM FOR ATTORNEYS' FEES IS UNFOUNDED............. 53

# TABLE OF AUTHORITIES

**Federal Cases**

*Academy of Motion Picture Arts and Sci. v.*
 *Creative House Promotions, Inc.*,
   944 F.2d 1446 (9th Cir. 1991) ......................................................................... 37

*Adler v. Vision Lab Telecomm, Inc.*,
   393 F. Supp. 2d 35 (D.D.C. 2005) ................................................................... 41

*Affum v. United States*,
   566 F.3d 1150 (D.C. Cir. 2009) ....................................................................... 41

*ALPO Petfoods, Inc. v. Ralston Purina Co.*,
   720 F. Supp. 194 (D.D.C. 1989) ...................................................................... 38

*ALPO Petfoods v. Ralston Purina Co.*,
   913 F.2d 958 (D.C. Cir. 1990) ......................................................................... 38

*America Online, Inc. v. IMS*,
   24 F. Supp. 2d 548 (E.D. Va. 1998) ................................................................ 37

*Appleseed Found., Inc. v. Appleseed Inst., Inc.*,
   981 F. Supp. 672 (D.D.C. 1997) ................................................... 32, 33, 36, 37

*Anheuser-Busch, Inc. v. Balducci Publ'ns, Inc.*,
   28 F.3d 769 (8th Cir. 1994) ....................................................................... 20, 23

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ..................................................................................... 14

*Art Metal-USA v. United States*,
   577 F. Supp. 182 (D.D.C. 1983) ...................................................................... 51

*Asay v. Hallmark Cards, Inc.*,
   594 F.2d 692 (8th Cir. 1979) ........................................................................... 16

*Bell Atlantic Corp. v. Twomble*,
   550 U.S. 544 (2007) ......................................................................................... 14

*Bosley Medical Institute, Inc. v. Kremer*,
   403 F.3d 672 (9th Cir. 2005) ........................................................................... 27

*Bramesco v. Drug Computer Consultants*,
    834 F. Supp. 120 (S.D.N.Y. 1993) ....................................................... 16

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999) ............................................................ 28

*Browne v. McCain*,
    612 F. Supp. 2d 1125 (C.D. Cal. 2009) ........................................ 21, 33, 34, 36

*Bucci v. Kaiser Permanente Found. Health Plan*,
    278 F. Supp. 2d 34 (D.D.C. 2003) ....................................................... 52

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................... 18, 22

*Caplan v. Am. Baby, Inc.*,
    582 F. Supp. 869 (S.D.N.Y. 1984) ....................................................... 17

*Cardtoons, L.C. v.*
 *Major League Baseball Players Ass'n*,
    95 F.3d 959 (10th Cir. 1996) ............................................................ 24

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
    284 F.3d 302 (1st Cir. 2002) ............................................................ 38

*Charles Atlas, Ltd. v. DC Comics, Inc.*,
    112 F. Supp. 2d 330 (S.D.N.Y. 2000) .................................................... 25

*Christian Scientist Bd. of Dirs. v. Robinson*,
    123 F. Supp. 2d 965 (W.D.N.C. 2000) ................................................ 21, 33

*Cliffs Notes, Inc. v.*
 *Bantam Doubleday Dell Pub. Group*,
    886 F.2d 490 (2d Cir. 1989) ........................................................ 21, 23, 24

*Coca-Cola Co. v. Purdy*,
    382 F.3d 774 (8th Cir. 2004) ........................................................ 21, 39

*Coles v. Washington Free Weekly, Inc.*,
    881 F. Supp. 26 (D.D.C. 1995) .......................................................... 16

*Dallas Cowboys Cheerleaders, Inc. v.*
 *Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979) ............................................................ 21

*Dan-Foam A/S & Tempur-Pedic, Inc. v.*
*Brand Named Beds, LLC*,
  500 F. Supp. 2d 296 (S.D.N.Y. 2007)..................................................... 37

*Eli Lilly & Co. v. Natural Answers, Inc.*,
  233 F.3d 456 (7th Cir. 2000) .................................................................. 28

*Eveready Battery Co. v. Adolph Coors Co.*,
  765 F. Supp. 440 (N.D. Ill. 1991) .......................................................... 26

*Everco Industs., Inc. v. O.E.M. Prods Co.*,
  63 F.R.D. 662 (N.D. Ill. 1974)................................................................ 50

*Federal Deposit Ins. Corp. v. Bathgate*,
  27 F.3d 850 (3d Cir. 1994)...................................................................... 16

*Federal Ins. Co. v. Speight*,
  220 F. Supp. 90 (E.D.S.C. 1963) ............................................................ 41

*Federal Prescription Serv., Inc. v.  Am. Pharm. Ass'n*,
  471 F. Supp. 126 (D.D.C. 1979).......................................................... 16, 17

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
  12 F. Supp. 2d 1068 (C.D. Cal. 1998) .................................................. 21, 29

*Fisher v. Dees*,
  794 F.2d 432 (9th Cir. 1986) .................................................................. 26

*Flowers v. Carville*,
  310 F.3d 118 (9th Cir. 2002) ................................................................ 16, 46

*Ford v. ChartOne, Inc.*,
  908 A.2d 72 (D.C. 2006) ........................................................................ 42

*Franchise Realty Interstate Corp. v.*
 *San Francisco Local Joint Executive Bd. of Culinary* Workers,
  542 F.2d 1076 (9th Cir. 1976) ................................................................ 17

*Hickman v. W. Heating and Air Conditioning Co.*,
  207 F. Supp. 832 (N.D. Ind. 1962) ........................................................ 41

*Highland Renovation Corp. v. Hanover Ins. Group*,
  620 F. Supp. 2d 79 (D.D.C. 2009)........................................................... 15

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
  276 F.3d 160 (3d Cir. 2001).................................................................... 31

*Hoyte v. Yum! Brands, Inc.*,
  489 F. Supp. 2d 24 (D.D.C. 2007) ............................................................... 42

*Hustler Magazine, Inc. v. Falwell*,
  485 U.S. 46 (1988) ................................................................... 26, 48, 49

*Hutchinson v.* Proxmire,
  443 U.S. 111 (1979) ....................................................................... 46

*Hydro-Tech Corp. v. Sundstrand Corp.*,
  673 F.2d 1171 (10th Cir. 1982) ............................................................ 17

*Independent Commc'ns Network, Inc. v.*
  *MCI Telecomm. Corp.*,
  657 F. Supp. 785 (D.D.C. 1987) ........................................................... 40

*Jaffe v. Pallotta TeamWorks*,
  374 F.3d 1223 (D.C. Cir. 2004) ............................................................ 52

*Jews for Jesus v. Brodsky*,
  993 F. Supp. 282 (D.N.J. 1998) ............................................................ 21

*Jordache Enters., Inc. v. Wyld, Ltd.*,
  828 F.2d 1482 (10th Cir. 1987) ............................................................ 23

*Klayman v. Judicial Watch, Inc.*,
  247 F.R.D. 10 (D.D.C. 2007) ........................................................... 39, 40

*Leibovitz v. Paramount Pictures Corp.*,
  137 F.3d 109 (2d Cir. 1998) ............................................................... 26

*Letica Corp. v. Sweetheart Cup Co.*,
  790 F. Supp. 702 (E.D. Mich. 1992) ....................................................... 17

*Lewis v. District of* Columbia,
  535 F. Supp. 2d 1 (D.D.C. 2008) .................................................... 14, 46, 52

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
  811 F.2d 26 (1st Cir. 1987) ............................................................... 23

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, LLC,
  507 F.3d 252 (4th Cir. Va. 2007) ......................................................... 36

*Lucasfilm Ltd. v. Media Mkt. Group, Ltd.*,
  182 F. Supp. 2d 897 (N.D. Cal. 2002) ..................................................... 26

*Lyons Partnership v. Giannoulas*,
    179 F.3d 384 (5th Cir. 1999) ........................................................ 18

*MasterCard Int'l, Inc. v. Nader 2000 Primary Comm., Inc.*,
    No. 00 Civ. 6086 (GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) .......................... 26

*Mattel, Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) ........................................................ 24

*MGM-Pathe Commc'ns Co. v. Pink Panther Patrol*,
    774 F. Supp. 869 (S.D.N.Y. 1991)..................................................... 21

*Miller & Son Paving, Inc. v. Wrightstown Twp. Civic Ass'n*,
    443 F. Supp. 1268 (E.D. Pa. 1978) ................................................... 17

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
    818 F.2d 254 (2d Cir. 1987)......................................................... 28

*N.A.A.C.P. v. N.A.A.C.P. Legal Def. and Educ. Fund*,
    559 F. Supp. 1337 (D.D.C. 1983) .................................................... 32

*National R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*,
    592 F. Supp. 2d 86 (D.D.C. 2009) ................................................... 14

*New Kids on the Block v. News Am. Publ'ns, Inc.*,
    971 F.2d 302 (9th Cir. 1992) ....................................................... 35

*Nike, Inc. v. "Just Did It", Enters.*,
    6 F.3d 1225 (7th Cir. 1993) ...............................................20-21, 22, 25

*Newborn v. Yahoo!, Inc.*,
    437 F. Supp. 2d 1 (D.D.C. 2006) .................................................... 54

*Noxell Corp. v. Firehouse No. Bar-B-Que Rest.*,
    771 F.2d 521 (D.C. Cir. 1985) ...................................................... 54

*OBH, Inc. v. Spotlight Magazine, Inc.*,
    86 F. Supp. 2d 176 (W.D.N.Y. 2000) ................................................. 21

*Oregon Natural Res. Council v. Mohla*,
    944 F.2d 531 (9th Cir. 1991) ....................................................... 17

*Pannonia Farms, Inc. v. Re/Max Int'l, Inc.*,
    407 F. Supp. 2d 41 (D.D.C. 2005).................................................... 54

*Partido Revolucionario Dominicano (PRD)*
*Seccional Metropolitana DE Washington-DC, Maryland Y Virginia*
*v. Partido Revolucionario Dominicano Seccional*
*DE Maryland Y Virginia,*
    312 F. Supp. 2d 1 (D.D.C. 2004) ...................................................... 30, 32, 36

*People for the Ethical Treatment of Animals, Inc. v. Doughney,*
    263 F.3d 359 (4th Cir. 2001) ..................................................................... 21

*Perkins v. Marriott Int'l,*
    945 F. Supp. 282 (D.D.C. 1996) .................................................................. 51

*Pfizer Inc., v. Sachs,*
    No. 08-cv-8065, 2008 WL 5596131 (S.D.N.Y. Nov. 14, 2008)...................................... 21

*Phantom Touring, Inc. v. Affiliated Publ'ns,*
    953 F.2d 724 (1st Cir. 1992)...................................................................... 16

*Pierce County, Wash. v. Guillen,*
    537 U.S. 129 (2003)............................................................................. 41

*Pizza Hut, Inc. v. Papa John's Int'l., Inc.,*
    227 F. 3d 489(5th Cir. 2000) .................................................................... 38

*Planned Parenthood Fed'n v. Bucci,*
    No. 97 Civ. 0629 (KMW) 1997 WL 133313 (S.D.N.Y. 1997) ...................................... 21

*Promatek Indus., Ltd v. Equitrac Corp.,*
    300 F.3d 808 (7th Cir. 2002) .................................................................... 28

*Robinson v. Eli Lilly & Co.,*
    535 F. Supp. 2d 49 (D.D.C. 2008) ............................................................... 52

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989)..................................................................... 24

*Rubin v. Brooks/Cole Publ'g Co.,*
    836 F. Supp. 909 (D. Mass. 1993) ............................................................... 44

*Sadowy v. Sony Corp. of Am.,*
    496 F. Supp. 1071 (S.D.N.Y. 1980)............................................................... 53

*SMJ Group, Inc v. 417 Lafayette Restaurant, LLC,*
    439 F. Supp 2d 281, 290 (S.D.N.Y. 2006)........................................................28, 33, 36-37

*Spanish Int'l Commc'ns Corp. v. Leibowitz,*
    608 F. Supp. 178 (S.D. Fla. 1985) ................................................................ 17

*Synergistic Int'l, LLC v. Korman,*
    402 F. Supp. 2d 651 (E.D. Va. 2005) .......................................................... 43

*Synergistic Int'l, LLC v. Korman,*
    470 F.3d 162 (4th Cir. 2006) ...................................................................... 43

*Taubman Co. v. Webfeats, Inc.,*
    319 F.3d 770 (6th Cir. 2003) ................................................................ 27, 28

*Trade Media Holdings Ltd., v. Huang & Assocs.,*
    123 F. Supp. 2d 233 (D.N.J. 2000) ............................................................ 21

*United States ex rel. Smith v. Yale Univ.,*
    415 F. Supp. 2d 58 (D. Conn. 2006) .......................................................... 16

*United States ex rel. Totten v. Bombardier Corp.,*
    380 F.3d 488 (D.C. Cir. 2004) .............................................................. 16, 42

*Union Bank v. Wolas,*
    502 U.S. 151 (1991) .................................................................................... 41

*United We Stand Am., Inc. v.*
 *United We Stand, Am. N.Y., Inc.,*
    128 F.3d 86 (2d Cir. 1997) .......................................................... 19, 31, 33

*Washington Post v. Keogh,*
    365 F.2d 965 (D.C. Cir. 1966) .................................................................... 16

*Williams v. The Purdue Pharma Co.,*
    297 F. Supp. 2d 171(D.D.C. 2003) ............................................................ 42

*Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.,*
    809 F. Supp. 267 (S.D.N.Y. 1992) ............................................................ 25

## State Cases

*Advance Music Corp. v. American Tobacco Co.,*
    296 N.Y. 79 (N.Y. 1946) ............................................................................ 51

*Andrews v. Steinberg,*
    122 Misc. 2d 468 (N.Y. Sup. Ct. 1983) .................................................... 53

*Board of Educ. v. Farmingdale Classroom Teachers Ass'n.*,
  38 N.Y.2d 397 (N.Y. 1975) ............................................... 51

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
  762 N.E.2d 303 (Mass. 2002) ........................................... 43

*DeMicco Bros. v. Consol. Edison Co.*,
  8 A.D.3d 99 (N.Y. App. Div. 1st Dep't 2004) .................. 51

*Grayson v. AT&T Corp.*,
  980 A.2d 1137 (D.C. 2009) .............................................. 43

*In re M.M.D. & B.H.M.*,
  662 A.2d 837 (D.C. App. 1995) ........................................ 41

*Kevin Spence & Sons, Inc. v. Boar's Head Provisions Co.*,
  5 A.D.3d 352 (N.Y. App. Div. 2d Dep't 2004) ............... 51

*Meyers v. Plan Takoma, Inc.*,
  472 A.2d 44 (D.C. App. 1983) .......................................... 16

*Moss v. Stockard*,
  580 A.2d 1011 (D.C. 1990) .............................................. 48

*New Times, Inc. v. Isaacks*,
  146 S.W.3d 144 (Tex. 2004) ....................................... 25, 26

*Pillsbury Co. v. Milky Way Prods., Inc.*,
  215 U.S.P.Q. 124 (N.D. Ga. 1981) ................................... 21

*Pulaski Constr. Co. v. Air Frame Hangars, Inc.*,
  950 A.2d 868 (N.J. 2008) ................................................. 53

*San Francisco Bay Guardian, Inc. v. Superior Ct.*,
  17 Cal. App. 4th 655 (1993) ............................................. 26

## Federal Statutes

15 U.S.C. §§ 1114(1)(a) & (b) ................................................ 31

15 U.S.C. § 1125 (c)(2)(C) (2006) ........................................... 37

15 U.S.C. § 1125(c)(3)(A) ....................................................... 36

15 U.S.C. § 1125(d)(1)(B)(i) ................................................................................ 38, 39

Anti-Cyber Squatting Consumer Protection Act, Pub. L. No. 106-113 (1999)............................ 2


**State Statutes**

D.C. St. § 28-3901(a)(1) ....................................................................................... 41

D.C. St. § 28-3901(a)(3) ....................................................................................... 44

D.C. St. § 28-3901(a)(7) ....................................................................................... 44

D.C. St. § 28-3901(b)(1) ....................................................................................... 41

D.C. St. § 28-3901(c) ............................................................................................ 41

D.C. St. § 28-3904 ................................................................................................. 40

D.C. Code § 28-3905(k)(1) (1981 ed.) ................................................................. 40

D.C. Code § 28-3905(k)(1) (2001 ed.) ............................................................. 41, 42

Va. Code Ann. § 59.1-198 ..................................................................................... 43

Va. Code Ann. § 59.1-204A ................................................................................... 43


**Rules**

Fed. R. Civ. P. 8(a)(2)........................................................................................... 14


**Legislative Materials**

145 Cong. Rec. 13,661 (June 21, 1999)................................................................... 2


**Other Authorities**

2 MOORE'S FEDERAL PRACTICE (3RD) § 9.08[1][b] ...................................................... 50

American Heritage Dictionary 1317 (3d ed. 1992) ................................................. 18

Clarissa Aykroyd, SAVAGE SATIRE: THE STORY OF JONATHAN SWIFT
 (Morgan Reynolds Pub. 2006).............................................................................. 20

J. Thomas McCarthy, 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
 § 30:101 (4th ed. 2009) ................................................................................. 54

RESTATEMENT (SECOND) OF TORTS § 623A,
 Comment a .................................................................................................... 45

RESTATEMENT (SECOND) OF TORTS § 623A ............................................... 45

RESTATEMENT (SECOND) OF TORTS § 870 ................................................. 51


Alan D. Sokal, *Transgressing the Boundaries: Toward a Transformative Hermeneutics of
Quantum Gravity*, 46 Social Text 47 (1996) ................................................. 20

*Music Company Settles Lawsuit*, Times Daily,
 June 15, 1996 at B1 col. 1 .............................................................................. 22

WEBSTER'S NEW WORLD DICTIONARY at 1034 (2d. coll. ed. 1984) ........................................... 18

## I.      INTRODUCTION

As the Defendants have publicly stated, their actions against the Chamber constituted "identity theft." The Complaint alleges that Defendants did so for the purpose of inflicting commercial harm on the Chamber and extracting commercial gain for Defendants. Commercial identity theft and cyberpiracy are two of the most serious concerns facing American consumers and businesses in the digital age,[1] and now the Chamber, a leading advocate for intellectual property interests (*see* First Am. Compl. ¶ 1), finds itself a victim of such pernicious attacks.

Defendants stole the Chamber's name, registered trademarks and copyrighted software to masquerade as the Chamber on the Internet and in the media as part of a scheme to promote their commercial movie venture and online merchandise business. Defendants even took deliberate steps to conceal and maintain their identity theft after being challenged. They admit in their motion to dismiss that they intended to confuse the news media, the business community and consumers into believing that the Chamber had made certain statements about its position on climate change that it had not made. Because the Chamber's *business* is policy advocacy (it does not manufacture any goods), it is vital to its financial and reputational interest that the public is *not* confused about the Chamber's policy positions and advocacy activities.

---

[1] *See, e.g.,* 145 Cong. Rec. 13,661 (June 21, 1999) ("This legislation will combat a new form of high-tech fraud that is causing confusion and inconvenience for consumers, increasing costs for people doing business on the internet, and posing an enormous threat to a century of pre-Internet American business efforts. … [T]he 'cybersquatter' can engage in a variety of nefarious activities ─ from the relatively-benign parody of a business or individual … to the destructive worldwide slander of a centuries-old brand name. … Whether it's people extorting companies by registering company names, misdirecting Internet users to inappropriate cites, or otherwise attempting to damage a trademark that a business has spent decades building into a recognizable brand, persons engaging in cybersquatting activity should be held accountable for their actions.") (statement of sponsor Sen. Abraham in support S. 1255, 106th Congress). The Senate bill and its counterpart, H.R. 3028, were passed, but were subsequently replaced by the similar Anti-Cybersquatting Consumer Protection Act, Title III of S. 1948, 106th Congress, which became the final appendix to Public Law 106-113 (1999).

HUNTON & WILLIAMS LLP

Not surprisingly, Defendants are now attempting to reverse-engineer their actions to fit under various legal theories.  They are also attempting to make this case into a referendum on climate change and the Chamber's misrepresented views on that issue.  Most importantly, they are asking this Court to broadly expand the legal defenses that would be made available to *all* perpetrators of commercial identity theft, cyberpiracy and misappropriation of intellectual property.  Fortunately, the Court is not obliged to extend categorical constitutional protection to otherwise unlawful acts merely because Defendants targeted the Chamber's core business of *public policy* as their means of inflicting commercial harm and extracting commercial gain.  The Complaint alleges (and the factual record is clear) that Defendants deliberately misappropriated the Chamber's intellectual property rights with the explicit intent of deception, *not* imitation.  The Defendants' unauthorized and wrongful use of the Chamber's intellectual property for their own commercial gain has damaged the Chamber's reputation and goodwill, and caused it to incur other expenses as well.  Thus, the motion to dismiss fails.

## II.      FACTUAL BACKGROUND

### A.    The Parties

#### 1.      Chamber of Commerce of the United States of America

The Chamber is a not-for-profit business incorporated in the District of Columbia, with its principal place of business in the District.  (First Am. Compl ¶ 1.)  It represents the interests of individual businesses, state and local chambers and industry associations nationwide before the news media, the courts, executive branch agencies and federal and state legislative bodies.  (*Id.*)  The goodwill and reputation of the Chamber are embodied in its famous and distinctive marks, U.S. CHAMBER OF COMMERCE®, THE SPIRIT OF ENTERPRISE®, and its Eagle and Stars Design Mark, all of which are registered.  (*Id.* ¶¶ 37-44 & Exs. 1-3.)  The oldest of

these marks has been in use since 1915.  (*Id.* ¶ 40.)  The Chamber uses its marks on its Web site

(*id.* ¶ 38),[2] and in other media such as press releases (*id.* ¶ 39).

### 2.   The Yes Men

Defendants Jacques Servin and Igor Vamos are con artists who have operated under

many aliases to perpetrate their schemes.  (*Id.* ¶¶ 2-3.)  They characterize their business as

"identity correction" — posing as other persons for the purpose of misrepresenting their positions

to the public.  This is just another way to say "identity theft."[3]  (Memorandum of Points and

Authorities in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint

("Brief") at 4 & n.4.)  Servin and Vamos film themselves as they conduct these shams for use in

their theatrical-release movies, such as *The Yes Men Fix The World*.  (First Am. Compl. ¶¶ 2-

3,12-13.)  They operate Web sites under the trade name the "Yes Men,"[4] where they sell

merchandise and promote their movies.[5]  (*Id.* ¶¶ 12-14.)  They also encourage people to create

fake Web sites emulating those of their targets.[6]  One leading movie review authority describes

---

[2] *See* http://www.uschamber.com/default.

[3] As Servin and Vamos wrote for the promotion of their current movie, "We call this 'identity correction,' which is like 'identity theft' except that everyone benefits." http://www.landmarktheatres.com/mn/yesmen.html (last visited Feb. 2, 1010).  Movie reviewers in general have adopted the Yes Men's own description of their antics as identity theft.  *See*, e.g., http://www.adpulp.com/archives/2009/12/bad_practices_m.php?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+Adpulp+%28AdPulp.com+-+Daily+juice+from+the+Ad+Biz%29 ("The [Yes Men], led by [alias] Mike Bonnano and [alias] Andy Bichlbaum, engage[] in 'identity correction,' a term they coined to describe their process of corporate identity theft.") (last visited Feb. 2, 2010).

[4] *See* http://theyesmen.org; http://challenge.theyesmen.org; http://theyesmen fixtheworld.com.  Paragraph 14 of the First Amended Complaint cites to these Web sites, although it contains typographical errors.

[5] http://theconnextion.com/yesmen/yesmen_index.cfm (last visited Feb. 2, 2010).

[6] The Yes Men urge, "Correct an identity online.  Set up a website with an url similar to that of your target, emulating their style and content ...."  http://challenge.theyesmen.org (last

4

the Yes Men's latest film as "Two guys in an undisclosed location creat[ing] counterfeit websites of real corporations.  If this sounds like part of an identity theft scheme, well, it is." http://alibi.com/index.php?story=30246 (last visited Feb. 2, 2010).

Defendants imply, with no support, that Servin and Vamos are merely individual artists. (*See* Brief at 40.)  The Yes Men are actually "a collective of about 300 people led by Andy Bichlbaum [sic: Servin] and Mike Bonanno [sic: Vamos]." http://louisproyect.wordpress.com/2009/07/28/the-yes-men-fix-the-world-%E2%80%9Cwho-the-is-jackson-pollock%E2%80%9D/ (last visited Feb. 2, 2010).  The Yes Men operate through a corporation known as Support and Commitment, Inc.  (First Am. Compl. ¶¶ 4, 19.)  Their commercial identity theft enterprise is generating a substantial cash flow; for example, they received at least $500,000 to finance and distribute their recent movie.  (*Id*. ¶ 13.)  They have repeatedly used their scheme against the Chamber to promote their movie and online merchandise business.  (*See, e.g.*, *id*. ¶¶ 28, 33.)

### 3.    Avaaz Action Factory DC

The remaining individual named Defendants are affiliated with Action Factory DC, formerly known as Avaaz Action Factory.  (*Id*. ¶¶ 5-7.)  Avaaz.org is a "global web movement" with over 3.5 million members.  http://www.avaaz.org/en/about.php (last visited Feb. 2, 2010). Action Factory is Avaaz's D.C.-based project.  (First. Am. Compl. ¶ 5.)  It assisted in the wrongful conduct through Defendants David Sievers, Morgan Goodwin and Sarah Murphy (in addition to other persons presently unknown).  Sievers is an organizer for Action Factory.  (*Id*. ¶ 5.)  Goodwin is in charge of New Media (i.e., electronic media).  (*Id*. ¶ 6.)  Murphy helped plan

---

visited Feb. 2, 2010).  Elsewhere on the same Web site, they say:  "Set up a website and wait. This is what we started out doing.  Download a website, alter it, post it at a believable web address, and voilà!"  http://challenge.theyesmen.org/how (last visited Feb. 2, 2010).

HUNTON & WILLIAMS LLP

the fake press release and/or press conference described below.  (*Id.* ¶ 7.)  Not only have these Defendants promoted the Yes Men's efforts (*see id.* ¶¶ 5-6, 27), members of the Action Factory, including Goodwin, were responsible for launching a "denial of service" attack on the Chamber's phones and computers the same day as the fake press conference to make it "the worst Monday ever" for the Chamber (*id.* ¶ 22).  They summed up their accomplishments for 2009 by writing, "I suppose we can claim credit for the defection of a major paper company from the U.S. Chamber of Commerce.  It happened just 1 day after we successfully pulled off an elaborate spoof press conference with the Yes Men. . . . ."  http://dc.actionfactories.org/ (blog entry for Dec. 29, 2009) (last visited Feb. 2, 2010).

### B. The Scheme To Misappropriate The Chamber's Intellectual Property In Order To Cause Confusion In Traditional And New Media

The Yes Men, Action Factory, and an organization known as BeyondTalk.net planned the attack on the Chamber.  (First Am. Compl. ¶ 17.)  In May 2009, the Web sites beyondtalk.net and theyesmenfixtheworld.com were registered through a Swiss company using a fictitious contact name.  (*Id.* ¶ 18.)  On October 16, 2009, the Yes Men, using the same fictitious contact person, registered a *fake* Chamber of Commerce domain name ─ www.chamber-of-commerce.us ─ through a French company.  (*Id.* ¶ 19.)  They then downloaded the appearance and content of the Chamber's real Web site, including the Chamber's embedded software code, and posted a *fake* Chamber of Commerce Web page at the *fake* Chamber domain name.  (*Id.* ¶ 20.)

The Yes Men's fake Chamber page was designed with precisely the same "look and feel" as the Chamber's *real* Web site.  (*Compare* Ex. A to Declaration of Jacques Servin ("Servin

Dec.")[7] (showing two pages from fake Web site) *with* http://www.uschamber.com/default (real Chamber Web site).)  The fake Web site included a fake Chamber press release (a hard-copy is attached as Exhibit C to Servin's Declaration) and fake written remarks attributed to Chamber President Thomas J. Donohue.  (Servin Dec. Ex. A.)  These materials used exact replicas of the Chamber's registered marks, and even a Chamber copyright notice, without permission.  (First Am. Compl. ¶ 20.)  The Yes Men took the further step of configuring the software so that if viewers "clicked" on the fake Web pages, they were taken to the *real* Chamber's Web site, so as to conceal from visitors the fraudulent nature of the Web pages.  (*Id.*)  The combination of the identical look-and-feel of these materials, and the embedded "click-through" feature, successfully deceived thousands of viewers and a number of sophisticated news organizations. (*Id.* ¶¶ 20, 30.)  CNBC Washington correspondent Hampton Pearson explained, "It looked authentic …. It has the Chamber's logo that we're all very familiar with, even the boilerplate at the end of a typical Chamber of Commerce news release." (*Id.* ¶ 24.)

Defendants also orchestrated a fake press conference at the National Press Club ("NPC") on October 19, 2009.  Based on a call from Sievers, who misrepresented his identity, the NPC booked a room in the name of "U.S.C. of C."  (*Id.* ¶ 21)  Starting on October 16, 2009, Defendants used the fake press release to steer real journalists to the sham press conference.[8] (*Id.* ¶¶ 22-23.)  When journalists arrived at the press room on October 19, they saw a podium

---

[7] Mr. Servin's declaration says that the fake press release is attached as Exhibit A to his declaration, but it actually appears as Exhibit C.  Conversely, he says that the fake Web site is captured in screenshots at Exhibit C, but those actually appear as Exhibit A.

[8] One journalist, from *Mother Jones*, later wrote that Defendants had tipped her off in advance.  (First Am. Compl. ¶ 23.)  One or more of the "journalists" were fake, such as Defendant Murphy of Action Factory, who also filmed the event.  (*See id.*; *see also* Servin Dec. Ex. B (DVD showing woman with hand-held video camera in press room).)

displaying identical replicas of the Chamber's marks and a table containing copies of the fake press release and fake speech of Mr. Donohue.  (*Id.* ¶ 23; Servin Dec. Ex. B at first minute.) Servin then took a position behind the podium with the Chamber's marks; an unknown female colleague introduced him as a "Chamber spokesperson and speaking on behalf of President Donohue." (First Am. Compl. ¶ 25; Servin Dec. Ex. B. at 00:01:53 to 00:01:56.)  Servin spoke for approximately 12 minutes (*see generally id.*), by which time some news outlets had attributed the event and the statements made by Servin and the press release to the real Chamber (First Am. Compl. ¶ 20).  About 13 minutes into the event, a real Chamber spokesman entered the room and challenged the legitimacy of the event, but Servin continued to conceal and maintain the identity theft.  When asked whether he was representing the Chamber, he said, "Yes, I am." (Servin Dec. Ex. B at 00:13:44-00:13:47.)  When pressed for his title, he identified himself as "the assistant to Mr. Donohue." (*Id.* at 00:14:36-00:14:41.)  When the Chamber spokesman described the event as a "stunt," Servin *denied* it to the assembled journalists, saying, "*This* [the Chamber's spokesman's entry] is the stunt." (*Id.* at 00:14:48-00:14:49.)  The next day, their fraud having been exposed by the Chamber, the Yes Men used the event to promote their commercial movie venture.  (First Am. Compl. ¶¶ 28-29.)

### C.   This Lawsuit

The Chamber attempted to protect its intellectual property rights and goodwill without litigation.  On October 22, 2009, its counsel sent a letter to the Internet Service Providers ("ISPs") responsible for hosting the Yes Men's fake Chamber Web site, requesting that it be taken down.[9]  (First Am. Compl. ¶ 30.)  Instead, the Yes Men's counsel from the Electronic

---

[9] Defendants claim that the Chamber has tried to prevent them from "continuing to engage in political speech." (Brief at 8.)  There is no such evidence in the record, and it is simply untrue.  The Chamber has never attempted to limit the content of the Defendants' speech.

Frontier Foundation ("EFF") wrote a letter threatening to sue the Chamber.  (*Id.*)  Meanwhile, the Yes Men took steps to "mirror" (copy) their fake Web site, and transferred it in the middle of the night from one ISP in California to another ISP in Delaware.  (*Id.*)  EFF also modified its own Web site to redirect Internet traffic to the newly relocated fake Chamber Web site.  (*Id.*)  The Yes Men defended their actions by asserting that the Chamber's request would hurt many movie theaters that were dependent on the Yes Men to sell tickets, which was necessary to "turn a profit."  (*Id.* ¶ 31.)  Defendants maintained the fake Web site until around the time that the Amended Complaint was filed on November 6, 2009.  (*See id.* ¶ 30.)[10]

During this litigation, the Chamber has requested that Defendants discontinue their use of the Chamber's intellectual property on the Web or elsewhere.  Defendants consistently refused, maintaining that they have a "First Amendment right" to use exact reproductions of the Chamber's marks.  (*See* letter from W. Potts to R. Corn-Revere (Nov. 17, 2009) (attached as Ex. A.).)

The Defendants' misappropriation of Chamber's identity, trademarks and other intellectual property, and its false statements, have injured the Chamber.  Among other things, Defendants have harmed the Chamber's reputation and caused it to incur costs to warn viewers who visited the fake Web site, as well as investigative and legal expenses.  (*Id.* ¶ 34.)  Thus, this lawsuit is needed to enforce the Chamber's rights.[11]

---

[10] The site might have been taken down sometime between November 3 and 6.

[11] The Chamber alleges that Defendants used so much of its intellectual property that their scheme was *not* parody.  (First Am. Compl. ¶ 20.)  Numerous commentators similarly recognize that the Defendants' theft of the Chamber's identity was not political speech and that their misappropriation of the Chamber's intellectual property cannot be discounted as a "joke" or parody.  *See*, *e.g.*, http://www.theregister.co.uk/2009/10/26/yes_men_hoax_and_the_dmca/ ("Regardless of what the intention was, says Mike Rodenbaugh, principal in the San Francisco intellectual property firm Rodenbaugh Law, the Yes Men hoax doesn't pass the parody test.

## III.    SUMMARY OF ARGUMENT

The Chamber's lawsuit has strong legal and factual support.  It should not be dismissed on a premature motion that is based on inapplicable legal doctrines and that is designed to prejudice the Court against the Chamber.  Instead, the Chamber must be allowed to pursue its claims and conduct the type of discovery that is typical in intellectual property misappropriation cases.  This includes discovery into the Defendants' commercial ventures, how their exact replication of the Chamber's marks helped to promote those commercial ventures, and how the Defendants' misappropriation caused confusion and otherwise injured the Chamber.

After having publicly characterized their own actions as "identity theft" and used their acts to advance their own commercial interests, Defendants now seek to wrap themselves in the mantle of the First Amendment.  They claim that they have a "right" to steal the Chamber's name and marks because they were simply making a "political" point and used the Chamber's property only as much as necessary to "parody" the Chamber.  However, these justifications rely on demonstrably false characterizations of their actual conduct.

---

'Taking [the Chamber's] entire web site design and completely fooling people crosses the line,' he tells *The Reg*.") (alteration in original) (last visited Feb. 2, 2010).  One commentator stated:

> [T]he Yes Men are treading a politically dangerous line.  Politics and culture wars are dirty enough, but introducing guerrilla impersonation warfare takes things to the next level.  It's one thing to adopt a fictitious political persona for entertainment … .   But it's a completely different ballgame when you impersonate real people or real organizations.  The Yes Men claim this was an act of free speech, but it's not hard to imagine how such a tactic would incite anger.

http://www.triplepundit.com/2009/10/us-chamber-will-see-yes-men-in-court/ (last visited Feb. 2, 2010); *see also* http://www.duetsblog.com/2009/10/articles/infringement/testing-trademark-law-us-chamber-of-commerce-v-the-yes-men/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+DuetsBlog+%28Duets+Blog%29 ("[T]he information publicly available now suggests that the Chamber has a strong case.  … I don't see much traction for a free speech defense, which requires at a minimum that the speech in question not be misleading.") (last visited Feb. 2, 2010).

HUNTON & WILLIAMS LLP

Moreover, Defendants ask the Court to conclude, without offering a shred of evidence, that the Chamber has brought this suit because of content of Defendants' speech, even though defense counsel has acknowledged "the Chamber's well-documented history of support for free speech." (*See* letter from Mathew Zimmerman, Esq. to Michael Kelly, Esq. (Oct. 22, 2009) (attached as Ex. B).) Rather, the Chamber has filed this suit because of the Defendants' *conduct*, which is only tangentially related to speech. Defendants set up a straw man by attempting to portray this case as being about Servin's statements at the fake press conference. But that is only a small portion of the overall scheme that Defendants perpetrated. Defendants misused the Chamber's intellectual property before, during and after the October 19 press conference. They deliberately forged precise replicas of the Chamber's marks on a fake press release and a speech attributed to Chamber President Thomas J. Donohue, as well as a fake Web site that was online for weeks and which unlawfully embedded the Chamber's software code. The motion to dismiss is virtually silent on these key facts. The First Amendment simply does not protect the kind of wrongdoing at issue here. Even Servin has admitted that his lawyers advised him in advance *not* to undertake this scheme because of its fraudulent implications. (*See* First Am. Compl. ¶ 29.)

Second, there is no support for many of the points in the motion to dismiss. Defendants inaccurately describe many of the cases they cite; others simply fail to support the propositions for which they are cited. Moreover, they ignore key allegations of the First Amended Complaint in order to argue that the Chamber has not pleaded all of the elements of its claims. As the Court will learn after discovery, virtually all of the facts alleged by the Chamber come from the Defendants' own words, as recorded on videotape; television; theatrical-release movies; Twitter; Facebook and other Web postings; and newspaper articles. At this time, however, the Court is required to treat the Chamber's allegations as true.

11

Defendants and amicus curiae Public Citizen Law Group ("PCLG") argue that Defendants have not violated the Lanham Act, relying almost entirely on their contentions that (1) parody is an absolute defense to trademark infringement and (2) they did not infringe the Chamber's marks "in commerce."  Both arguments are fatally flawed.  Parody is not an absolute defense to Lanham Act claims.  Moreover, Defendants intentionally sought to *impersonate* the Chamber, not merely *parody* it.  The Chamber has also adequately pleaded that Defendants used its marks "in commerce."  Further, courts have consistently held that the Lanham Act applies to non-profit entities and to political speech, political advocacy, and consumer education.  The Defendants' widespread use of identical copies of the Chamber's marks to indicate source demonstrably and actually confused numerous members of the media and the public.

The Defendants' "nominative use" defense is equally flawed.  Rather than use just so much of the Chamber's marks as was necessary to identify the Chamber, Defendants copied the Chamber's marks exactly and extensively to indicate the source of the Defendants' message.  The very case Defendants cite to support their argument explicitly exempts such conduct from this defense.

Their arguments about the Chamber's unlawful trade practices claim under D.C. law are also misplaced.  The Defendants' assertion that the statute only applies to "consumer-merchant" transactions is based on cases decided *before* the statute was amended:  for the past ten years, it has permitted not only consumers, but any other "person," to bring suit.  In addition, the Chamber specifically alleges that Servin and Vamos sell merchandise and, thus, are merchants.

The Defendants' challenge to the Chamber's injurious falsehood claim is also ungrounded.  Their unsubstantiated assertion that they did not act with "reckless disregard of the truth" when they used the Chamber's name, trademarks and computer code to impersonate the

Chamber is simply incredible.  In any event, this is an issue of fact that cannot be resolved on a motion to dismiss.  And the assertion that the costs the Chamber has incurred in dealing with the Defendants' fraudulent Web site were due to the Chamber's "overreaction" ignores the facts. The Chamber incurred those costs because Defendants took elaborate measures, including the misappropriation of embedded software from the Chamber's Web site, to mislead the public, and they took additional steps to frustrate the Chamber's efforts to prevent further misuse of its name, trademarks and software.

Finally, the Chamber has properly pleaded its prima facie tort claim, contrary to the Defendants' contentions.  This claim is available under New York law, and the Chamber expressly alleges that three of the individual defendants reside in New York and that they engaged in planning and actions to implement their scheme there.  Once the Chamber conducts discovery into the extent of the Defendants' activities, it expects to establish that New York law applies to this particular claim under applicable choice of law principles.

In addition to these flawed legal arguments, Defendants inconsistently refer to the facts in the First Amended Complaint as mere "allegations," while at the same time offering a plethora of "facts" from outside the record.  Their brief is replete with unsupported assertions by counsel, about, for example, the Defendants' supposed "motive" or their non-commercial interests. Remarkably, although Servin has filed a declaration that identifies fake documents Defendants disseminated in the Chamber's name, he declines to say anything else under oath.  Nor would it matter if he had; the Chamber is entitled to discovery before the Court could countenance any such evidence.  For that reason, the Chamber has opposed the Defendants' motion to prevent discovery.  (*See* Docket No. 21.)

HUNTON & WILLIAMS LLP

Having exposed the Defendants' flawed legal arguments and unsupported factual assertions, it is clear that the Chamber has stated claims for each of the asserted statutory and common law causes of action.  The Court should deny the motion to dismiss.

## IV.  DEFENDANTS HAVE MISCHARACTERIZED THE STANDARD OF REVIEW.

The issue before the Court is whether the Chamber's First Amended Complaint states a claim upon which relief may be granted.  The United States Supreme Court has explained:

> [Fed. R. Civ. P.] 8(a)(2) requires *only* "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."

*Bell Atlantic Corp. v. Twombley,* 550 U.S. 544, 555-56 (2007) (emphasis added) (citation omitted).  A complaint satisfies this requirement if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Twombley*).  In determining whether a claim is "plausible on its face," the Court "must treat the complaint's factual allegations ─ including mixed questions of law and fact ─ as true and draw all reasonable inferences therefrom in the plaintiff's favor."  *Lewis v. District of Columbia,* 535 F. Supp. 2d 1, 9 (D.D.C. 2008); *see also National R.R. Passenger Corp. v. Veolia Transp. Services, Inc.*, 592 F. Supp. 2d 86, 92 (D.D.C. 2009).

Defendants have improperly set forth various "facts" about the Chamber that are neither found in the Complaint nor relevant to the specific wrongdoing that is at issue in this case.  (*See, e.g.*, Brief at 1 n.1 & 3-4 (discussing lobbying expenditures, ostensible Chamber views on climate change, and presumed reasons why five companies changed their relationship with the Chamber).)  These are mere diversions.  This case is focused on the Defendants' misappropriation of the Chamber's intellectual property rights, not the Chamber's advocacy

14

efforts or position on climate change.[12]   Moreover, the Court cannot consider, on a motion to

dismiss, the extraneous facts that Defendants have scattered throughout their Brief.  Nor are they

matters of which the Court may take judicial notice.  In short, they are not properly before the

Court.[13]

Defendants incorrectly assert that the Chamber's complaint must satisfy a "heightened

pleading standard" simply because they claim that their actions (identity theft, misappropriation

of computer source code, and misappropriation of trade name and trade marks) were protected

by the First Amendment.  (Brief at 9-10.)  Notably, Defendants do not make any attempt to

define this purported "heightened pleading standard."  The reason for this is simple.  Several of

the cases that Defendants rely upon to support their contention are summary judgment decisions

---

[12] In any event, Defendants are selective in the facts that they present.  For example, the Chamber spokesperson who called for a "Scopes monkey trial" on climate change immediately retracted the remark, and the Chamber itself continues to disavow it.  *See* http://www.uschamber.com/facts.htm.  The Chamber believes that climate change is an important issue, and the Chamber supports comprehensive climate legislation.  *See* http://www.chamberpost.com/2009/11/climate-change---a-different-approach.html   (reprinting Chamber's letter to Senators Boxer and Inhofe).  These positions, however, are utterly irrelevant to this lawsuit.  We note them only to avoid the unfair taint that Defendants may be trying to create by injecting matters from outside the pleadings.

[13] Defendants assert that the Court may treat their motion to dismiss as a motion for summary judgment because they have referenced information outside the pleadings.  (Brief at 3 n.3 (citing *Highland Renovation Corp. v. Hanover Ins. Group,* 620 F. Supp. 2d 79 (D.D.C. 2009).)  Their reliance on *Highland* is misplaced.  In *Highland,* the defendant submitted a sworn affidavit to establish facts necessary to prove the statute of limitations had run on the claim at issue, and the Court found that there was no genuine dispute as to those facts.  *Id.* at 80, 86.  In doing so, the Court reiterated the fundamental rule that summary judgment may be granted only when there is no genuine issue as to any material fact.  *Id.* at 83.  Here, by contrast, Defendants submitted an affidavit that merely identifies three of the documents they disseminated using the Chamber's name and trademarks, and a recording of their fake press conference.  They did not submit an affidavit or any competent evidence to rebut the critical allegations of the First Amended Complaint, or to establish the numerous factual assertions that Defendants make in support of their motion, such as their alleged motive for misappropriating the Chamber's name and marks, or their assertion that this theft caused no confusion.  Those and other assertions involve disputed issues of fact that require discovery and trial.

that say nothing at all about pleading requirements, much less the "heightened pleading standard" advocated by Defendants.  *E.g.*, *Washington Post v. Keogh,* 365 F.2d 965 (D.C. Cir. 1966); *Coles*, 881 F. Supp. 26 (D.D.C. 1995); *Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n,* 471 F. Supp. 126 (D.D.C. 1979).   The other cases the Defendants cite to support a "heightened pleading standard" say nothing about pleading the claims involved here.

Over half of the cases that Defendants claim require a "heightened pleading standard" address defamation claims.[14]   They have no relevance to the Chamber's complaint.   The Chamber has not asserted a defamation claim.   Even in those cases, however, the courts have required no greater pleading detail than what the Chamber has alleged.   For example, in *Flowers*, the Ninth Circuit held that the trial court *erred* when it granted motions to dismiss certain defamation claims.   It explained that the claims were sufficiently pleaded because the complaint (a) identified the statements alleged to be false and defamatory, the persons who made the statements, and when the statements were made; and (b) "averred the required state of mind generally, without alleging corroborating evidence."[15]   310 F.3d at 1131.   The Chamber has pleaded at least this level of detail; it specifically identifies the conduct that forms the basis for its claims, the persons who engaged in the conduct, when the conduct occurred, and the Defendants' motivation for engaging in the conduct.

---

[14] *Flowers v. Carville,* 310 F.3d 1118 (9th Cir. 2002); *Federal Deposit Ins. Corp. v. Bathgate,* 27 F.3d 850 (3d Cir. 1994); *Phantom Touring, Inc. v. Affiliated Publ'ns Ins.,* 953 F.2d 724 (1st Cir. 1992); *Asay v. Hallmark Cards, Inc.,* 594 F.2d 692 (8th Cir. 1979); *Washington Post v. Keogh,* 365 F.2d 965 (D.C. Cir. 1966); *United States ex rel. Smith v. Yale Univ.,* 415 F. Supp. 2d 58 (D. Conn. 2006); *Coles v. Washington Free Weekly, Inc.,* 881 F. Supp. 26 (D.D.C. 1995); *Bramesco v. Drug Computer Consultants*, 834 F. Supp. 120 (S.D.N.Y. 1993); *Meyers v. Plan Takoma, Inc.,* 472 A.2d 44 (D.C. App. 1983).

[15] None of the other eight defamation cases that Defendants cite impose any greater pleading requirement than what is described in *Flowers*.

16

The rest of the cases that Defendants cite for their "heightened pleading standard" argument involve claims governed by the *Noerr-Pennington* doctrine,[16] which immunizes from the antitrust laws "genuine" action before the courts, administrative agencies and legislative bodies. *Federal Prescription Serv., Inc. v. American Pharm. Ass'n,* 471 F. Supp. 126, 128 (D.D.C. 1979). These cases merely stand for the proposition that, if a plaintiff seeks to hold a defendant liable for engaging in such action, the complaint must allege sufficient facts to show that the conduct falls within the "sham" or other exceptions to the *Noerr-Pennington* doctrine. This requirement is inapplicable here. The Chamber's claims are not based on any action Defendants took before the courts, administrative agencies or legislative bodies. Moreover, even though there is no requirement to plead that Defendants engaged in a "sham," the Chamber's complaint is replete with factual details that Defendants did, in fact, engage in a sham by fraudulently using the Chamber's identity, computer code, and trademarks.

The First Amended Complaint contains extensive and detailed factual allegations concerning the Defendants' wrongdoing. As demonstrated below, those allegations state claims for relief that are plausible on their face, and they give Defendants fair notice of the Chamber's

---

[16] *Oregon Natural Res. Council v. Mohla,* 944 F.2d 531 (9th Cir. 1991) (alleged abuse of judicial and administrative processes); *Hydro-Tech Corp. v. Sundstrand Corp.,* 673 F.2d 1171 (10th Cir. 1982) (alleged abuse of judicial process); *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Bd. of Culinary Workers,* 542 F.2d 1076 (9th Cir. 1976) (alleged abuse of administrative process involving building permits); *Letica Corp. v. Sweetheart Cup Co.,* 790 F. Supp. 702 (E.D. Mich. 1992) (allegedly improper assertion of trade dress rights); *Spanish Int'l Commc'ns Corp. v. Leibowitz,* 608 F. Supp. 178 (S.D. Fla. 1985) (alleged abuse of the FCC administrative process); *Caplan v. Am. Baby, Inc.,* 582 F. Supp. 869 (S.D.N.Y. 1984) (alleged abuse of judicial process); *Federal Prescription Serv., Inc. v. Am. Pharm. Ass'n,* 471 F. Supp. 126 (D.D.C. 1979) (alleged abuse of judicial, administrative and legislative processes); *Miller & Son Paving, Inc. v. Wrightstown Twp. Civic Ass'n,* 443 F. Supp. 1268 (E.D. Pa. 1978) (alleged abuse of administrative processes concerning permits).

claims and the grounds upon which they rest.   The complaint, therefore, fully satisfies all

applicable pleading requirements.  The Court must deny the motion to dismiss.

**V.      IDENTITY THEFT IS NOT PROTECTED BY THE FIRST AMENDMENT.**

> **A.      The First Amendment Does Not Protect The Defendants' Misappropriation Of The Chamber's Name And Intellectual Property.**

The First Amendment does not require dismissal of any of the Chamber's claims.  First,

Defendants did not engage in "parody."  Second, the Defendants' acts are alleged to have caused

public and press confusion.

> **1.      The Defendants Were Not Engaged In A "Parody."**

A "parody" is a "literary or musical composition imitating the characteristic style of some

other work of a writer or composer, but treating a serious subject in a nonsensical manner, as in

ridicule" or "a poor or weak imitation."  WEBSTER'S NEW WORLD DICTIONARY at 1034 (2d. coll.

ed. 1984); *see also Lyons Partnership v. Giannoulas,* 179 F.3d 384, 388 (5th Cir. 1999) ("a

parody is defined as an "'artistic work that imitates the characteristic style of an author or a work

for comic effect or ridicule'"") (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580

(1994) (quoting American Heritage Dictionary 1317 (3d ed. 1992))).

The Defendants' "works" went far beyond mere "imitation" of the style of the Chamber

to deliberately and deceptively impersonate the Chamber by every possible means.  And rather

than treat a serious subject in a nonsensical or comedic manner, the Yes Men conducted their

activities with utmost seriousness over an extended period.  They did so not simply to  "poke

fun" at the Chamber, but rather to convince members of the press and public that the Chamber

had, in fact, taken a position that it did not take, and that the Chamber had ceased lobbying on an

issue of immense concern to many of its members.  (*See, e.g.*, First Am. Compl. ¶ 86(c).)  The

initial fake press release posted on a fake U.S. Chamber of Commerce Web site announced in

straightforward fashion that the Chamber had decided to support the Kerry-Boxer Clean Energy Jobs and American Power Act.  Nothing about the announcement appeared to be nonsensical or comedic and nothing alerted readers that the release had not been prepared by the Chamber itself.  In fact, links on the page of the Web site where the fake press release was posted were carefully designed to link directly to the Chamber's own Web site, thus creating a perfect illusion.  The fake press release was accompanied by a statement ostensibly made by Chamber President and CEO Thomas J. Donohue.  Nothing in the format or presentation of that statement would have given readers any reason to suspect that it was anything but Mr. Donohue's actual remarks.

In *United We Stand America, Inc. v. United We Stand, America New York, Inc.,* 128 F.3d 86 (2d Cir. 1997), the Second Circuit rejected arguments similar to those advanced by Defendants in this case.  The plaintiff owned a service mark initially used by the Ross Perot presidential campaign committee.  The defendant used the mark in connection with its own political activities.  The court concluded that the use of a mark in connection with political activities is a use covered by the Lanham Act, and that the defendant's use of the mark in connection with its own political activities could not be regarded as parody because it had used the mark "not as a commentary on its owner, but instead as a source identifier."  *Id.* at 92.  In the same fashion, Defendants here misused the Chamber's marks not as a commentary on their owner, but to misidentify the source of the statements regarding climate change legislation, thereby causing considerable public and press confusion.

Notably, in neither of the historical examples of parody that Defendants discuss (*see* Brief at 11-12) did the parodist undertake to pass himself off as representing an organization with which he had no affiliation, or to publish statements under the name of that organization in order to lead the press and public to believe that the organization had altered its positions on

19

issues of public importance. Jonathan Swift published *A Modest Proposal* anonymously. *See* Clarissa Aykroyd, SAVAGE SATIRE: THE STORY OF JONATHAN SWIFT (Morgan Reynolds Pub. 2006). Similarly, when Alan D. Sokal chose to demonstrate that a scholarly journal would publish a scientifically unsound article, he published his admittedly nonsensical article under his own name. Alan D. Sokal, *Transgressing the Boundaries: Toward a Transformative Hermeneutics of Quantum Gravity*, 46 Social Text 47 (1996). Neither Swift nor Sokal appropriated the name or trademarks of others. Thus, neither satirist's commentary inflicted the injury that the Lanham Act and other laws the Chamber has sued on were designed to prevent.

## 2. Parody Is Not, In Any Event, Fully Protected by the First Amendment.

Upon concluding that the Defendants' actions are not parody, the Court should put aside the First Amendment defenses. Even if, however, the Defendants' scheme did contain some element of parody, the First Amendment still would provide no protection. Defendants incorrectly assert that courts "have repeatedly found parodies are fully protected First Amendment speech."[17]   (Brief at 12.)   To the contrary, "No such absolute right exists." *Anheuser-Busch, Inc. v. Balducci Publ'ns, Inc.,* 28 F.3d 769, 775 (8th Cir. 1994) (reversing dismissal of trademark claims, and instructing entry of judgment for plaintiff).   In short, "the First Amendment places no bar to the application of the Lanham Act." *Id.* at 776

Numerous courts have reached the same conclusion, and none have concluded otherwise.[18]   Not surprisingly then, where parties have engaged in acts of deception similar to those engaged in by Defendants here, courts regularly have granted relief against them.[19]

---

[17]Defendants contradict themselves by confessing later that "this is not to say that *every* parody is cloaked with *absolute* protection."  (Brief at 18.)

[18] *See, e.g., Nike, Inc. v. "Just Did It" Enters.,* 6 F.3d 1225, 1228 (7th Cir. 1993) ("[P]arody is not an affirmative defense but an additional factor in the analysis . . . the parody

has to be a takeoff, not a ripoff."); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir. 1979) (holding defendant liable for using cheerleader uniform in X-rated film); *Pillsbury Co. v. Milky Way Prods., Inc.*, 215 U.S.P.Q. 124, 135 (N.D. Ga. 1981) (finding defendant liable for dilution for publishing cartoon of "Poppin' Fresh" and "Poppie Fresh" doughpersons engaging in sexual acts); *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1077 (C.D. Cal. 1998) (stating "cases of parody or competing artistic titles should not be singled out for preferential treatment where the interests underlying the Lanham Act and the First Amendment are in conflict.  Neither the language in the relevant case law nor public policy supports such a distinction") (internal quotation marks omitted); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group*, 886 F.2d 490, 493-94 (2d Cir. 1989) ("Trademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression.") (internal quotation marks omitted); *Browne v. McCain*, 612 F. Supp. 2d 1125, 1131 (C.D. Cal. 2009) ("[C]ourts have recognized that the Lanham Act applies to noncommercial (i.e., political) and commercial speech.  Indeed, the Act's purpose of reducing consumer confusion supports application of the Act to political speech, where the consequences of widespread confusion as to the source of such speech could be dire.") (internal citations omitted); *Pfizer Inc., v. Sachs*, No. 08-cv-8065, 2008 WL 5596131 (S.D.N.Y. Nov. 14, 2008) (holding "the likelihood of confusion negates any claimed FirstAmendment defense to trademark infringement"); *MGM-Pathe Commc'ns Co. v. Pink Panther Patrol*, 774 F. Supp. 869, 877 (S.D.N.Y. 1991) ("[Defendants] contend that because the Patrol is engaged in political speech, it is less subject to the trademark laws.  There is no legal support for this position.  The seriousness and virtue of a cause do not confer any right to the use of the trademark of another.").

[19] *E.g., Coca-Cola Co. v. Purdy*, 382 F.3d 774, 787-88 (8th Cir. 2004) ("While *Purdy* has the right to express his message over the Internet, he has not shown that the First Amendment protects his appropriation of plaintiffs' marks in order to spread his protest message by confusing Internet users into thinking that they are entering one of the plaintiffs' websites."); *People for the Ethical Treatment of Animals, Inc. v. Doughney*, 263 F.3d 359 (4th Cir. 2001) (rejecting parody defense for use of PETA mark and PETA.org Web site registration by organization adverse to PETA); *Christian Scientist Bd. of Dirs. v. Robinson*, 123 F. Supp. 2d 965, 971 (W.D.N.C. 2000) (holding that "conveying the impression to Internet users that he is actually a part of or sponsored by the Plaintiffs" violates Lanham Act); *Trade Media Holdings Ltd., v. Huang & Assocs.*, 123 F. Supp. 2d 233, 242 (D.N.J. 2000) ("Defendant has appropriated plaintiff's mark in order to reach an audience of internet users who want to reach plaintiff's services and viewpoint, intercepting them and misleading them in an attempt to offer his own political message."); *OBH, Inc. v. Spotlight Magazine, Inc.*, 86 F. Supp. 2d 176, 186 (W.D.N.Y. 2000) (rejecting parody defense for use of mark on Web site even where express disclaimer is made because use created confusion); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 307-08 (D.N.J. 1998) (finding defendant created a "bogus Jews for Jesus" site intended to intercept for the "use of deceit and trickery the audience sought by Plaintiff Organization"); *Planned Parenthood Fed'n v. Bucci*, No. 97 Civ. 0629 (KMW)1997 WL 133313 (S.D.N.Y. 1997) (opponent created Web site critical of plaintiff's views with domain www.plannedparenthood.com — affecting plaintiff's ability to offer its services), *aff'd*, 152 F.3d 920 (2d Cir. 1998).

Defendants misstate that *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569 (1994) held "no claim arose from 2 Live Crew's sexually explicit parody of Roy Orbison's classic song 'Pretty Woman.'" (Brief at 15.)  In *Campbell*, the district court had granted summary judgment for the defendant.  The Sixth Circuit reversed, reasoning that the commercial nature of the parody at issue rendered it presumptively unfair under the fair use doctrine; that the defendant took the heart of the original song and made it the heart of a new song; and that the defendant's commercial use gave rise to a presumption of harm to the market for the plaintiff's work.  The Supreme Court held that the Sixth Circuit erred in holding that fair use could not exist as a matter of law, and it remanded the case for the resolution of the factual dispute of whether the parodic use at issue met the fair use standards.  With respect to the First Amendment "parody" defense, the Court commented:  "The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived."  *Campbell,* 510 U.S. at 582.  The case subsequently settled ─ leaving unresolved whether listeners would perceive the defendant's song to be a parody or simply an appropriation of the plaintiff's work.  *Music Company Settles Lawsuit*, Times Daily, June 5, 1996, at B1 col. 1 (reporting that "2 Live Crew agreed to license the sale of their version of the Roy Orbison classic").

The actions of the Defendants in this case plainly do not constitute parody.  Accordingly, Defendants have no basis to rely upon *Campbell* ─ by analogy or otherwise.

The First Amendment doctrine that has evolved from these decisions is that a trademark owner is entitled to relief if it shows a valid trademark and a likelihood of confusion on the part of the public.  The courts have been clear that "[p]arodies do not enjoy a dispensation from this standard."  *Nike, Inc.,* 6 F.3d at 1227-28.  The *Anheuser-Busch* case provides a useful template for analyzing whether the use of a trademark may be enjoined, consistent with First Amendment

principles, when the defendant claims the use is parody.  In that case, the defendant published a humor magazine, which displayed on its back cover a mock advertisement for the fictitious product, "Michelob Oily," with a small disclaimer on the side.  *Anheuser-Busch*, 28 F.3d at 772. The defendant argued that the mock ad was a parody.  *Id.*  The Eighth Circuit first considered whether the use of the plaintiff's marks caused a likelihood of confusion; it then evaluated whether the First Amendment would prohibit the enforcement of laws designed to prevent such confusion.  The court held the trial court erred in conflating the two issues.  *Id.* at  773.  It firmly stated, "'An intent to parody is not an intent to confuse.'"  *Id.* at 774 (quoting *Jordache Enters., Inc. v. Wyld, Ltd.,* 828 F.2d 1482, 1486 (10th Cir. 1987)).  The court then considered the First Amendment defense.  After reviewing numerous cases in which defendants had attempted to use the First Amendment to shield parody from infringement claims, it observed that not a single case had accepted the First Amendment as an absolute defense.  The court thus concluded that a "parody creating a likelihood of confusion may be subject to a trademark infringement action." *Id.* at 776 (citing *Cliffs Notes*, 886 F.2d at 494; and *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 32 n.3 (1st Cir. 1987)).  The court ultimately held that the confusion engendered by the phony ad outweighed any First Amendment interests that might be harmed by the claim, because the defendant could have taken steps, such as "altering the protected marks in a meaningful way," to substantially lessen the risk of consumer confusion.  *Id.*

Here, the Yes Men and other Defendants made *no effort whatsoever* to warn the readers of the fake press release and statement, or the reporters attending their fake press conference, that they were engaged in parody.  Defendants' conduct was not aimed at making their audience laugh at the Chamber, but to *believe* that the Chamber was taking positions and actions that it was not taking.  This deception allowed Defendants to gain much greater notoriety than they

23

otherwise could have, thereby further advancing their commercial goals regarding their movie project and online merchandise.  It also harmed the Chamber in a way that mere parody never could, and that the Lanham Act, the Federal Trademark Dilution Act, the Anti-Cybersquatting Act, and the state laws under which this action is brought were enacted to prevent.

None of the cases cited by the Defendants in support of their First Amendment defense present facts that are at all analogous to the extreme facts of this case.  For example, in *Mattel, Inc. v. Walking Mountain Prods.,* 353 F.3d 792 (9th Cir. 2003), the defendant developed a series of 78 photographs entitled "Food Chain Barbie," in which he depicted Barbie in various absurd and often sexualized positions.  The Ninth Circuit concluded that this use of the mark could not lead consumers to believe that Mattel sponsored the works.  *Id.* at 807.  Second, in *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 972 (10th Cir. 1996), the defendant produced baseball trading cards with nicknamed caricatures of players and faux facts; the cards expressly stated that they were "a parody and NOT licensed" by the plaintiff.  Third, the use of the title "Ginger and Fred" for a movie about two Italian cabaret performers could not be understood to mean that Ginger Rogers endorsed the film or had a role in producing it; thus, the court did not enjoin its use in *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989).  Fourth, the defendant in *Cliffs Notes* published a spoof that warned readers five times in red lettering that the work was a "satire."  Moreover, the work was not at all similar to actual Cliffs Notes.  The court noted, "A parody must convey two *simultaneous*—and contradictory—messages:  that it is the original, but also that it is *not* the original and is instead a parody.  To the extent that it does only the former but not the latter, it is not only a poor parody but also vulnerable under trademark law, since the customer will be confused."  *Cliffs Notes,* 886 F.2d at 494.

24

Fifth, in *Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*, 809 F. Supp. 267 (S.D.N.Y. 1992), *New York* magazine spoofed the *Farmer's Almanac* by using elements of its cover design, and by contrasting thrifty gifts with extravagant gifts in one of the articles.  The court held that the magazine had "made it sufficiently clear that the obvious reference to the *Almanac* was a joke and that *New York* made clear its own identity by bold prominent display of its title."  *Id.* at 272.  Sixth, in *Charles Atlas, Ltd. v. DC Comics, Inc.*, 112 F. Supp. 2d 330 (S.D.N.Y. 2000), DC Comics parodied the Charles Atlas bodybuilding program through a cartoon character, Flex Menatello, that could not be mistaken as originating from the plaintiff company.  Notably, the Defendants mis-describe this case as holding that the use of a "character resembling Superman to criticize Superman's misogynistic characteristics was protected speech."  (Brief at 14.)

Defendants' reliance on *Nike* is not merely misplaced, but helpful to the Chamber's contention that a motion to dismiss is premature, given the important issues of fact on which the Chamber's case rests.  There, although the court reversed summary judgment for the plaintiff, it did so on the ground that, "[n]either we nor the district court can conclude as a matter of law that [defendant's] parody does or does not confuse the purchasing public.  *Too many disputed facts require a trial for resolution.*"  *Nike, Inc.*, 6 F.3d at 1232 (use of Nike's swoosh with the name Mike instead of Nike) (emphasis added).

Amazingly, Defendants strongly rely upon *New Times, Inc. v. Isaacks*, 146 S.W.3d 144 (Tex. 2004), for the proposition that a parody is regarded as effective if it initially confuses the public.  The defendant in that case lampooned the action of law enforcement officials who had arrested a seventh grader for writing a Halloween story that described shooting a teacher and two classmates.  The lampoon took the form of a satirical article entitled "Stop the Madness," stating the plaintiffs also had arrested and detained "a diminutive 6 year-old" girl for writing a book

report on the children's book, "Where the Wild Things Are."  The Texas Supreme Court held, as

a matter of law, that the article could not be "reasonably understood as describing actual facts" in

light of its unorthodox headline, statements that the girl was placed in ankle shackles, and mock

quotations of George W. Bush condemning "Where the Wild Things Are" for its "deviant,

violent and sexual overtones." *Id.* at 157-58.  Contrary to the Defendants' assertion, the court

did not find that the parody was effective because it caused initial confusion.  The court held that

a "reader may initially approach the article as providing straight news," but that the article

contained such "a procession of improbable quotes and unlikely events that a reasonable reader

could only conclude that the article was satirical." *Id.* at 161.   The other authorities the

Defendants cite are similarly inapposite, because they involved claims based on publications that

were so patently absurd they could not be regarded as making assertions of actual fact.[20]

In contrast to the situations in all of those cases, in this case, Defendants ─ as they admit

─ intended to and *did* deceive both the public and the press, and the Chamber has alleged as

much.  (*E.g.*, First Am. Compl. ¶ 24 (quoting CNBC correspondent who was deceived).)  No one

---

[20] *See Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46 (1988) (upholding defense judgment in emotional distress case because advertisement could not reasonably be understood as describing actual facts about plaintiff or actual events in which he participated); *Fisher v. Dees,* 794 F.2d 432 (9th Cir. 1986) (copyright and unfair competition action by composers of "When Sunny Gets Blue" against composer of "When Sonny Sniffs Glue"); *Lucasfilm Ltd. v. Media Mkt. Group, Ltd.,* 182 F. Supp. 2d 897, 901 (N.D. Cal. 2002) (defendant produced a pornographic spoof of "Star Wars," called "Starballz"); *San Francisco Bay Guardian, Inc. v. Superior Ct.,* 17 Cal. App. 4th 655, 661 (1993) ("Because the average reader would recognize the April Fool's issue as a parody, the letter does not defame [the plaintiff] by false attribution or presentation of false facts."); *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109, 116 (2d Cir. 1998) (Leslie Nielsen posing like Demi Moore's famous pregnant nude photograph on the cover of Vanity Fair); *MasterCard Int'l, Inc. v. Nader 2000 Primary Comm., Inc.,* No. 00 Civ. 6086 (GBD), 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) (Ralph Nader ad employed MasterCard's trademarked phrases "Priceless" and "There are some things money can't buy"); *Eveready Battery Co. v. Adolph Coors Co.,* 765 F. Supp. 440 (N.D. Ill. 1991) (Leslie Nielsen playing role of Eveready bunny in beer ad could not cause confusion).

could or did conclude that the Defendants' actions were in any manner parody or satire.  In fact, the precise problem with the Defendants' scheme, unlike the situations in *Cliffs Notes* and the other cases discussed above, is that Defendants conveyed that their work *was* that of the Chamber, and did nothing whatsoever to signal that it was a parody or that the Chamber was not the source of the work.

Amicus curiae PCLG broadly contends that all noncommercial uses of trademarks are protected by the First Amendment irrespective, apparently, of whether such uses cause such confusion that they interfere with the ability of others to make their voices heard and to offer their products or services.  They rely for this extreme argument primarily on *Bosley Medical Institute, Inc. v. Kremer,* 403 F.3d 672 (9th Cir. 2005), and *Taubman Co. v. Webfeats, Inc.,* 319 F.3d 770 (6th Cir. 2003).  The former case, however, held only that "the noncommercial use of a trademark as the domain name of a website, the subject of which is consumer commentary about the products and services represented by the mark, does not constitute infringement under the Lanham Act."  *Bosley,* 403 F.3d at 674.  The Web site at issue in *Bosley* was not a deliberate fabrication of the plaintiff's site, as is the case here.  Instead, it contained "information that is highly critical of" the plaintiff, making it clear to readers that the site was not the plaintiff's own site.  *Id.* at 675.  It did not sanction, as the amicus suggests, the sort of deliberate fraud that took place here. [21]  Similarly, in *Taubman,* the defendant used the plaintiff's mark followed by the

---

[21] In *Bosley,* the Ninth Circuit expressed concern that the Fourth Circuit had interpreted the Lanham Act so broadly in *People for the Ethical Treatment of Animals,* 263 F.3d 359, that it would restrict "almost all uses of a registered trademark, even when the mark is merely being used to identify the object of consumer criticism."  403 F.3d at 679.  Which interpretation of the Lanham Act is correct is irrelevant here because the Defendants did not simply use the Chamber's marks to identify the object of consumer criticism.  They used identical copies of them to persuade the public and press that the fake positions were those of the Chamber.  Prohibiting this type of use does not violate the First Amendment.  *See supra* notes 18-19.

word "sucks" as the names for Web sites that were critical of the plaintiff.  This use was treated

as non-infringing and, hence, protected by the First Amendment, because there was no

"confusion as to the source."  *Taubman,* 319 F.3d at 778.

Notwithstanding their initial extreme position that the First Amendment is an absolute bar

to the Chamber's claims, Defendants ultimately ask for First Amendment protection based on the

factual assertion that "no reasonable viewer would actually mistake the Yes Men's position for

the Chamber's."  (Brief at 18.)  They premise this assertion on their observation that the

Chamber interrupted their phony press conference and exposed their deception.  As an initial

matter, the Yes Men continued the fraud even after the Chamber's representative entered;

Defendant Servin *continued* to deceive the journalists who were present.  (*See* Servin Dec. ex.

B.)  Moreover, the fact that the Chamber was able to expose the hoax does not change the fact

that the Defendants themselves perpetrated a misappropriation of the Chamber's name and marks

by publishing false press releases, and by persuading the press and public that the Chamber had

changed its position.  Moreover, Defendants kept publishing their fake Chamber Web site long

after the press conference, with no disclaimer that it was a fake.  Even if any readers *later* came

to understand that these publications were fakes, none of the Defendants' authorities support the

proposition that the Chamber cannot recover for the harm it suffered before the public learned

the truth.  Nor would there be any logical or public policy reason to establish such authority. [22]

---

[22] In fact, the initial confusion created by a "parody" can itself be sufficient to create trademark liability.  *E.g.*, *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 464 (7th Cir. 2000).  "Initial interest" confusion, recognized in numerous circuits, occurs when a defendant uses a plaintiff's trademark to capture initial consumer attention, even though there is no confusion regarding source at the time a sale is consummated.  *Promatek Indus., Ltd. v. Equitrac Corp.,* 300 F.3d 808, 812 (7th Cir. 2002); *Brookfield Commcn's, Inc., v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1062 (9th Cir. 1999) (collecting cases); *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 259-60 (2d Cir. 1987); *Eli Lilly & Co.,* 233 F.3d at 464; *SMJ Group, Inc.,* 439 F. Supp. 2d at 290.  Here, Defendants used the Chamber's marks for the very purpose of

Finally, Defendants argue that "[w]ithout using the Chamber's marks, the parody would have lost virtually all of its force and purpose."  (Brief at 18.)  That plainly is not the case. *Saturday Night Live* effectively parodies presidents, politicians, and celebrities every week without creating the illusion that the actors portraying their targets are the real thing.  The Chamber itself is the subject of occasional parodies by various groups that do no depend on intentional misappropriation of intellectual property and deceptive impersonation to make their points, and the Chamber makes no effort to inhibit their legitimate free speech activities.  Parody depends for its effectiveness not on its ability to deceive, but rather to exaggerate and make fun of a style or characteristic that an audience can identify as that of the parodist's target.[23]

## VI.   DEFENDANTS HAVE ENGAGED IN MULTIPLE VIOLATIONS OF THE LANHAM ACT

The Chamber has alleged that Defendants infringed its marks (Count I), engaged in unfair competition (Count II), diluted its marks (Count III), engaged in false advertising (Count IV), and committed cyberpiracy (Count V) — all in violation of the Lanham Act.  With the exception of one element in each of the Chamber's false advertising and cyberpiracy claims, Defendants do

---

capturing attention.  Indeed, they attracted the media to their fake press conference with the Chamber's marks.  Similarly, they drew public attention on the Internet by using a Web address confusingly similar to the Chamber's, along with exact replicas of the Chamber's marks. Without using the Chamber's identical tradename and marks, it is unlikely that the Defendants' press conference or their Web site would have been viewed by so many.  As a result, Defendants have improperly benefited at the Chamber's expense.

[23] Defendants contend that the First Amendment requires the Court to import from the law of defamation the actual malice requirement imposed on public figures, citing cases such as *Films of Distinction, Inc. v. Allegro Film Prods., Inc.,* 12 F. Supp. 2d 1068 (C.D. Cal. 1998). (Brief at 19.)  That case, however, *rejected* a First Amendment defense against a Lanham Act claim, noting that a balancing of interests has "already been adequately accomplished by the statutory framework."  *Films of Distinction*, 12 F. Supp. 2d at 1078 (denying motion to dismiss). Even if an actual malice requirement applied, dismissal would be inappropriate because the Chamber has alleged that Defendants were in engaged in the sort of deliberate deception that constitutes actual malice.

not dispute that the Chamber has adequately pleaded all of the elements of these causes of action. Rather, Defendants contend that they were not engaged in commerce or commercial speech, and that their use of the Chamber's marks was "nominative."  As to the dilution claim, Defendants raise as a separate argument that they offered no service in competition with the Chamber.  In advancing these theories, Defendants overlook numerous allegations in the Chamber's complaint regarding the Defendants' own public statements, ignore relevant precedent and misapply or misinterpret other cases, and ask the Court to credit bald assertions in their Brief, which is improper at this (or any stage) of the proceeding.

PCLG raises similarly flawed arguments.  In addition to its First Amendment arguments, which are addressed above, PCLG asserts that, because there is no sale of goods or services at issue, trademark law does not apply.  This position essentially echoes the Defendants' argument that they were not engaged in commerce or commercial speech and should be rejected for the same reasons.  PCLG also makes the astonishing claim that "[c]onfusion over the origin or attribution of ideas ... is not the sort of confusion the trademark laws were designed to address." This directly contradicts *Partido Revolucionario Dominicano (PRD) Seccional Metropolitana DE Washington-DC, Maryland Y Virginia v. Partido Revolucionario Dominicano Seccional DE Maryland Y Virginia*, where this Court not only held that the Lanham Act is applicable to such confusion, but also explained that confusion over the origin and attribution of ideas, if left unchecked, "would be catastrophic."  312 F. Supp. 2d 1, 16 (D.D.C. 2004)

### A.   The Chamber Has Properly Alleged Trademark Infringement, Including The Requirement That The Use Be "In Commerce."

The Lanham Act prohibits using a copy, reproduction or counterfeit of another's mark "*in commerce*" where such use is likely to cause confusion.   15 U.S.C §§ 1114(1)(a) & (b).[24] Contrary to the assertion of Defendants and PCLG, the term "in commerce," as used in the Lanham Act does not require that Defendants be engaged in commercial speech or even profit-seeking or commercial activity.   Rather, "[t]he history and text of the Lanham Act show that 'use in commerce' reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit seeking uses of a trademark." *United We Stand Am.*, 128 F.3d at 92; *see also Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160 (3d Cir. 2001) (broadly construing "use in commerce" requirement).

Thus, even assuming that Defendants were engaged solely in political advocacy, with no commercial speech, commercial activity, or profit motive, their conduct is still actionable as trademark infringement.   Although Defendants have publicly linked their misappropriation of the Chamber's marks and other intellectual property to their ongoing commercial enterprises, there is no support for the assertion that commercial activity or commercial speech is *required* for the Lanham Act to apply in the District of Columbia.   Equally baseless is PCLG's argument that trademark infringement requires the sale of competing goods or services.   (PCLG Br. at 9-10.) Indeed, consistent with the text and history of the Lanham Act, this Court has repeatedly held entities liable for trademark infringement that were *not* engaged in commercial speech or

---

[24] The elements of trademark infringement and unfair competition are essentially identical.  *PRD Seccional Metropolitana*, 312 F. Supp. 2d at 16.   Unfair competition provides a remedy to the owner of an unregistered mark.   Since Defendants do not contest the registration of the Chamber's marks, the distinction is not relevant and this Memorandum uses "trademark infringement" to refer to both Counts I and II.

commercial activity.  *E.g., PRD Seccional Metropolitana*, 312 F. Supp. 2d at 16 (holding

political party liable for trademark infringement for using name similar to that of another

organization); *Appleseed Found., Inc. v. Appleseed Inst., Inc.*, 981 F. Supp. 672, 675 (D.D.C.

1997) (providing that a Lanham Act claim can be based on source confusion between non-profit

organizations); *N.A.A.C.P. v. N.A.A.C.P. Legal Def. and Educ. Fund*, 559 F. Supp. 1337, 1342

(D.D.C. 1983) ("Nor is the right to enjoin an infringement limited to commercial enterprise. It is

as available to public service organizations as to merchants and manufacturers."), *rev'd on other

grounds*, 753 F.2d 131 (D.C. Cir. 1985).

    In fact, this Court has held that political activity is a "service" sufficient to meet the

Lanham Act's requirement that a trademark use be "in connection with goods and services."  For

instance, in *PRD Seccional Metropolitana* this court permanently enjoined a political

organization from using the mark of another political organization.  312 F. Supp. 2d at 16.  The

Court found that the plaintiff was an authorized "section" of one of the three major political

parties of the Dominican Republic and was entitled to use the official party name.  In issuing the

injunction, the Court based its reasoning on political speech — adopting a platform and

endorsing candidates — as opposed to commercial speech or activity:

> a political organization that adopts a platform and endorses a candidate under a
> trade name performs a valuable service of communicating to voters that it has
> determined that the election of those candidates would be beneficial to the
> objectives of the organization. . . . If different organizations were permitted to
> employ the same trade name in endorsing candidates, voters would be unable to
> derive any significance from an endorsement, as they would not know whether
> the endorsement came from the organization whose objectives they shared or
> from another organization using the same name.  Any group trading in political
> ideas would be free to distribute publicity statements, endorsements, and position
> papers in the name of the "Republican Party," or the "Democratic Party," or any
> other.  The resulting confusion would be catastrophic; voters would have no way
> of understanding the significance of an endorsement or position taken by parties
> of recognized major names.

*Id.* at 16 (quoting *United We Stand*, 128 F.3d at 90).   Significantly, the Court made it clear that its decision was not based on "competition for the solicitation of donations and the provision of membership benefits" — which PCLG argues are the only protections the Lanham Act affords a non-profit entity like the Chamber.   (PCLG Br. at 12.)   Rather, the Court was concerned with ideas — "publicity statements, endorsements, and position papers" — and the "catastrophic" harm that would result over confusion regarding the origin and attribution of ideas.

Likewise, in *Appleseed Foundation*, this Court enjoined a non-profit foundation from using the mark of another non-profit organization, even though it found that both entities were "[e]ngaged primarily in the occupation of social advocacy and activism" rather than commercial activities.   981 F. Supp. at 673, 676.

Other courts also have consistently held that entities that infringe another's trademarks in the course of political advocacy, political activity, or educational services — as Defendants try to characterize their conduct here — violate the Lanham Act.   *See Browne v. McCain*, 612 F. Supp. 2d 1125, 1131 (C.D. Cal. 2009) ("Indeed, the [Lanham Act's] purpose of reducing consumer confusion supports application of the Act to political speech, where the consequences of widespread confusion as to the source of such speech could be dire."); *Christian Science Bd. of Dirs. v. Robinson*, 123 F. Supp. 2d 965, 970 (W.D.N.C. 2000) ("[Defendant's] counsel argued that during the time prior to the initiation of this action, [Defendant] was not offering anything for sale. . . .   However, there is no profit requirement in the Lanham Act").   The District Court for the Southern District of New York explained, "[D]efendants seek to educate the public, an admirable service, but an individual being educated should not be misled about the source of that education, just as an individual purchasing a can of peas should not be misled about the source of those peas."   *SMJ Group, Inc.*, 439 F. Supp. 2d at 287.   A California District Court also

concluded that the Lanham Act regulates commercial *and* non-commercial speech.  *Browne*, 612 F. Supp. 2d at 1131 ("…the Act's purpose of reducing consumer confusion supports application of the Act to political speech, where the consequences of widespread confusion as to the source of such speech could be dire.  Thus, to the extent [defendant's] Motion is based on its theory that the Lanham Act applies only to commercial speech, that theory is rejected.").

Further, the notion that Defendants were engaged in purely political speech requires the Court to ignore well-substantiated allegations in the Complaint and to allow the Defendants to rewrite history.  The Chamber alleges that Defendants are entrepreneurs and businessmen who infringed its marks, not as a part of a parody, but as part of a systematic and comprehensive campaign to generate income for themselves by misidentifying the Chamber as the source of certain positions on matters of public policy.  (First Am. Compl. ¶¶ 12, 15.)  At this stage of the proceedings, these allegations must be accepted as true.  In any event, as demonstrated above, even *if* this Court accepted the Defendants' characterizations of themselves and their conduct, the Chamber still has stated its claims.  The Defendants' political activities (as well as their ongoing movie and merchandising businesses) are commercial "services" under the Lanham Act, and the confusion they have created about the source of their message is actionable.

### B.  Defendants' Use Of The Chamber's Marks Was Not Nominative.

In arguing that they made "fair" or "nominative" use of the Chamber's marks, Defendants overlook the allegations in the Complaint about their conduct, ignore their own public statements, and attempt to rewrite history.

Nominative use allows the use of another's mark in limited circumstances when (1) the product or service in question is one not readily identifiable without the use of the trademark, (2) the use of the mark is limited to only so much as is reasonably necessary to identify the product or service, and (3) the user does not do anything that would, in conjunction with the

34

mark, suggest sponsorship or endorsement by the trademark holder. *New Kids on the Block v. News Am. Publ'ns, Inc.*, 971 F.2d 302 (9th Cir. 1992). Examples of nominative use include comparative advertising or referring to a sports team by its trademarked name, such as the Washington Redskins.

Under this well-accepted three part test, which Defendants cite but do not apply, the Defendants' impersonation of the Chamber and misappropriation of its marks is not nominative use. With respect to the first element, Defendants could have readily identified the Chamber without displaying identical copies of the Chamber's marks on the press release, phony Web site, or podium at the fake press conference. Again, Defendants did not merely refer to the Chamber or use the Chamber's marks to identify the Chamber; Defendants used the Chamber's exact marks to *pretend that they were* the Chamber and to attribute to the Chamber positions it did not hold. (*See* First Am. Compl. ¶ 29.) The second element of nominative use also cuts against the Defendants. They could have replicated a portion of the Chamber's marks rather than copy the Chamber's exact marks and the computer code of the Chamber's Web site. Third, Defendants used the Chamber's marks — by their own admission — to impersonate the Chamber and falsely attribute positions to the Chamber. *Id.* Therefore, the Defendants' use of the Chamber's marks was not nominative.

Defendants completely ignore the first two requirements of nominative use. This is no surprise, because the precedent is squarely against them. Moreover, their argument that there is no confusion is nonsense. According to Defendants, "[i]n this particular context, where the very purpose of the parody requires discovery of the fact that the Chamber was being lampooned for its political positions, there is no chance that the event would imply the Chamber's endorsement of the Yes Men." (Brief at 25.) The "particular context" to which Defendants refer is the

wholesale copying of the Chamber's marks in an effort to impersonate it and falsely attribute positions to it.  Defendants intended to suggest the Chamber sponsored, affiliated itself with, or endorsed the positions contained in the phony press release, posted on the fake Web site, and stated during the bogus press conference.  (*See* First Am. Compl. ¶ 29.)  These acts were meant to cause source confusion.  Thus, Defendants' argument that the "bedrock principle" of nominative use protects them from liability is baseless.

### C.   Defendants Diluted The Chamber's Marks.

It is uncontested that the Chamber has alleged the requisite elements of a dilution claim.  Defendants only assert that (1) because they used the Chamber's marks as part of a parody, they are immune from liability for dilution by tarnishment; and (2) because there was no product involved, they are protected from liability for dilution by blurring.

The first argument fails because, as discussed above, Defendants engaged in identity theft, not parody.  Where, as here, a defendant uses a mark as an indicator of source, there is no immunity from liability for dilution by tarnishment.  15 U.S.C. § 1125(c)(3)(A); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog*, LLC, 507 F.3d 252, 266 (4th Cir. 2007) ("Under the statute's plain language, parodying a famous mark is protected by the fair use defense only if the parody is not 'a designation of source for the person's own goods or services.'").

The Defendants' argument that there was no dilution by blurring because "there was no product with which to associate the Chamber" is baseless.  Defendants associated the Chamber with a position that was not its own on a significant piece of legislation.  As explained above, non-profit activities, including political activism, fall within the Lanham Act's definition of commercial activity.  *See, e.g.,* PRD Seccional Metropolitana, 312 F. Supp. 2d at 16; *Appleseed Found.*, 981 F. Supp. at 675; *Browne*, 612 F. Supp. 2d at 1131 (C.D. Cal. 2009); *SMJ Group,*

*Inc.*, 439 F. Supp. 2d at 287.  Accordingly, the Chamber has properly pleaded an association that constitutes dilution by blurring.

Defendants also argue that tarnishment applies only if the allegedly diluting activities associate the mark with sex, drugs, or illegal activity.  This argument oversimplifies the law. "'[D]ilution by tarnishment' is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125 (c)(2)(C) (2006).  Thus, tarnishment is not limited to sex, drugs, and illegal activity.  *See Appleseed Found.*, 981 F. Supp. at 677 n.5 (noting that tarnishment occurs where a junior mark presents shoddy products or services, thereby damaging the reputation of the senior mark); *Dan-Foam A/S & Tempur-Pedic, Inc. v. Brand Named Beds, LLC*, 500 F. Supp. 2d 296, 307 (S.D.N.Y. 2007) (observing that tarnishment is not limited to seamy conduct); *Academy of Motion Picture Arts and Sci. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (finding dilution because "[i]f the Star Award looks cheap or shoddy, . . . the Oscar's distinctive quality as a coveted symbol of excellence . . . is threatened"); *America Online, Inc. v. IMS*, 24 F. Supp. 2d 548 (E.D. Va. 1998) (finding tarnishment due to the risk of negative associations between the plaintiff's mark and junk emailing practices).

The Chamber has pleaded that the Defendants' actions tarnished its reputation.  (First Am. Compl. ¶¶ 29, 63 & 75.)  The Defendants' fraud created a damaging association between the Chamber's marks and a hoax or a fraud.  This constitutes a prima facie case for tarnishment that should not be dismissed.

### D.    The Defendants' Actions Amount to False Advertising.

To prevail on a false advertising claim under section 43(a) of the Lanham Act, a plaintiff must prove that the defendant's ads were false or misleading, actually or likely deceptive, material in their effects on buying decisions, connected with interstate commerce, and actually or

likely injurious to the plaintiff. *ALPO Petfoods v. Ralston Purina Co.*, 913 F.2d 958, 964 (D.C. Cir. 1990). Defendants assert they are not liable for false advertising because they did not engage in commercial speech, and because the Chamber does not allege that the false statements materially affected purchasing or buying decisions. As shown above, the "commercial speech" argument fails because the Chamber alleges that the Defendants' false statements were part of a scheme to sell tickets to their movie and other merchandise. (First Am. Compl. ¶¶ 12 and 15.) Similarly, the Chamber alleges that Defendants intentionally made false statements. (*Id.* ¶ 29.) Such statements give rise to a presumption of materiality. *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 311-312 (1st Cir. 2002); *Pizza Hut, Inc. v. Papa John's Int'l., Inc.*, 227 F. 3d 489, 497 (5th Cir. 2000); *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 720 F. Supp. 194, 214 (D.D.C. 1989), *rev'd in part on other grounds,* 913 F.2d 958 (D.C. Cir. 1990).

### E. Defendants Have Engaged In Cyberpiracy.

Conceding that all of the other elements are properly alleged, the Defendants' sole challenge to the Chamber's cyberpiracy claim is the incorrect assertion that the Chamber does not allege a bad faith intent to profit. Again, Defendants ignore numerous allegations in the Complaint detailing the Defendants' intent to profit from their scheme, and charging that their conduct was undertaken in bad faith. Among other allegations, the Chamber alleges that "Defendants Servin and Vamos executed a comprehensive scheme to promote their movie, and increase sales of tickets and merchandise." (First Am. Compl. ¶ 15.)

The Anti-cybersquatting Consumer Protection Act ("ACPA") provides a number of factors to consider in determining bad faith. 15 U.S.C. § 1125(d)(1)(B)(i).[25] Factors V and VII are most relevant here, although nearly every factor weighs against Defendants.

---

[25] In all, the ACPA provides nine factors for determining "Bad Faith:"

Defendants registered the domain name "chamber-of-commerce.us" and then attempted to divert online visitors from the Chamber's real site to a site that could harm the Chamber. (*See, e.g.* First Am Compl. ¶¶ 19, 20, 30.)   This conduct falls squarely within factor V.  *See Coca-Cola Co. v. Purdy*, 382 F.3d 774, 784 (8th Cir. 2004) (finding cybersquatting where defendant registered confusingly similar Web addresses and used them to link to anti-abortion Web sites). Implicating factor VII, "To conceal their identity and plan, the domain was registered to 'Support and Commitment, Inc.' through a company located in France called GANDI.net and a non-existent New York, New York billing address was used." *Id.*  In keeping with the plain language of the statute, this Court has held that allegations that a defendant concealed its identity when registering a domain name are sufficient to support the bad faith element of a cyberpiracy claim. *Klayman v. Judicial Watch, Inc.*, 247 F.R.D. 10, 16 (D.D.C. 2007).  Similarly, this Court has also

---

(I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.  15 U.S.C. § 1125(d)(1)(B)(i)

held that allegations that a defendant registered a domain name for "commercial gain and for purposes of promoting [his business]" is a sufficient intent to profit.  *Id.* at 16.

In short, the Chamber has sufficiently alleged the Defendants' bad faith intent to profit not only in Paragraphs 15 and 19 of the First Amended Complaint, but throughout the Complaint as well.  (*See* First Am. Compl. ¶¶ 12, 14, 16, 22, 29, 49 & 75.)

## VII.   DEFENDANTS' CONDUCT IS ACTIONABLE UNDER STATE LAW.

### A.   The Complaint States A Valid Claim For Unlawful Trade Practices Under D.C. Code Section 28-3904.

Count VI alleges that Defendants violated D.C.'s Consumer Protection Procedures Act (the "CPPA"), D.C. St. § 28-3904.  Defendants argue that the Chamber has failed to state a claim because it has  not alleged that the Chamber and the Yes Men have a "consumer-merchant relationship" or that Defendants are "merchants."  The Defendants are wrong.

As an initial matter, the cases that the Defendants cite for the proposition that a "consumer-merchant" relationship is a prerequisite to a claim under the CPPA were decided before the CPPA was amended in 2000 to expand the class of plaintiffs who could sue.  In fact, the leading case, which the Defendants cite for the proposition that a "non-consumer" cannot sue under the CPPA, relied for its holding on the very language that was amended.  *See Independent Commc'ns Network, Inc. v. MCI Telecomm. Corp.*, 657 F. Supp. 785, 786-87 (D.D.C. 1987) (construing section governing lawsuits).  Specifically, the Court relied upon the following provision in the pre-2000 version of the statute:

> *Any consumer* who suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia . . . may bring an action in the Superior Court of the District of Columbia . . . .

D.C. Code § 28-3905(k)(1) (1981 ed.) (emphasis added).  This language is materially different from that in the current version:

> A *person*, whether *acting for the interests of itself*, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia . . . .

D.C. Code § 28-3905(k)(1) (2001 ed.) (emphasis added).[26]  The term "person," in turn, is defined as "an individual, firm, corporation, partnership, cooperative, association, or any other organization, legal entity, or group of individuals however organized." *Id.* § 28-3901(a)(1). Significantly, the 2000 amendments also added a rule of construction to the CPPA, requiring that the Act "be construed and applied liberally to promote its purpose." *Id.* § 28-3901(c).  The express purpose of the CPPA is to "assure that a just mechanism exists to remedy all improper trade practices *and deter the continuing use of such practices*; . . . ." *Id.* § 28-3901(b)(1) (emphasis added).  The italicized language was also added in the 2000 amendments.

A statutory amendment that changes the language of the law is persuasive evidence of legislative intent, and raises the presumption that the legislature intended to depart from the prior law. *In re M.M.D. & B.H.M.*, 662 A.2d 837, 847 & n.11 (D.C. App. 1995) (citing *Hickman v. W. Heating and Air Conditioning Co.*, 207 F. Supp. 832, 834 (N.D. Ind. 1962); *Federal Ins. Co. v. Speight*, 220 F. Supp. 90, 95 (E.D.S.C. 1963)).  Indeed, when the legislature amends a statute, courts must "presume it intends its amendment to have real and substantial effect." *Pierce County, Wash. v. Guillen*, 537 U.S. 129, 145 (2003); *accord Affum v. United States*, 566 F.3d 1150 (D.C. Cir. 2009).  Even if the legislating body "may not have foreseen all of the consequences of a statutory enactment[, that] is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991).  Instead, when the

---

[26] To be sure, this Court has relied on *Independent Communications* in construing the CPPA to apply only to transactions "between a consumer and a merchant." *Adler v. Vision Lab Telecomm., Inc.* 393 F. Supp. 2d 35, 39 (D.D.C. 2005).  *Adler*, however, did not mention the 2000 amendments; nor did it even cite the language of Section 28-3905(k)(1).

language of a statute is plain, the court must apply the statute according to its terms.   *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004).

This Court has acknowledged that the intent of the 2000 amendment to Section 28-3905(k)(1) was to "expand [the CPPA's] reach even further."   *Williams v. The Purdue Pharma Co.*, 297 F. Supp. 2d 171, 173-74 (D.D.C. 2003).[27]   The expansion of the Act encompasses the Chamber and confers upon it the right to bring this lawsuit.   Under the plain language of the CPPA, the Chamber, as a "business corporation" (First Am. Compl. ¶ 1), clearly falls within the definition of "person."   And, because "[a] person . . . acting for the interests of itself" may assert a claim under the CPPA, the Chamber can bring its claim against the Defendants.

Defendants are sure to raise now the case that they did not cite, but from which they extracted, almost word-for-word, the argument that runs from page 32 to page 33 of their Brief. In *Ford v. ChartOne, Inc.*, 908 A.2d 72 (D.C. 2006), the D.C. Court of Appeals surmised that the amendment to Section 28-3905(k)(1)t was intended "to permit representative actions on behalf of consumers."   Although that was clearly one intent of the amendment, *see id.* (allowing "[a] person . . . acting for the interests of . . . its members or the general public" to bring suit under the CPPA), a full reading of the new language reveals a broader intent.   As noted above, Section 28-3905(k)(1) states that "[a] person, *whether acting for the interests of itself*" or others may file suit.   The court's construction of the statute in *ChartOne* would improperly read the italicized language out of the statute altogether.   *See Totten*, 380 F.3d at 499 ("It is, of course, a cardinal

---

[27] The Court in *Williams* held that the amendments did not apply retroactively to conduct occurring prior to its effective date, *id.* at 174, and it applied, and relied upon case law applying, the prior version of the Act, *id.* at 174-75, 176.   Subsequently, in *Hoyte v. Yum! Brands, Inc.*, 489 F. Supp. 2d 24 (D.D.C. 2007), this Court again acknowledged the expansiveness of the language in D.C. Code § 28-3905(k)(1), but held that a plaintiff must still have constitutional standing — an injury-in-fact — in order to assert a CPPA claim.   *Id.* at 28-29.   The Defendants do not argue that the Chamber has not pleaded an injury-in-fact.

HUNTON & WILLIAMS LLP

principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant.").

In any event, in a later case, the D.C. Court of Appeals allowed a plaintiff to bring claims under the CPPA as a "whistleblower," in order to recover certain monies for the District of Columbia. *Grayson v. AT&T Corp.*, 980 A.2d 1137 (D.C. 2009). In fact, the plaintiff was not even affected by the practices that he claimed to be unlawful. Significantly, in commenting on the 2000 amendment to Section 28-3905(k), the court stated, "[if] the Council had intended for the CPPA to have a narrower reach, it would not have eliminated, with its 2000 Amendment, language which expressly limited the persons permitted to bring claims." *Id.* at 1155.

Moreover, other states have allowed claims similar to those of the Chamber to proceed under their consumer protection statutes. For example, in *Synergistic Int'l, LLC v. Korman*, 402 F. Supp. 2d 651 (E.D. Va. 2005), *aff'd in part, vacated in part on other grounds and remanded*, 470 F.3d 162 (4th Cir. 2006), the plaintiff sued the defendant for service mark infringement and unfair competition under the Lanham Act, as well as for deceptive trade practices under the Virginia Consumer Protection Act (the "VCPA"). Like D.C.'s CPPA, the VCPA provides a cause of action for "any person" injured by unfair or deceptive trade practices. Va. Code Ann. § 59.1-204A. The court in *Synergistic* found that the plaintiff "falls within the statutory definition of 'person' because it is a limited liability corporation." 402 F. Supp. 2d at 663 (citing Va. Code Ann. § 59.1-198). Similarly, the highest court in Massachusetts held that its state statute, which allows "any person who has been injured" by a deceptive trade practice to bring a cause of action, was unambiguous and did not limit lawsuits to "direct purchasers." *Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 309-20 (Mass. 2002). Moreover, the United States District Court in Massachusetts allowed a plaintiff to sue under that statute for defendant's false

representation to the public that it had his permission to reprint portions of his book. *Rubin v. Brooks/Cole Publ'g Co.*, 836 F. Supp. 909, 924-25 (D. Mass. 1993).

Defendants also argue that the Chamber fails to allege that the Yes Men are "merchants." This argument has no merit. The CPPA defines "merchant" as "a person…who does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who does or would supply the goods or services which are or would be the subject matter of a trade practice." D.C. Code § 28-3901(a)(3). For purposes of the CPPA, "goods and services" are "*any and all parts of the economic output of society*, at any stage or related or necessary point in the economic process . . . ." D.C. Code § 28-3901(a)(7) (emphasis added).

The Chamber repeatedly alleges that the Yes Men sell "merchandise," which makes them merchants. Defendant Servin and Vamos conduct business through the "Yes Men," and are engaged in the business of making movies for public consumption, promoting the movies to the public, and selling merchandise. (*E.g.*, First Am. Compl. ¶¶ 2, 3, 12, 14.) The Chamber also alleges that the defendants used the fraudulent Chamber Web site, press releases and fake speech of Mr. Donohue, all of which stole the Chamber's marks, to "promote their movie, and increase sales of tickets and merchandise." (*Id.* ¶ 15; *see also*, *e.g.*, *id.* ¶¶ 28, 29.)

## B. The Complaint States A Valid Claim For Injurious Falsehood.

In Count VII of the First Amended Complaint, the Chamber contends that Defendants are liable for the publication of injurious falsehood. Under this tort doctrine:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> > (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely do so, and
> >
> > (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

RESTATEMENT (SECOND) OF TORTS § 623A.[28]   The Chamber alleges all of these elements (First Am. Compl. ¶¶ 85-90), and provides extensive factual detail to support its claim (*id.* ¶¶ 13, 15-26, 29-31, 34).   The Complaint specifically includes four of the Defendants' false statements: (a) Servin's assertion, at the October 19, 2009 press conference, that he represented the Chamber; (b) the Defendants' representation that the Chamber issued the fake press release — which Defendants distributed world-wide on their fraudulent "chamber-of-commerce.us" Web site; (c) the Defendants' statement, in that press release, that the Chamber had announced "an immediate moratorium on lobbying and publicity work;" and (d) their statement, in an October 23, 2009 press release issued in the name of the "Yes Men," that the Chamber had shut down the "www.theyesmen.org" Web site and the Web sites of hundreds of activist groups.  (*Id.* ¶ 86.)

Defendants do not dispute that the Chamber has alleged the publication of false statements harmful to its interests.[29]   Nor do they dispute that they intended to harm the pecuniary interests of the Chamber.  Defendants, however, contend that the injurious falsehood claim should be dismissed because, allegedly, (1) "the statements . . . were not published with reckless disregard of the truth,"[30] and (2) "the Chamber has not shown sufficient loss."  (Brief at 33.)  Both arguments are untenable.

---

[28] Liability for injurious falsehood extends not only to false statements concerning land, chattels and intangible things, but also to false statements that harm any other type of interest that has a pecuniary value.  RESTATEMENT (SECOND) OF TORTS § 623A, Comment a.

[29] Defendants specifically *admit* that they published false statements during the October 19, 2009 press conference.  They make no mention of the other false statements alleged in the Complaint.  (*See* Brief at 35.)

[30] Defendants have not filed any affidavit to support the assertion that they did not act "with reckless disregard of the truth" when they made the false statements.

1. **The Defendants' Unsubstantiated Assertion That They Did Not Act With Reckless Disregard Of The Truth Involves A Factual Issue That Cannot Be Resolved On A Motion To Dismiss.**

Whether Defendants published the false statements with actual knowledge of their falsity, or with reckless disregard of their truth, is a question of fact that cannot properly be resolved on a motion to dismiss. *See, e.g., Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9 (1979) (stating that "'actual malice' calls a defendant's state of mind into question . . . and does not readily lend itself to summary disposition"); *Flowers,* 310 F.3d. at 1131 (observing that "malice" cannot properly be determined on a motion to dismiss). At this stage of the case, the Court must treat as true all factual allegations in the complaint, and draw "all reasonable inferences" from those allegations in the Chamber's favor. *Lewis,* 535 F. Supp. 2d at 9.

The Chamber expressly avers that Defendants "published the false statements with knowledge that the statements were false, or acted with reckless disregard of their truth or falsity." (First Am. Compl. ¶ 88.) It also alleges a number of additional facts that support this allegation, including the facts that (1) Servin and Vamos are engaged in an actual business of impersonating government and business entities for the purpose of misrepresenting the entities' positions to the public; (2) Servin and Vamos have admitted through their advertisements that they "lie their way into big business conferences;" (3) Defendants published the false statements as part of a carefully planned scheme to fraudulently attribute statements to the Chamber; (4) Defendants created a fraudulent Web site to disseminate their fraudulent press release and the fake remarks of Mr. Donohue, and took sophisticated measures to conceal their identities and their plan when creating that Web site; (5) Defendants created a false telephone contact number and contact name as part of their scheme to falsely attribute statements to the Chamber; (6) Defendants "mirrored" their fraudulent Web site after the Chamber discovered it, and then relocated it to another host to avoid the Chamber's efforts to remove the false press release from

46

the Web; and (7) Defendants planned and orchestrated the shut-down of Web sites that they attributed to the Chamber.  (*Id.* at ¶¶ 2, 3, 13, 15, 16, 17, 19, 20, 21, 30.)  These factual allegations, which must be accepted as true, demonstrate that Defendants made false statements deliberately and with knowledge that they were false.

Moreover, the very nature of the Defendants' statements reveals that they must have known the statements were false when they published them.  Defendants could not possibly have believed, or had any reason to believe, that the Chamber issued a "press release" that they themselves drafted and disseminated.  Defendants could not possibly have believed, or had any reason to believe, that the Chamber had announced "an immediate moratorium on lobbying and publicity work," when Defendants themselves concocted that announcement for their fraudulent "press release."  Servin could not possibly have believed, or had any reason to believe, that he actually represented the Chamber when he appeared at the October 19 press conference.  And Defendants could not possibly have believed, or had any reason to believe, that the Chamber shut down the "www.theyesmen.org" Web site or "hundreds" of other Web sites when the Chamber had requested ― in writing ― that only *two* specific Web pages be taken down, both of which were on the fraudulent "chamber-of-commerce.us" Web site *created and controlled by Defendants!*  Thus, taking the complaint's allegations as true, and giving the Chamber the benefit of all reasonable inferences from those allegations, the Chamber has more than sufficiently alleged that Defendants published false statements with knowledge that they were false, or with reckless disregard of the truth.

Defendants, however, conjecture that "no reasonable person" could have believed the statements that Servin made during the October 19 press conference because the press conference was discovered and interrupted by a real Chamber representative shortly after it

47

began.  (Brief at 35.)  They seem to believe that, simply because they make this argument, Count

VII must be dismissed under *Hustler Magazine v. Falwell,* 485 U.S. 46 (1988).  (Brief at 34.)

This argument is unwarranted for three reasons.

First, the Defendants' argument only purports to address one of the four false statements

alleged in the complaint.  It ignores the false statements that Defendants made in issuing press

releases that they disseminated by e-mail and over the Web.  One of those press releases was

issued in the Chamber's name, and Defendants disseminated it both before and after the October

19 press conference without notifying readers that it was a fraud or a "hoax."  The press release

issued in the "Yes Men's" name four days after the October 19 press conference falsely accused

the Chamber of shutting down Web sites.  The fact that a Chamber representative interrupted the

October 19 press conference cannot be assumed to have rectified the false statements that

Defendants disseminated over the Web in the Chamber's name (which were read by thousands of

persons).  And the fact that a Chamber representative interrupted the October 19 press

conference cannot possibly have rectified false statements that Defendants published four days

later.

Second, defendants' assertion that "no reasonable person" could have believed the false

statements they made during the October 19 press conference involves a question of fact for the

jury.  *Cf. Hustler Magazine v. Falwell*, 485 U.S. 46 (1988*); Moss v. Stockard*, 580 A.2d 1011,

1023 (D.C. 1990) ("If it appears that the statements are at least capable of a defamatory meaning,

whether they were defamatory and false are questions of fact to be resolved by the jury.").

Significantly, Defendants did not acknowledge that the press conference was a "hoax" or a

"parody" when the Chamber representative interrupted it.  Instead, Servin continued to insist that

he was an authorized representative of the Chamber, and he challenged the credentials of the real

48

Chamber representative.  (Servin Decl. Ex. B.)  In light of this, Defendants cannot claim that, as a matter of law, "no reasonable person" could have believed what they said at the press conference.

Finally, Defendants have seriously mischaracterized the *Falwell* decision.  Contrary to Defendants' assertion, *Falwell* did *not* say that "speech cannot be found to have been made with reckless disregard for the truth" if it could not reasonably be understood as describing actual facts or events.  (Brief at 34.)  Rather, the Supreme Court held that speech about a public figure will not support a claim for intentional infliction of emotional distress unless the speech purports to state actual facts about the public figure.  *Falwell*, 485 U.S. at 56-57.  The Supreme Court ultimately held that Falwell could not recover on his claim because, *after a full trial*, the jury found that the parody advertisement at issue could not reasonably be understood to describe actual facts or events.  *Id.* at 57.  The jury's conclusion was supported by the fact that the parody advertisement bore a disclaimer ("ad parody ─ not to be taken seriously") and was also identified in the magazine's table of contents as "Fiction; Ad and Personality Parody."  *Id.* at 48.  Here, by contrast, Defendants knowingly published false statements of fact without any disclaimer or other indication that they were hoaxes, and took elaborate measures to ensure that their false statements would mislead the public.

> ## 2.   The Complaint Adequately Alleges That The Defendants' False Statements Caused Pecuniary Loss.

The Chamber clearly pleads that the Defendants' false statements caused it pecuniary loss, including (a) the legal and investigative fees incurred in identifying and contacting the host of the fraudulent Web site; and (b) the costs incurred in investigating the Defendants' false

statements and attempting to mitigate the harm from them.[31]   (First Am. Compl. ¶ 89.)

Defendants contend that this allegation does not show a "sufficient" loss to support a claim

because, according to Defendants, the costs resulted from the Chamber's "overreaction" to the

false statements, and were, therefore, not a "natural and direct" result of Defendants' actions.[32]

(Brief at 33, 36.)  This argument is frivolous.

Defendants developed and implemented an elaborate scheme to steal the Chamber's

identity, and to issue false statements in the Chamber's name, as a means of undermining the

Chamber's standing in the business community and before the government bodies before which

it advocates (i.e., the Chamber's "consumers").   As part of this scheme, Defendants took

deliberate measures, including the misappropriation of embedded software from the Chamber's

Web site, to ensure that their so-called "hoax" would mislead the public.  (First Am. Compl.

¶ 30.)   After the Chamber discovered the Defendants' fraudulent Web site, they moved it to

another host to evade the Chamber's attempt to prevent further dissemination of the fraudulent

press release and fake statement from Mr. Donohue.  (*Id.*)   The Chamber's efforts to stop the

---

[31] There is "no 'hard and fast' formula for determining whether an allegation of special damages has been stated with sufficient particularity under Rule 9(g)."  2 MOORE'S FEDERAL PRACTICE (3RD) § 9.08[1][b].  "[A]n allegation of special damages is sufficient when it notifies the defendant of the nature of the claimed damages even though it does not delineate them with 'as great precision as might be possible or desirable'."  *Everco Industs., Inc. v. O.E.M. Prods. Co.,* 63 F.R.D. 662, 666 (N.D. Ill. 1974).  And where the nature of the defendant's wrongdoing precludes the plaintiff from ascertaining with certainty the amount of his damages at the time the complaint is filed, "it would be a perversion of fundamental principals of justice to deny all relief to the wronged person merely because the precise computation or manner of proof of damages is not alleged in the Complaint."  *Id. at 662*  The Chamber's complaint, which was filed just seven days after the Defendants' fraudulent press conference, and *before* they issued the October 23 press release and took down the fake Web site, clearly notified Defendants of the nature of the Chamber's damages.

[32] Defendants have made a number of claims about what the Chamber should have alleged *vis-a-vis* damages.  (Brief at 35-36.)  Such assertions are irrelevant, because the Chamber does not seek damages for loss of business, custom, or donations.

ongoing theft of its identity, and the ongoing dissemination of false statements in its name, cannot be considered an "overreaction" in any sense of the word.  They were natural and direct responses to a serious violation of the Chamber's legal rights.  The costs thus incurred constitute recoverable damages  for publication of injurious falsehood.

### C.    The Complaint States A Valid Claim For Prima Facie Tort

The Chamber's final claim, in Count VIII, is that Defendants committed a prima facie tort.  (First Am. Compl. ¶¶ 93-95.)  Under this doctrine, "[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justified under the circumstances.  This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability."  RESTATEMENT (SECOND) OF TORTS § 870.  Defendants assert that Count VIII should be dismissed for four reasons.  Not one has merit.

First, Defendants argue that the prima facie tort claim should be dismissed because it is not a cause of action under District of Columbia law.  (*See* Brief at 36.)  The Chamber, however, brings its claim under New York law,[33] which is where three of the five named individual Defendants reside, and where, as the Complaint alleges, Defendants undertook the necessary planning and actions to implement their scheme.[34]  The Chamber anticipates that, once it

---

[33] Defendants concede that New York recognizes a claim for prima facie tort.  (Brief at 36 (quoting *Art Metal-USA*, 577 F. Supp. at 184 (D.D.C. 1983) ("District of Columbia courts have not embraced a form of generic tort like the prima facie tort recognized by New York courts . . . .").)  Indeed, New York has long recognized this cause of action.  *See, e.g., Board of Educ. v. Farmingdale Classroom Teachers Ass'n.*, 38 N.Y.2d 397, 406 (N.Y. 1975); *Advance Music Corp. v. American Tobacco Co.*, 296 N.Y. 79, 84 (N.Y. 1946); *DeMicco Bros. v. Consol. Edison Co.*, 8 A.D.3d 99, 100 (N.Y. App. Div. 1st Dep't 2004); *Kevin Spence & Sons, Inc. v. Boar's Head Provisions Co.*, 5 A.D.3d 352 (N.Y. App. Div. 2d Dep't 2004).

[34] To determine which jurisdiction's law applies, this Court must employ the District of Columbia's choice-of-law principles, *see Perkins v. Marriott Int'l*, 945 F. Supp. 282, 284

uncovers the full extent of the Defendants' activities, the District of Columbia's choice of law principles will dictate that New York law applies to the Chamber's prima facie tort claim.[35]

Second, Defendants contend that a cause of action for prima facie tort exists only if the defendant was motivated solely by malice, which supposedly is not present here because "it is not possible to disregard the fact" that the Defendants' activities were designed to "poke fun at the Chamber and spark debate over its position on climate change." (Brief at 39.) However, the Court cannot bestow on Defendants the benefit of an inference that the Chamber's allegations somehow implicitly stated a motivation other than malice. *See Lewis*, 535 F.Supp. 2d at 22 . As noted above, the Chamber has specifically alleged that the Defendants' motive was *not* parody.

Third, Defendants contend that the Chamber's complaint "repeatedly uses defamation terminology," and that the dissemination of defamatory materials will not support a claim for prima facie tort. (Brief at 37-38.) But, such a claim is valid when "not premised solely on defamatory statements, . . . but rather on an entire course of conduct consisting of defamatory

---

(D.D.C. 1996), which "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more substantial interest in the resolution of the issue," *Jaffe v. Pallotta TeamWorks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (internal quotation marks omitted). "Substantial interest" considers (1) "the place where the injury occurred," (2) "the place where the conduct causing the injury occurred," (3) "the domicile, residence, nationality, place of incorporation and place of business of the parties," and (4) "the place where the relationship is centered." *Id.* (internal quotation marks omitted). Moreover, the Court must "conduct a choice of law analysis for each distinct issue that it adjudicates." *Bucci v. Kaiser Permanente Found. Health Plan*, 278 F. Supp. 2d 34, 35 (D.D.C. 2003).

[35] "When the injury occurred in two or more states . . . *the place where the defendant's conduct occurred* will usually be given particular weight in determining the state of the applicable law." *Robinson v. Eli Lilly & Co.*, 535 F. Supp. 2d 49, 53 (D.D.C. 2008) (emphasis added). Indeed, in cases involving fraud and misrepresentation, "there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury . . . ." *Id.* Here, the Defendants' conspiracy of fraud and misrepresentation injured the Chamber's intellectual property and reputation not just in the District of Columbia, but also throughout the United States. Because the Chamber's injury occurred in two or more states, the place of the Defendants' tortious conduct is paramount to the choice of law analysis.

statements and publications . . . ." *Sadowy v. Sony Corp of Am.*, 496 F. Supp. 1071, 1076 (S.D.N.Y.1980)(denying motion to dismiss a prima facie tort claim based on conduct that included defamatory statements).  Here, the Chamber has alleged that the Defendants' scheme included a course of tortious acts — most of which is grounded in *conduct, not speech*.  (*E.g.*, First Am. Compl. ¶¶ 29-31, 35, 94.)  Thus, the Defendants' belief that some of the Chamber's allegations involve defamatory statements does not defeat the prima facie tort claim.

Finally, Defendants have asserted that the prima facie tort doctrine cannot be used as a "catch-all" for every claim that does not satisfy the elements of other torts, arguing that New York courts wish to prevent the "over-extension" of this tort claim.[36]  (Brief at 37.)  New York courts, however, recognize a claim for prima facie tort as a "broadly fashioned, adaptable instrument permitting the courts to afford a remedy to a wide range of injuries which society believes should be compensable."  *Andrews v. Steinberg*, 122 Misc. 2d 468, 472 (N.Y. Sup. Ct. 1983).  The fact that New York courts have sometimes expressed a concern about the over-extension of this doctrine is not grounds for dismissing the Chamber's prima facie tort claim, which it has sufficiently pleaded.  In some ways, Defendants, through their complex "identity correction" schemes, have invented a new wrong that calls for some type of remedy.

## VIII.    THE DEFENDANTS' CLAIM FOR ATTORNEYS' FEES IS UNFOUNDED.

Section 35 of the Lanham Act states that "the court in exceptional cases may award reasonable attorney fees to the prevailing party."  The Defendants concede that they must make a showing that this case is "exceptional."  (Brief at 39.)

---

[36] In support of this proposition, Defendants cite a New Jersey case that addressed whether, and to what extent, a prima facie tort was a valid claim under *New Jersey* law.  *See Pulaski Constr. Co. v. Air Frame Hangars, Inc.*, 950 A.2d 868, 870 (N.J. 2008).

Courts define "exceptional" differently; some courts hold that a different standard applies to prevailing defendants than applies to prevailing plaintiffs. *See* J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 30:101 (4th ed. 2009). This Court has refused to award a prevailing defendant attorneys' fees unless the defendant establishes that the lawsuit was intended to harass. *Newborn v. Yahoo!, Inc.*, 437 F. Supp. 2d 1, 7 (D.D.C. 2006) (refusing to grant the defendant attorneys' fees under the Lanham Act even though the plaintiff's claim was "'wholly without merit,' relied on inapposite statutes, and contained 'vague allegations,'" because "there [was] no evidence that the original or amended complaints, though deficient in many respects, were 'designed to harass the defendants'"); *Pannonia Farms, Inc. v. Re/Max Int'l, Inc.*, 407 F. Supp. 2d 41, 46 (D.D.C. 2005) (denying defendant attorneys' fees where case was dismissed for lack of standing); *compare Noxell Corp. v. Firehouse No. Bar-B-Que Rest.*, 771 F.2d 521, 526 (D.C. Cir. 1985) (granting fees to defendant where plaintiff's litigation indicated economic coercion and harassment; plaintiff sued defendant, a sole proprietor located in California, in District of Columbia even though a Supreme Court decision "plainly declared the impropriety of that course").

Defendants acknowledge that the "general" rule requires them to show the Chamber was motivated by "willfulness or bad faith." (Brief at 40.) But they make no effort to establish such, other than to hint at the relative size of the parties[37] and to baldly assert that "there is no possible way that the Chamber can reasonably expect to succeed on its claims." *Id.* These are throw-away arguments. This Memorandum offers substantial reason to believe that the Chamber can

---

[37] This is not a "David versus Goliath" battle. As noted *supra* Part II.A.2, the Yes Men are an organization of more than 300 individuals, and they received at least $500,000 to finance and distribute the movie that they have been promoting through their attack on the Chamber.

HUNTON & WILLIAMS LLP

and will succeed on its claims.  Even Servin publicly admitted that his attorneys advised him

against the scheme because of its fraudulent nature.  (First. Am. Compl. ¶ 29.)

Dated: February 5, 2010

HUNTON & WILLIAMS, LLP

*/s/ Michael J. Mueller*
RICHARD L. WYATT, JR.
(D.C. Bar No. 424775)
MICHAEL J. MUELLER
(D.C. Bar No. 412025)
THOMAS M. HUGHES
(D.C. Bar No. 460134)
WILLIAM E. POTTS, JR.
(D.C. Bar No. 945824)
1900 K Street, NW
Washington, DC 20006
Tel: 202-955-1500
Fax: 202-778-2201

Of Counsel:

Thomas R. Julin
Hunton & Williams, LLP
1111 Brickell Avenue, Suite 2500
Miami, FL  33131
Tel:  305-810-2500
Fax: 305-810-2460

HUNTON & WILLIAMS LLP

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic mail and U.S. Mail postage pre-paid this 5th day of February, 2010 upon:

Robert Corn-Revere, Esq.
Davis Wright Tremaine, LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, D.C. 20006


Matthew Zimmerman, Esq.
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110

Counsel for Defendants


By: /s/ Michael J. Mueller_____
    Michael J. Mueller