**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **CHAMBER OF COMMERCE OF THE** | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-02014-RWR |
| | ) | |
| **JACQUES SERVIN, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT**

Robert Corn-Revere (D.C. Bar No. 375415)
bobcornrevere@dwt.com
Lisa B. Zycherman (D.C. Bar No. 495277)
lisazycherman@dwt.com
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W., Suite 200
Washington, DC 20006
(202) 973-4225
(202) 973-4499 fax

Thomas R. Burke (*admitted pro hac vice*)
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
(415) 276-6500
(415) 276-6599 fax

Bruce E. H. Johnson (*admitted pro hac vice*)
brucejohnson@dwt.com
Ambika Doran (*admitted pro hac vice*)
ambikedoran@dwt.com
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
(206) 757-7700 fax

Matthew Zimmerman (*admitted pro hac vice*)
mattz@eff.org
Corynne McSherry (*admitted pro hac vice*)
corynne@eff.org
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
(415) 436-9993 fax

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

I.  INTRODUCTION ........................................................................................... 1

II.  ARGUMENT ................................................................................................... 3

    A.  The Chamber's Interpretation Threatens the Careful Balance Courts
        Have Struck Between First Amendment and Trademark Rights ................................. 3

    B.  The Court Should Dismiss the Chamber's Trademark Infringement
        Claim Because the First Amendment Protects Defendants' Parody ........................... 7

        1.  Defendants Unquestionably Engaged In a Parody .............................................. 7

        2.  Defendants' Speech Was Not Commercial ...................................................... 10

    C.  The Court Should Dismiss the Chamber's Remaining Claims ................................. 13

        1.  The Court Should Dismiss the Chamber's Dilution Claim ............................... 13

        2.  The Court Should Dismiss the Chamber's False Advertising
            Claim ................................................................................................................. 14

        3.  The Court Should Dismiss the Chamber's Cyberpiracy Claim ........................ 15

        4.  The Court Should Dismiss the Chamber's Unlawful Trade
            Practices Claim ................................................................................................. 17

        5.  The Court Should Dismiss the Chamber's Injurious Falsehood
            Claim ................................................................................................................. 20

        6.  The Court Should Dismiss the Chamber's Prima Facie Tort
            Claim ................................................................................................................. 22

    D.  Defendants Are Entitled to Their Attorneys' Fees .................................................. 23

III.  CONCLUSION ................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Adler v. Vision Lab Telecomms., Inc.*,
    393 F. Supp. 2d 35 (D.D.C. 2005) ...................................................................17

*Anheuser-Busch, Inc. v. Balducci Publ'ns*,
    28 F.3d 769 (8th Cir. 1994) ..........................................................................11

*Appleseed Found., Inc. v. Appleseed Inst., Inc.*,
    981 F. Supp. 672 (D.D.C. 1997) ......................................................................12

*\*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ..................................................................................17

*\*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...............................................................................16, 17

*\*Bosley Med. Inst., Inc. v. Kremer*,
    403 F.3d 672 (9th Cir. 2005) ....................................................................6, 11, 12

*Buendorf v. National Public Radio, Inc.*,
    822 F. Supp. 6 (D.D.C. 1993) .........................................................................20

*Busch v. Viacom Int'l, Inc.*,
    477 F. Supp. 2d 764 (N.D. Tex. 2007) ...............................................................21

*Cairns v. Franklin Mint Co.*,
    292 F.3d 1139 (9th Cir. 2002) .......................................................................9-10

*Carroll v. Fremont Inv. & Loan*,
    636 F. Supp. 2d 41 (D.D.C. 2009) .....................................................................7

*\*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*,
    284 F.3d 302 (1st Cir. 2002)..........................................................................14

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3d Cir. 2001) ............................................................................9

*Coca-Cola Co. v. Purdy*,
    382 F.3d 774 (8th Cir. 2004) .........................................................................12

*\*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*,
    312 F.3d 1292 (10th Cir. 2002)........................................................................21

*CPC Int'l, Inc. v. Skippy Inc.*,
214 F.3d 456 (4th Cir. 2000) ............................................................3

*DaimlerChrysler v. The Net Inc.*,
388 F.3d 201 (6th Cir. 2004) ..........................................................15

*Eli Lilly & Co. v. Natural Answers, Inc.*,
233 F.3d 456 (7th Cir. 2000) ............................................................9

*Elsmere Music v. National Broad. Co.*,
623 F.2d 252 (2d Cir. 1980) ..............................................................7

*ETW Corp. v. Jireh Publ'g Inc.*,
332 F.3d 915 (6th Cir. 2003) ..........................................................10

*Fisher v. Dees*,
794 F.2d 432 (9th Cir. 1986) ............................................................7

*Flowers v. Carville*,
310 F.3d 1118 (9th Cir. 2002) ........................................................21

*Girl Scouts of United States v. Bantam Doubleday Dell Publ'g Group*,
808 F. Supp. 1112 (S.D.N.Y 1992) ..................................................4

*Groucho Marx Prods., Inc. v. Day & Night Co.*,
689 F.2d 317 (2d Cir. 1982) ..............................................................7

*Interstellar Starship Servs., Ltd. v. Epix, Inc.*,
304 F.3d 936 (9th Cir. 2002) ............................................................9

*J.K. Harris & Co. v. Kassel*,
253 F. Supp. 2d 1120 (N.D. Cal. 2003) ..........................................10

*Kaempe v. Myers*,
367 F.3d 958 (D.C. Cir. 2004) ..........................................................7

*L.L. Bean, Inc. v. Drake Publishers, Inc.*,
811 F.2d 26 (1st Cir. 1987) ..........................................................7, 10

*Lamparello v. Falwell*,
420 F.3d 309 (4th Cir. 2005) ........................................................9, 16

*Leibovitz v. Paramount Pictures Corp.*,
137 F.3d 109 (2d Cir. 1998) ............................................................10

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*,
507 F.3d 252 (4th Cir. 2007) ..........................................................13

iii

*Lucas Nursery & Landscaping, Inc. v. Grosse,*
  359 F.3d 806 (6th Cir. 2004) .................................................................................... 15, 16

*Lucent Techs., Inc. v. Lucentsucks.com,*
  95 F. Supp. 2d 528 (E.D. Va. 2000) ................................................................................ 16

*Mattel, Inc. v. MCA Records,*
  296 F.3d 894 (9th Cir. 2002) .......................................................................................... 4

*McKenzie v. Dow Jones & Co.,*
  No. 08-4096-CV, 2009 U.S. App. LEXIS 26734 (2d Cir. Dec. 9, 2009) ........................... 22

*N.A.A.C.P. v. N.A.A.C.P. Legal Def. & Educ. Fund,*
  559 F. Supp. 1337 (D.D.C. 1983) ..................................................................................... 12

*New Kids on the Block v. News Am. Publ'g, Inc.,*
  971 F.2d 302 (9th Cir. 1992) ........................................................................................ 4, 9

*Nicosia v. De Rooy,*
  72 F. Supp. 2d 1093 (N.D. Cal. 1999) ............................................................................... 20

*Nissan Motor Co. v. Nissan Computer Corp.,*
  378 F.3d 1002 (9th Cir. 2004) .......................................................................................... 3

*Partido Revolucionario Dominicano (PRD) Seccional Metropolitina de Washington-DC,
  Maryland y Virginia v. Partido Revolucionario Dominicano Seccional de Maryland y
  Virginia,*
  312 F. Supp. 2d 1 (D.D.C. 2004) ....................................................................................... 12

*People for Ethical Treatment of Animals v. Doughney,*
  263 F.3d 359 (4th Cir. 2001) ............................................................................................ 12

*Pring v. Penthouse Int'l Ltd.,*
  695 F.2d 438 (10th Cir. 1982) ............................................................................................ 7

*Rogers v. Grimaldi,*
  875 F.2d 994 (2d Cir. 1989) ......................................................................................... 4, 10

*SMJ Group, Inc. v. 417 Lafayette Restaurant, LLC,*
  439 F. Supp. 2d 281 (S.D.N.Y. 2006) .............................................................................. 12

*Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.,*
  202 F.3d 489 (2d Cir. 2000) ............................................................................................ 15

*Taubman Co. v. Webfeats,*
  319 F.3d 770 (6th Cir. 2003) ............................................................................................ 11

*Taylor Bldg. Corp. of Am. v. Benfield*,
  507 F. Supp. 2d 832 (S.D. Ohio 2007) ................................................................. 9

*\*United We Stand America, Inc. v. United We Stand, America New York, Inc.*,
  128 F.3d 86 (2d Cir. 1997) .......................................................................... 6, 12

*Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*,
  527 F.3d 1045 (10th Cir. 2008) ......................................................................... 3

*Washington Post Co. v. Keogh*,
  365 F.2d 965 (D.C. Cir. 1966) ........................................................................ 13


**STATE CASES**

*Belsky v. Lowenthal*,
  62 A.D.2d 319, 405 N.Y.S.2d 62 (1st Dep't 1978) ............................................. 22

*\*Blatty v. New York Times Co.*,
  42 Cal. 3d 1033 (1986) ........................................................................... 13, 20

*District Cablevision Ltd. P'ship v. Bassin*,
  828 A.2d 714 (D.C. 2003) .............................................................................. 18

*Ford v. Chartone, Inc.*,
  908 A.2d 72 (D.C. 2006) ................................................................................ 18

*\*Gomez v. Independence Mgmt. of Del., Inc.*,
  967 A.2d 1276 (D.C. 2009) ....................................................................... 18, 19

*Grayson v. AT&T Corp.*,
  980 A.2d 1137 (D.C. 2009) ....................................................................... 19, 20

*San Francisco Bay Guardian, Inc. v. Superior Court*,
  17 Cal. App. 4th 655 (1993) ............................................................................. 8

*Sudderth v. Sudderth*,
  984 A.2d 1262 (D.C. 2009) ............................................................................. 21


**FEDERAL STATUTES**

15 U.S.C. § 1125(c)(3) ............................................................................. 4, 13, 14

15 U.S.C. § 1125(d) ................................................................................ 15, 16, 17

**STATE STATUTES**

D.C. Code §§ 28-2-312 - 318 ................................................................................19

D.C. Code § 28-3904 .......................................................................... 17, 19, 20

D.C. Code § 28-3905(k) ........................................................................ 18, 19


**RULES**

Fed. R. Civ. P. 9(g) ..............................................................................................21

*Fed. R. Civ. P. 12(b)(6) .....................................................................................17


**REGULATIONS**

47 D.C. Reg. 6574 (Aug. 18, 2000) ...................................................................18

47 D.C. Reg. 6615 (Aug. 18, 2000) ...................................................................18


**LEGISLATIVE MATERIAL**

Cong. Rec. H10824 (daily ed. Aug. 5, 1999) (statement of Rep. Coble) ...................................15

S. Rep. No. 106-140 (1999)................................................................................15


**OTHER AUTHORITIES**

Hannibal Travis, *The Battle for Mindshare: The Emerging Consensus That the First Amendment Protects Corporate Criticism and Parody on the Internet,* 10 VA. J.L. & TECH. 3 (2005) ..................................................................................1

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:35 (4th ed. 2001)................................................................................14

Robert D. Sack, *Sack on Defamation* § 13.1.4.6 (2006) ..........................................21

## I.     INTRODUCTION

Describing itself as a "victim" of a "pernicious attack," the Chamber hopes to paint a picture dramatic enough that this Court will be distracted from the essentially frivolous core of this lawsuit, and allow it to go forward.[1]  But as Mark Twain aptly noted: "Noise proves nothing. Often a hen who laid an egg cackles as if she laid an asteroid."  *The Writings of Mark Twain*, Vol. 5, Following the Equator at 56 (Harper & Bros., New York, 1897).  The simple, relevant facts are as follows.  The Chamber took a controversial position on a vital political matter, climate change.  Defendants engaged in a parody to criticize that position.  The Chamber suffered no actual damage, but apparently suffered such an extreme case of embarrassment that it filed this lawsuit.  The Chamber's embarrassment may be understandable; the suit is not.

The Chamber's opportunistic behavior is merely an attempt to silence its critics. Ironically, the Chamber has long contended that courts should broadly protect First Amendment expression and refrain from narrowly defining speech as commercial.  When one court did so, the Chamber lambasted the decision, bemoaning the fact that "[e]ven where such speech touches on matters of acknowledged public concern, and even where it is tinged with direct political or legislative overtones, it will be entitled only to lesser protection," and that uncertainty about the scope of commercial speech "can only inhibit the exercise of [First Amendment] freedoms by lead[ing] citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked."  Brief Amicus Curiae of the Chamber of Commerce of the

---

[1] As trademark scholars have noted, this is a common and unfortunately effective speech-chilling tactic.  "Many non-competitive users of trademarks in artistic, cultural, and political speech have finally prevailed in court only after incurring massive costs.  Such costs, including attorney's fees, the costs of expert witnesses, lost time, and uncertainty can deter both lawful and unlawful conduct - indeed, the 'specter of such expenses' is part of traditional deterrence analysis."  Hannibal Travis, *The Battle for Mindshare: The Emerging Consensus That the First Amendment Protects Corporate Criticism and Parody on the Internet,* 10 Va. J.L. & Tech. 3, 14 (2005).

United States in Support of Petitioners, *Nike v. Kasky*, No. 02-575, 2003 WL 835350 (U.S. Sup. Ct. Feb. 28, 2003) (quotations and citations omitted). Indeed, the Chamber singled out as meriting protection speech by gas companies on climate change. *Id.*

Here, however, the Chamber's keen interest in a broad construction of the First Amendment mysteriously has vanished. The Chamber offers an improbably dire characterization of the activities forming the basis of its Complaint – a "fake" press release, "fake" prepared comments, and statements made during a "fake" press conference, all about the Chamber's very public and very controversial position on climate change. Opp. at 6-7. These activities are alternatively identified as "fraud," a "sham," "forgery," and even "identity theft." Yet even the Chamber does not truly believe its own rhetoric. For example, in alleging "identity theft," the humorless Chamber relies on the Yes Men's sarcastic description of their actions as "identity theft except that everyone benefits." *Id.* at 4 n.3. The Chamber does not contend that the Yes Men engaged in fraud (or they would have alleged it) or true identity theft, i.e., stealing personal information to withdraw money from bank accounts or otherwise do financial harm. Indeed, the Chamber admits that it "does not seek damages for loss of business, custom, or donations." *Id.* at 50 n.32. And while the Chamber describes the Yes Men as "con artists who have operated under many aliases to perpetrate their schemes," *id.* at 4, it also alleges that Defendants took steps to ensure that their "scheme" would be revealed promptly by "tipping off" a Mother Jones reporter, Amended Complaint ¶ 23, and that the Yes Men are a group known for pretending to issue statements on behalf of company or government officials ***to criticize and poke fun at the absurdity of those officials' real-life positions***. That criticism, whether the target is the Chamber or the Canadian Government, touches directly "on matters of acknowledged public concern," and is protected by the First Amendment.

The Court should not allow the Chamber to distract it from this fundamental point, and the material facts, all of which are properly before it.  Defendants' political parody did not use trademarks to lead consumers to wrongly affiliate Defendants with the Chamber and purchase products or services based on that mistaken affiliation.  Instead, they sought to make a satirical point about the Chamber's own political positions.  The undisputed facts and pleadings before the Court plainly show this, and the myriad cases the Chamber cites on the point of confusion are inapposite.  Likewise, the Chamber's suggestion that entirely noncommercial, noncompetitive uses can violate the Lanham Act does not comport with well-established precedent, including cases that show political *competitors* may bring such claims against each other only where they compete in providing *similar services*.  The Yes Men and the Chamber do not compete for votes or members.  They compete in the marketplace of political ideas, a marketplace that falls under the purview of the First Amendment, not the Lanham Act.

## II.    ARGUMENT

### A.    The Chamber's Interpretation Threatens the Careful Balance Courts Have Struck Between First Amendment and Trademark Rights

In a world where trademarks are part of common political discourse, "trademarks [must] not be transformed from rights against unfair competition to rights to control language." *CPC Int'l, Inc. v. Skippy Inc.,* 214 F.3d 456, 462 (4th Cir. 2000)  (internal quotation marks and citation omitted); *see also Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004).  Because of this potential threat, Congress and reviewing courts have made quite clear that "the Lanham Act is intended to protect the ability of consumers to distinguish among competing producers, not to prevent all unauthorized uses."   *Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1052 (10th Cir. 2008) (internal quotation marks and citation omitted).   Congress imposed important limits on the reach of

3

trademark law because it understood that, "[t]o prevent filmmakers, novelists, painters, and political satirists from including trademarks in their works is to cordon off an important part of modern culture from public discourse."[2]  The anti-dilution statute explicitly acknowledges this in exempting from its purview "noncommercial use."  *See* 15 U.S.C. § 1125(c)(3)(C).  And it is now black-letter law that "in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion *outweighs* the public interest in free expression." *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989) (emphasis added).

In bringing this case, the Chamber is remarkably candid regarding its intention to undo the First Amendment balance that has protected political parody from improper trademark claims.  On the Chamber's theory, if consumers are ever confused, even if the confusion is a deliberate, temporary, and essential part of the parody, trademark law forbids the speech.  It argues that "Defendants, through their complex 'identity correction' schemes, have invented a new wrong that calls for some type of remedy."  Opp. at 53.  But what the Yes Men have done here is neither new, nor does it call for some type of "remedy," apart from "more speech."  Rather, Defendants' actions carry on an honorable tradition of political parody and satire.

In 1936, for example, a group of Princeton University students created "Veterans of Future Wars" in response to legislation authorizing early payment of bonuses to veterans of World War I.  Calling for advance payment of bonuses for wars yet to come, VFW chapters formed at universities around the country and its ranks swelled to 50,000 members.  Its visibility

---

[2] *Girl Scouts of United States v. Bantam Doubleday Dell Publ'g Group*, 808 F. Supp. 1112, 1119 (S.D.N.Y 1992) (citation omitted), *aff'd*, 996 F.2d 1477 (2d Cir. 1993).  *See also Mattel, Inc. v. MCA Records,* 296 F.3d 894, 906 (9th Cir. 2002); *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992).

4

increased when it was denounced in Congress.[3]   More recently, "Billionaires for Bush," a "grassroots network of corporate lobbyists, decadent heiresses, Halliburton CEOs, and other winners under George W. Bush's economic policies" sponsored several political pranks wherein members, posing as wealthy conservatives, commented on the influence of "big money" on politics.[4]   Such parodies also take the form of "culture jamming," in which advocacy groups re-use popular brands or corporate identities as foils for political commentary – a tactic that has been described as "subvertisements."   For example, the Adbusters Media Foundation regularly uses mimicry to make its point, such as its series of ads featuring "Joe Chemo," a sickly-looking cartoon camel in the style of Marlboro's Joe Camel.[5]

The Chamber's theory of trademark law would stymie this tradition of vibrant political dialogue, and its "remedy" would be to reduce the scope of constitutional protection for speech. The Chamber has lost touch with the purpose and operation both of trademark law and of the First Amendment.   Simply put, the Chamber's asserted injury is not business-related, but is

---

[3] Alex Boese, *The Museum of Hoaxes* 107 (Dutton Books 2002); *see also Education: Future Veterans,* Time, Mar. 30, 1936, *available at* http://www.time.com/time/magazine/article/0,9171,931382-1,00.html (last visited Feb. 17, 2010).

[4] Dana DiFilippo, *Funny Way to Run a Protest*, Philadelphia Daily News, July 29, 2000. Among other things, the group organized a "Million Billionaires March" in conjunction with the 2004 Democratic National Convention in which 150 marchers presented a fake check for the amount of "whatever it takes" to the local offices of the Republican Party, purportedly to help the effort to re-elect George Bush.  Simon Vozick-Levinson, *'Wealthy' Protesters Make Case Outside DNC*, The Harvard Crimson, July 30, 2004, *available at* http://www.thecrimson.com/article/2004/7/30/wealthy-protesters-make-case-outside-dnc/ (last visited Feb. 11, 2010).

[5] *See* https://www.adbusters.org/gallery/spoofads (last visited Feb. 11, 2010).  Adbusters also produced an ad mimicking Calvin Klein's Obsession for Women perfume ads; like the originals, the ad features a thin beautiful woman against a dreamy grey background – only the woman is leaning over a toilet, suggesting she has an eating disorder.

entirely speech-related: The Yes Men's parody made it look bad.  And its desired remedy is speech-related too: to suppress the Yes Men's speech and further punish them with crippling financial penalties.

To be clear, contrary to the Chamber's contention, Defendants have never asserted that *all* parody is absolutely immune from a trademark infringement claim.  Instead, Defendants assert that a noncommercial political parody such as theirs, no matter how irritating to the target, is simply not a "wrong" trademark law is designed to redress, particularly where, as here, any actual confusion was immediately dispelled long before it could result in any conceivable harm.

The Chamber seeks to confuse this argument by citing cases such as *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 90 (2d Cir. 1997), which concern political and non-profit organizations using a trademark, permanently, of the parent organization without permission.  However, such cases apply only where the trademark is being used by a competing political organization, and not in situations where the mark holder seeks to censor criticism.  *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 676 (9th Cir. 2005).  Indeed, the court in *United We Stand* deliberately distinguished parody, noting the defendant was "not using the phrase 'United We Stand America' for an expressive purpose such as commentary, comedy, parody, news reporting or criticism, but instead as a means to associate itself with the political movement that sponsored the Ross Perot campaign."  128 F.3d at 93 (citation omitted).

Taking these and other trademark cases out of context, the Chamber distorts not just the Lanham Act and the First Amendment, but the very concept of parody.  It argues that there was no parody here because the Yes Men "conducted their activities with utmost seriousness" and that there was nothing "nonsensical or comedic" about the fake press release or the press

6

conference.  Opp. at 18-19.  However, contrary to the Chamber's limited view, parody exists and

is protected by the First Amendment even when the butt of the joke doesn't get, or appreciate,

the humor.  *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 33 (1st Cir. 1987) (while

parody is often offensive, it is nevertheless "deserving of substantial freedom - both as

entertainment and as a form of social and literary criticism").[6]

### B. The Court Should Dismiss the Chamber's Trademark Infringement Claim Because the First Amendment Protects Defendants' Parody

#### 1. Defendants Unquestionably Engaged In a Parody

Setting aside the Chamber's blustery rhetoric about Defendants' motives and actions, this

Court can and should simply review Defendants' actions, as shown in the attachments to the

Servin Declaration, which the Complaint incorporates, to conclude that Defendants engaged in a

political parody.[7]  Defendants did not "set up a straw man" by focusing in their initial motion on

the press conference.  Opp. at 11.  Instead, they fully admit that the parody comprised a

---

[6] *See also Fisher v. Dees*, 794 F.2d 432, 437-38 (9th Cir. 1986) ("'Destructive' parodies play an important role in social and literary criticism and thus merit protection even though they may discourage or discredit an original author.") (citation omitted); *Pring v. Penthouse Int'l Ltd.*, 695 F.2d 438 (10th Cir. 1982) (defendants' bawdy "spoof" and "ridicule" of Miss America pageant entitled to full range of First Amendment protection); *Groucho Marx Prods., Inc. v. Day & Night Co.*, 689 F.2d 317, 319 n.2 (2d Cir. 1982) (noting "the broad scope permitted parody in First Amendment law"); *Elsmere Music v. National Broad. Co.*, 623 F.2d 252, 253 (2d Cir. 1980) ("[I]n today's world of unrelieved solemnity, copyright law should be hospitable to the humor of parody . . . .").

[7] The Chamber erroneously suggests that Defendants impermissibly rely on materials outside the pleadings, the Court must accept the Chamber's allegations as true, and the Court must permit discovery if it converts Defendants' motion into one for summary judgment.  Opp. at 11, 14-15.  But the Chamber does not dispute that Defendants relied only upon materials that are subject to judicial notice.  The Court need not "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (citation omitted).  And, even if the Court converts this motion into one for summary judgment, it need not allow the Chamber to take discovery.  *See, e.g.*, *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41, 47 (D.D.C. 2009) (converting motion into one for summary judgment, but declining discovery where plaintiffs failed to identify facts essential to opposing motion and articulate how they would obtain them through discovery).

campaign, of which the press conference was the culminating event.  Prior to the press conference, Defendants issued a press release and prepared comments announcing the Chamber's "new" position on climate change.  They posted these documents on the internet. During the press conference, Mr. Servin read in part from the remarks.  Copies of the press release and remarks were available there, and the website remained active for some time.

The prepared remarks clearly demonstrate that Defendants were engaged in parody.  The "Chamber" laments the demise of the Lehman Brothers, who "ate lamb, but were left without wool when the cold, hard winter set in."  Servin Decl., Ex. A.  It purportedly admits it has tried to "keep climate science from interfering with business.  But without a stable climate, there will be no business."  *Id.*  It foretells a "new foreclosure crisis" that "this time" won't affect "only the poor . . . .  Sure, they'll be first . . . .  But that's only a start."  *Id.*  And it purports to critique its own members who "stymie progress through greenwashing and other stalling tactics.  Corporate Social Responsibility just won't cut it anymore folks – Mother Nature means business . . . ." Thus there can be little question that there was much that was "nonsensical or comedic" about the parody, and that a reasonably astute audience would have understood.  Opp. at 18.

The Chamber's own allegations show that Defendants never intended for any initial confusion to persist: The Chamber states that Defendants advised at least one reporter, from Mother Jones, that the press conference was a parody.  Amended Complaint ¶ 23.  That Defendants intended for ***momentary*** confusion to exist, or that confusion did exist for some until the Chamber interrupted the press conference, Opp. at 28, is not dispositive.  It is in the very nature of parody to confuse initially, and it is for the Court to evaluate whether the actions constitute a parody:  "The question is not one that is to be answered by taking a poll of readers but is to be answered by considering the entire context in which the offending material appears."

*See, e.g.*, *San Francisco Bay Guardian, Inc. v. Superior Court*, 17 Cal. App. 4th 655, 660 (1993). Moreover, "[w]here confusion has little or no meaningful effect in the marketplace, it is of little or no consequence in our analysis." *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 297 (3d Cir. 2001).[8]  The Chamber does not, and cannot, allege any confusion in the marketplace.  The Chamber's attempt to distinguish Defendants' cases largely on this basis, Opp. at 24-26, must therefore fail; obvious or not, parody is protected.  Defendants engaged in a single parody of a single issue, contributing to healthy debate about climate change.[9]

Nor does Defendants' successful effort to imitate the Chamber eliminate the nominative fair use defense.  The Chamber's marks are the most effective way to refer to the Chamber; characterizing it as "a large business lobbying group located in Washington" would hardly suffice.  *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 307 (9th Cir. 1992) ("[O]ne might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls.").

---

[8] *See also Lamparello v. Falwell,* 420 F.3d 309, 317-18 (4th Cir. 2005) (initial interest confusion requires use of mark "to capture the markholder's customers and profits"); *Interstellar Starship Servs., Ltd. v. Epix, Inc.,* 304 F.3d 936, 946 (9th Cir. 2002) (firm not liable for using another's mark in its domain name if it "could not financially capitalize on [a] misdirected consumer [looking for the markholder's site] even if it so desired"); *Taylor Bldg. Corp. of Am. v. Benfield,* 507 F. Supp. 2d 832, 846 (S.D. Ohio 2007) (finding no infringement where website using mark contained no commercial content, provided no links to commercial websites, and offered no products or services for sale on the website).

[9] The Chamber's suggestion of initial interest confusion fails for the same reason.  "Such confusion, which is actionable under the Lanham Act, occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product ***before consummating a purchase***."  *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (emphasis added).  There is no allegation, nor can there be, that Defendants used their parody to entice consumers to purchase a competitive product.  In *Eli Lilly*, for example, the defendant offered dietary supplements ("Herbrozac") as a natural alternative to Plaintiff's pharmaceutical product ("Prozac").  The court specifically rejected the notion that the defendant had engaged in a parody, and found it likely that the defendant sought to take advantage of consumer confusion to sell a competing product.

The Chamber's marks were used no more than was necessary to accomplish the parody. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1154 (9th Cir. 2002) (reasonable necessity "differs from case to case"). In *J.K. Harris & Co. v. Kassel*, for example, the court found the defendant had engaged in fair use where his references to the plaintiff's name (reporting complaints about the plaintiff) were frequent but not "gratuitous." The defendant used the plaintiff's mark solely "in order to make statements about it. . . . [Such] referential use . . . is exactly what the nominative use doctrine is designed to allow." 253 F. Supp. 2d 1120, 1127 (N.D. Cal. 2003). That is precisely what Defendants did, as the Chamber concedes, *see* Amended Complaint ¶¶ 11-12. As for the third factor (whether the defendants have done anything to suggest endorsement by the plaintiff), it is obvious to everyone except, perhaps, the Chamber, that the Defendants never intended to confuse voters, legislators or anyone else beyond the initial spoof. The entire purpose of "identity correction" is to call attention to the ***actual*** positions and activities of the entities and corporations targeted.[10]

## 2.      Defendants' Speech Was Not Commercial

The Chamber misses a critical point about the nature of the speech at issue. Even if what it calls Defendants' "shams" (i.e., speech) were used to promote "theatrical-release movies," Opp. at 4, which they were not, the expression is constitutionally-protected because movies are expressive works, as are the advertisements promoting them. *See*, *e.g.*, *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998) (spoof of plaintiff's famous nude photograph of

---

[10] The Chamber also pulls out a long-rejected theory that Defendants' parody is not protected because they could have used another form of speech, e.g., a skit in the mode of Saturday Night Live. This is just another version of the "alternative forms of communication" argument once imported from real property law but long since rejected in the trademark context. *L.L. Bean*, 811 F.2d at 29; *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989); *ETW Corp. v. Jireh Publ'g Inc.*, 332 F.3d 915 (6th Cir. 2003).

Demi Moore in advertisement for upcoming film was protected speech).  The Chamber did not even attempt to distinguish the numerous cases on this point that both Defendants and Amicus Curiae cited.  *See* Defendants' Motion to Dismiss the First Amended Complaint ("Mot.") at 22-23; Brief of Amicus Curiae Public Citizen Litigation Group ("Amicus Br.") at 5.[11]

Because the Lanham Act regulates only commercial speech, this alone forecloses almost all of the Chamber's claims.  *Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003) is directly on point.  The court stated: "If [the defendant's] use is commercial, then, and only then, do we analyze his use for a likelihood of confusion" because the Lanham Act regulates only commercial speech.  *Id.* at 774.  In *Taubman*, the defendant not only registered the plaintiff's mark followed by the word "sucks," Opp. at 27-28, but notably, the plaintiff's mark alone. When the plaintiff sued for infringement, the court held that the Lanham Act did not prohibit defendant's use of the trademark in his domain name because it was not "in connection with the sale . . . or advertising of any goods or services."  319 F.3d at 771-72.  Its decision did not turn on "confusion as to source," Opp. at 28, which was an alternative holding.  *See also Bosley,* 403 F.3d at 676 ("The Supreme Court has made it clear that trademark infringement law prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers.").

And yet the vast majority of the cases the Chamber cites involve commercial use of the parodied mark, creating confusion with the mark's products.  For example, in *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769 (8th Cir. 1994), the court found that the defendant's use of the plaintiff's mark in an advertisement, which was used in association with the Michelob line of beers, caused actual consumer confusion.  *Id.* at 775 ("The survey evidence, whether considered

---

[11] As noted in Defendants' initial motion, the Chamber does not and cannot allege that the Action Factory defendants could benefit financially from the Yes Men's movie.

as direct or indirect evidence of actual confusion, tilts the analysis in favor of Anheuser-Busch."). By contrast, Defendants do not compete with the Chamber, there was no confusion as to the sponsorship of any products, and political parodies specifically designed to influence public policy discussion deserve even more First Amendment protection.

Because of this obvious difference, the Chamber does not contend that the Yes Men parody had even a potential for inducing current or prospective members to join a competing lobbying organization or to affiliate in some way with the Yes Men.[12] This fact sets this case far apart from the decisions on which the Chamber heavily relies. The "appropriate inquiry is whether [the defendant] offers *competing* services to the public." *Bosley,* 403 F.3d at 679 (distinguishing *United We Stand,* 128 F.3d at 90). As in *Bosley*, the Yes Men are not the Chamber's competitor; they are its critic, and the use of the Chamber's mark "is not in connection with a sale of goods or services - it is in connection with the expression of . . . opinion *about* [the Chamber's] goods and services." *Id.* This precludes Defendants from asserting Lanham Act claims.[13]

---

[12] *See* Opp. at 50 n.32 (Yes Men's parody caused no loss of "business, custom, or donations"). Nevertheless, the Chamber's legal argument is predicated on the false premise that the Chamber and the Yes Men provide some type of competing "services." In particular, the cases string-cited in footnote 20 generally turned on the defendants' bad faith intent to directly profit from driving visitors to particular domain names. *See, e.g., Coca-Cola Co. v. Purdy*, 382 F.3d 774, 786 (8th Cir. 2004) (First Amendment did not protect registration of famous marks as domain names where mark owners bore no relationship to anti-abortion message); *People for Ethical Treatment of Animals v. Doughney,* 263 F.3d 359, 366-67 (4th Cir. 2001) (defendant who created website with PETA's mark linked to websites selling products); *SMJ Group, Inc. v. 417 Lafayette Restaurant, LLC,* 439 F. Supp. 2d 281, 290 (S.D.N.Y. 2006) (leaflets could have caused confusion among restaurant customers).

[13] The remaining political party cases the Chamber cites are distinguishable for largely the same reasons. *See, e.g., Partido Revolucionario Dominicano (PRD) Seccional Metropolitina de Washington-DC, Maryland y Virginia v. Partido Revolucionario Dominicano Seccional de Maryland y Virginia*, 312 F. Supp. 2d 1, 16 (D.D.C. 2004) (political offshoot serving same population with same purpose could not use main party's trade name to confuse voters);

### C.      The Court Should Dismiss the Chamber's Remaining Claims

If the Court finds the First Amendment protects Defendants' activity, it must dismiss the

Chamber's remaining claims.  The Chamber does not dispute that constitutional protections "are

not peculiar to [defamation] actions but apply to all claims *whose gravamen is the alleged*

*injurious falsehood of a statement*."  *Blatty v. New York Times Co.*, 42 Cal. 3d 1033, 1042-43,

1045 (1986) (emphasis added).  In other words, because the Chamber bases its claims on the

allegedly false and defamatory nature of Defendants' statements, the same constitutional

principles apply to those claims, and require their dismissal.  Similarly, the Chamber's attempt to

distinguish cases in the defamation context that require a heightened pleading standard are also

futile; by extension and by their language, those cases are not confined to particular types of

claims, but rather to all meritless claims that target First Amendment conduct, where the D.C.

Circuit has noted that quick dismissal is "essential."  *See Washington Post Co. v. Keogh*, 365

F.2d 965, 968 (D.C. Cir. 1966).

### 1.      The Court Should Dismiss the Chamber's Dilution Claim

Defendants' activities did not dilute the Chamber's marks because the trademark dilution

statute expressly protects parody as a fair use of a trademark.  15 U.S.C. § 1125(c)(3).  The

Chamber cannot prevail on its argument that Defendants' activities were "identity theft," rather

than "parody," for the reasons already set forth.  The Chamber claims that *Louis Vuitton*

*Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252 (4th Cir. 2007) stands for the

proposition that the fair use defense does not apply where "a defendant uses a mark as an

---

*Appleseed Found., Inc. v. Appleseed Inst., Inc.,* 981 F. Supp. 672 (D.D.C. 1997) (two non-profits "in direct competition" with respect to at least one service); *N.A.A.C.P. v. N.A.A.C.P. Legal Def. & Educ. Fund*, 559 F. Supp. 1337 (D.D.C. 1983) (parent organization and its legal defense fund, which sought to be independent), *rev'd on other grounds*, 753 F.2d 131 (D.C. Cir. 1985).

indicator of source." Opp. at 36.  But there, the court found that the defendant's use of CHEWY VUITON was fair use, and considered an even more extreme circumstance because the defendant had used the mark to identify its own goods.  *Louis Vuitton*, 507 F.3d at 266.  Here, Defendants did not use the Chamber's marks to identify any goods or services, but rather, to make a political statement.[14]

### 2. The Court Should Dismiss the Chamber's False Advertising Claim

As for the Chamber's false advertising claim, the Chamber offers no legal support for the proposition that the Defendants' statements were not protected speech in their own right.  Opp. at 38.  Furthermore, the Chamber claims its allegation that "Defendants ***intentionally*** made false statements" gives "rise to a presumption of materiality."  *Id.* (emphasis added).  However, the very cases that the Chamber cites make clear that, "[w]hether a misrepresentation is material has nothing to do with the nature of the relief sought or the defendant's intent.  Rather, materiality focuses on whether the false or misleading statement is likely to make a difference ***to purchasers***."  *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:35 (4th ed. 2001) (emphasis added).  Thus, even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers."  *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312 n.10 (1st Cir. 2002).  Again, because the Chamber does not allege  that Defendants' words or actions had any "influence on consumers," the false advertising

---

[14] Again, as already discussed, Defendants' use of the Chamber's marks also falls squarely within the Lanham Act's exemption of "noncommercial use[s]" from the anti-dilution provisions.  *See* 15 U.S.C. § 1125(c)(3)(C)  (providing that "any noncommercial use of a mark" "shall not be actionable as dilution by blurring or dilution by tarnishment").  Defendants cited several cases for this proposition, Mot. at 25 n.14, none of which the Chamber addressed.

claim must fail.  *See* Opp. at 50 n.32 (Chamber does not allege that the Yes Men's parody caused any loss of "business, custom, or donations").

### 3.      The Court Should Dismiss the Chamber's Cyberpiracy Claim

Notwithstanding the Chamber's lengthy recitation from the Congressional Record, Opp. at 2 n.1, it still does not grasp the object of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA").   The ACPA grants trademark owners a remedy against "cybersquatting," i.e., when a trademark owner claims that another party registered or used its trademark as a domain name with the bad faith intent of profiting from the sale or use of the domain name.  *See*, *e.g.*, *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 204 (6th Cir. 2004); *Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 493 (2d Cir. 2000).

Although the ACPA lists a number of factors that courts "may consider," in assessing cybersquatting claims, the Chamber myopically focuses on particular factors while losing sight of the purpose of the Act – to prevent cybersquatters from warehousing domain names and "holding companies for ransom."[15]   Indeed, the statutory factors are provided to courts as a guide, not a substitute, for careful thinking about whether the conduct at issue is motivated by a bad faith intent to profit.  *See Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 811 (6th Cir. 2004);   *Sporty's Farm L.L.C.*, 202 F.3d at 499 (courts must look to the "unique circumstances" of each case).   The Chamber generically asserts that, "although nearly every factor [contained in Section 1125(d)(1)(B)(I)] weighs against Defendants," factors V and VII are "most relevant here."[16]   Neither factor establishes that the Yes Men acted with a bad faith intent

---

[15]*See*, *e.g.*, Cong. Rec. H10824 (daily ed. Aug. 5, 1999) (statement of Rep. Coble); S. Rep. No. 106-140, at 7 (1999).

[16] Opp. at 38.  In particular, the Chamber alleges that the Yes Men engaged in a bad faith intent to profit under factor VII, because "'[t]o conceal their identity and plan, the domain was

to profit.  Both of these factors (V – the intent to divert *consumers* from the mark's online location, and VII – the provision of material and misleading contact information) relate to the object of the ACPA to preclude practice of holding domain names for ransom with an intent to profit directly from selling them, s*ee Lucas Nursery*, 359 F.3d at 810, something the Chamber does not even allege in this case.

It is not disputed that the Yes Men temporarily concealed their identities to aid their political theater, but this is hardly indicative of a bad faith attempt to profit from the Chamber's marks in the circumstances here.  It also is undisputed that the Yes Men's identities were very quickly revealed at the press conference.  Indeed, that was the entire point.  The ultimate revelation was the very purpose of the parody.  In this circumstance, the Court should look to factor IV, "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name" as being the most relevant.  15 U.S.C. § 1125(d)(1)(B)(I)(IV).  Factor IV is controlling in this case, because Congress made clear its intent that the ACPA not "impinge the First Amendment rights of critics and commentators."  *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005).  A bad faith intent to profit is not established under the Act where, as here, the trademarks were used for criticism of a trademark holder or political parody.  *See*, *e.g.*, *Lucent Techs., Inc. v. Lucentsucks.com*, 95 F. Supp. 2d 528, 535-36 (E.D. Va. 2000) ("A successful showing that lucentsucks.com is effective parody and/or a cite [sic] for critical commentary would seriously undermine the requisite elements for [the ACPA].").

Viewing the facts in a light most favorable to the Chamber and drawing all reasonable inferences in its favor, but discounting mere speculation, *Bell Atl. Corp. v. Twombly*, 550 U.S.

---

registered to 'Support and Commitment, Inc.' through a company located in France called GANDI.net and a non-existent New York, New York billing address was used.'"  Opp. at 39.

544, 555 (2007), there can be no question the Yes Men made noncommercial or fair use of Plaintiff's marks.  The website at issue is nothing more than a parody site in furtherance of Defendants' message.  This is a valid exercise of free speech rights, and not the type of harm that the ACPA was designed to prevent.  Based on the foregoing, this Court should find that the Chamber failed to plead sufficient facts to support a cybersquatting claim.

### 4.      The Court Should Dismiss the Chamber's Unlawful Trade Practices Claim

The Chamber attempts in its brief to revise the allegations in its Complaint, now claiming that Count VI avers a valid claim for unlawful trade practices under D.C. Code Section 28-3904 in a representative capacity.  Opp. at 43.  However, the Chamber's allegations do not adequately plead such a claim under *Twombly/Iqbal* and should be dismissed.  The Chamber's reliance on the 2000 amendment to the District of Columbia's Consumer Protection Procedures Act ("CPPA") is misplaced, and cannot revive its inadequate claim.

The Supreme Court has stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted).  Moreover, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citations omitted).  "[A] complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*citing Twombly*, 550 U.S. at 557).  The Chamber's conclusory and imprecise CPPA claim does not meet this pleading standard.

The Chamber concedes that the parties lack a consumer-merchant relationship, but claims it may nevertheless bring an action without such a relationship.  Opp. at 40-41.  As Plaintiff

admits, this Court has construed the CPPA (even after the 2000 amendments that Plaintiff relies so heavily on) "to apply only to transactions 'between a consumer and a merchant.'"  Opp. at 41 n.26 (*quoting Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005)). Plaintiff attempts to distinguish this precedent by claiming that "*Adler*, however, did not mention the 2000 amendments; nor did it even cite the language of Section 28-3905(k)(1)."  *Id.*

The Chamber's feeble attempt to distinguish controlling precedent fails.  As this Court explained in *Adler*, the amendment was not intended to broaden the application of the statute to companies like the Chamber that seek to bring a nonconsumer claim.  Instead, the amendment sought to permit entities acting in the public interest or the District of Columbia government to stand in the shoes of consumers and bring claims against merchants.[17]  As such, the CPPA (specifically D.C. Code § 28-3905(k)) was amended in 2000 to permit plaintiffs to sue in a representative capacity and to increase the amount of statutory damages available to a successful plaintiff, not to create new claims for entities like the Chamber.  *See* 47 D.C. Reg. 6574, 6615 (Aug. 18, 2000).

It is no wonder that the Chamber seeks to have this Court overreach the intended application of the CPPA to its claims – the remedies available under the Act pursuant to the 2000 amendment are considerable.[18]  However, such remedies are available only to consumers, and those who seek to speak for them, to deter merchants from preying on the public.  As the D.C. Court of Appeals unambiguously explained, after the Act was amended in 2000, "a valid claim

---

[17] *See Gomez v. Independence Mgmt. of Del., Inc.*, 967 A.2d 1276, 1287 (D.C. 2009) (describing legislative history and purpose of amendment to authorize representative action for consumer protection claims).

[18] The CPPA "affords a panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices." *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 717 (D.C. 2003).

18

for relief under the CPPA must originate out of a consumer transaction." *Ford v. Chartone, Inc.*, 908 A.2d 72, 81 (D.C. 2006). The Chamber fails to allege such a transaction with the Yes Men.

Indeed, the Chamber fails to allege that the Yes Men engaged in any cognizable unfair trade practice under the Act. In *Gomez*, 967 A.2d at 1285, the D.C. Court of Appeals explained that the CPPA itself provides "thirty-some detailed examples of unfair trade practices set forth in D.C. Code § 28-3904 (2001)." The Chamber's First Amended Complaint does not specify or allege that the Yes Men engaged in any of these practices. Moreover, the court noted that "some portions of § 3904 make it a violation of the CPPA for any person to 'violate any provision' of several other statutes," but none of these subsections mentions the Lanham Act.[19] The court in *Gomez* held that the plaintiff could not establish a claim by bootstrapping allegations that the defendant had violated the Sales Act, which was comprehensive legislation with its own provisions for compliance. For the same reason, the Chamber cannot piggyback its trademark claims in search of enhanced damages.

The Chamber's alternative argument, that its CPPA claim is a representative action, likewise lacks substance. The Chamber did not plead a representative action under the CPPA, nor can it. In *Grayson v. AT&T Corp.*, 980 A.2d 1137 (D.C. 2009), the D.C. Court of Appeals explained that a representative action is one brought "'in the interests of . . . the general public,' to seek injunctive relief, or other redress designed to stop an improper trade practice." *Id.* at

---

[19] The statutes referenced by the CPPA include various consumer protection laws such as D.C. Code §§ 28-2-312 through 28-2-318 (relating to express and implied warranties under the UCC) (§ 28-3904(x)); the District of Columbia Consumer LayAway Plan Act (§ 28-3904(y)); the Rental Housing Locator Consumer Protection Act of 1979 (§ 28-3904(z)); the provisions of sections 32-404, 32-405, 32-406, and 32-407 (relating to employment agencies) (§ 28-3904(aa)); and the Real Property Credit Line Deed of Trust Act of 1987 (§ 28-3904(cc)). The CPPA also incorporates by reference title 16 of the District of Columbia Municipal Regulations (relating to consumers and commercial practices) (§ 28-3904(dd)).

1154 (*quoting* D.C. Code § 28-3905(k)(1)).  *Grayson* set forth the allegations necessary to assert a representative cause of action as including specific claims relating to "unfair trade practices" enumerated in the CPPA.  The plaintiff in *Grayson* alleged that the defendants had "knowingly taken advantage of the inability of the customer reasonably to protect his interests because of age, physical or mental infirmities, ignorance, illiteracy, and inability to understand the language of the agreement" in violation of D.C. Code § 28-3904(r), and specified "the impact of defendants' unlawful trade practices on senior citizens and disabled persons."  *Id.* at 1156.

This case is a far cry from such a legitimate representative action.  The Chamber has not specifically alleged that the Yes Men engaged in any of the unfair trade practices enumerated in the CPPA.  Nor does the First Amended Complaint assert any basis for a representative action under the CPPA.  Accordingly, the Court should disregard the Chamber's belated attempt to salvage its CPPA claim as a representative action.

### 5. The Court Should Dismiss the Chamber's Injurious Falsehood Claim

The Chamber's injurious falsehood must fail as well because the Chamber fails to adequately plead actual malice and special damages.  Despite the Chamber's assertions, actual malice is a question of fact that can be properly addressed in a motion to dismiss or a motion for summary judgment.  *See*, *e.g.*, *Buendorf v. National Public Radio, Inc.*, 822 F. Supp.  6, 13 (D.D.C. 1993) (granting summary judgment and noting: "Based upon the alleged facts and the 'actual malice' standard defined in *New York Times* and its progeny, the Court finds that there is no evidence of 'reckless disregard for the truth' in this case.  Accordingly, the Court concludes that the record does not contain clear and convincing evidence to support a jury finding of 'actual malice.'"); *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1109 (N.D. Cal. 1999) (plaintiff "has failed

to plead actual malice with the required specificity, and hereby grants [defendant's] motion to dismiss for failure to state a claim").

The Chamber cites only one case for the proposition that the question of actual malice cannot be disposed of on a motion to dismiss, and even that case simply reasons that actual malice "is **typically** proven by evidence beyond the defamatory publication itself."  *See* Opp. at 46; *see also Flowers v. Carville*, 310 F.3d 1118, 1131 (9th Cir. 2002) (emphasis added). Instances of parody and satire do not make for "typical" speech cases, because any "falsity" is communicated with the understanding that the speaker is not stating facts about the plaintiff. This is the essence of parody.  *See, e.g., Busch v. Viacom Int'l, Inc.*, 477 F. Supp. 2d 764, 775 (N.D. Tex. 2007) (granting defendants' motion to dismiss and noting: "The court further determines that, as a matter of law, because Plaintiff's image appears in a 'fake endorsement' of [a] diet shake on *The Daily Show*, a satiric program, no reasonable viewer would have believed that the challenged clip contained assertions of fact about Plaintiff.").  As already explained, when the events are viewed in their entirety and in context, no reasonable person would believe that Defendants asserted facts about the Chamber.

Moreover, the harm the Chamber has alleged is plainly insufficient.  In making an injurious falsehood claim, "[t]he most important distinction between defamation and injurious falsehood is the requirement in injurious falsehood cases that special damages be pleaded and proved."  Robert D. Sack, *Sack on Defamation* § 13.1.4.6 (2006); *see also* Fed. R. Civ. P. 9(g) (explicitly requiring that, "[i]f an item of special damage is claimed, it must be specifically stated").  Despite the Chamber's overwrought assertion, the costs of this lawsuit and generalized assertions about damage to its "goodwill" cannot constitute special damages. *See Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.,* 312 F.3d 1292, 1298 (10th Cir. 2002) (damages

alleging generic business injury insufficient; "Special damages, then, must be specific, actual, and non-speculative."); *Sudderth v. Sudderth,* 984 A.2d 1262, 1269 (D.C. 2009) ("In the absence of statutory or rule authority, attorney's fees generally are not allowed as an element of damages, costs, or otherwise.") (internal quotation marks and citations omitted).  If such costs of a lawsuit *could* constitute special damages, this requirement would essentially be moot, because every plaintiff would be able to claim – successfully – that their legal fees in bringing the lawsuit were "special damages."

### 6.        The Court Should Dismiss the Chamber's Prima Facie Tort Claim

The Chamber asks this Court to overlook the fact that it failed to properly invoke New York law in support of its Prima Facie Tort claim because the Complaint otherwise notes that New York is where "three of the five named individual Defendants reside, and where . . . Defendants undertook the necessary planning and actions to implement their scheme."  Opp. at 51.  This claim fails even if New York law applies to the Chamber's Prima Facie Tort claim under the District of Columbia's choice of law principles.

Defendants' motion to dismiss explained that New York courts strictly hold that a prima facie tort cause of action does not lie unless the actions complained of can be plausibly said to have been motivated solely by malice towards the plaintiff.  *See Belsky v. Lowenthal*, 62 A.D.2d 319, 321, 405 N.Y.S.2d 62, 65 (1st Dep't 1978).  The First Amended Complaint fails to allege that the Yes Men acted with malice.  The Chamber misses the point when it argues that "the Court cannot bestow on Defendants the benefit of an inference that the Chamber's allegations somehow implicitly stated a motivation other than malice."  Opp. at 52.  Where a defendant's actions can be seen, even in part, as being motivated by the desire to express an opinion, a cause of action for Prima Facie Tort will fail under New York law.  This is so even if the Chamber

were correct that the expression at issue was motivated in part by a desire to injure the plaintiff. *See McKenzie v. Dow Jones & Co.*, No. 08-4096-CV, 2009 U.S. App. LEXIS 26734 (2d Cir. Dec. 9, 2009).   The absence of malice also defeats the Chamber's claim that "Defendants' scheme included a course of tortious acts – most of which is grounded in *conduct, not speech*." Opp. at 53 (emphasis in original).

Finally, the Chamber asks this Court to disregard New York courts' consistent doctrine that the Prima Facie Tort should not be over-extended and misused as a "catchall" cause of action.   The Chamber claims that its use is appropriate here because "[i]n some ways, Defendants, through their complex 'identity correction' schemes, have invented a new wrong that calls for some type of remedy."  Opp. at 53.  The Chamber's "kitchen sink" approach to pleading a complaint set forth this eighth count with little foundation and in contravention of well-established New York law precluding Prima Facie Tort claims based on the dissemination of allegedly defamatory materials and requiring that the actions complained of be motivated solely by malice.  This makeweight claim should be dismissed.

### D.    Defendants Are Entitled to Their Attorneys' Fees

The Chamber's assertion that this case is not sufficiently "exceptional" to warrant attorneys' fees under the Lanham Act, Opp. at 54,  is not surprising, but it is wrong.  The Chamber did not bring this lawsuit to secure any injunctive relief, since Defendants' parody is long over – the press conference concluded months ago, the statements are no longer available on the internet, and the website no longer in Defendants' control.  There is no need for the Chamber to be "made whole" by this lawsuit, and this fact makes this case "exceptional." Rather, the Chamber brought and continues to pursue this action for one reason only – to harass and punish Defendants because of their biting parody that exposed the Chamber to

embarrassment over its *actual* political positions.  Such punitive action is clearly "exceptional" under the Lanham Act, for it seeks no relief that can be granted by this Court.

## III.   CONCLUSION

For the foregoing reasons, Defendants request that the Court dismiss the Chamber's claims with prejudice.

Dated this 19th day of February, 2010.

Respectfully submitted,

      /s/   Robert Corn-Revere
Robert Corn-Revere (D.C. Bar No. 375415)
Lisa B. Zycherman (D.C. Bar No. 495277)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W.
Suite 200
Washington, DC 20006
(202) 973-4225
(202) 973-4499 fax
bobcornrevere@dwt.com
lisazycherman@dwt.com

Bruce E. H. Johnson (*admitted pro hac vice*)
brucejohnson@dwt.com
Ambika Doran (*admitted pro hac vice*)
ambikedoran@dwt.com
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101-3045
(206) 622-3150
(206) 757-7700 fax

Thomas R. Burke (*admitted pro hac vice*)
thomasburke@dwt.com
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111-6533
(415) 276-6500
(415) 276-6599 fax

Matthew Zimmerman (*pro hac vice pending)*
mattz@eff.org
Corynne McSherry (*pro hac vice pending*)
corynne@eff.org
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
(415) 436-9333
(415) 436-9993 fax

## CERTIFICATE OF SERVICE

Pursuant to LCvR 5.3, I hereby certify that, on February 19, 2010, I electronically filed with the Clerk of the Court the foregoing Reply in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint and proposed order using the CM/ECF system, and service was effected electronically pursuant to LCvR 5.4(d) on the parties listed below.

> Michael John Mueller
> Hunton & Williams LLP
> 1900 K Street, NW, Suite 1200
> Washington, DC 20006
> mmueller@hunton.com
>
> Deepak Gupta
> Public Citizen Litigation Group
> 1600 20th Street, NW
> Washington, DC 20009
> dgupta@citizen.org
>
> Gregory A. Beck
> Public Citizen Litigation Group
> 1600 20th Street, NW
> Washington, DC 20009
> gbeck@citizen.org

>    /s/   Robert Corn-Revere
> Robert Corn-Revere (D.C. Bar No. 375415)